B1040 (FORM 1040) (12/15)

| **ADVERSARY PROCEEDING COVER SHEET**<br>(Instructions on Reverse) | **ADVERSARY PROCEEDING NUMBER**<br>(Court Use Only) |
|---|---|

| **PLAINTIFFS**<br><br>Kara S. Rescia, Chapter 7 Trustee | **DEFENDANTS**<br>EK Real Estate Fund I, LLC: 215 Park Ave South, Suite 1713-1718,<br>New York, NY 10003 & Domestic Agent: 225 Asylum St., 20th Fl,<br>Hartford, CT 06103; EasyKnock, Inc.: 215 Park Ave South, Suite 1713,<br>New York, NY 10003 & 111 W. 33rd St. Ste 1901, New York, NY 10120 |
|---|---|
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br><br>Paige M. Vaillancourt, Esq. & Kara S. Rescia, Esq.<br>Rescia Law, P.C. 5104A Bigelow Commons, Enfield, CT 06082<br>Tel: 860-452-0052 | **ATTORNEYS** (If Known) |
| **PARTY** (Check One Box Only)<br>□ Debtor       □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor    □ Other<br>☒ Trustee | **PARTY** (Check One Box Only)<br>□ Debtor       □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor    ☒ Other<br>□ Trustee |

| **CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)<br>Avoidance and recovery of fraudulent transfer 11 U.S.C. §544; 548(a)(1)(B), 550(a) & 551;Connecticut General Statute §§ 42-110a,<br>et seq., §42-110(g)(a); §42-110(g)(d); 11 U.S.C. §§ 101-1330 and Federal Rule of Bankruptcy Procedure 7001(1), 548(1),<br>28 U.S.C. §§157 and 1334(b); 28 U.S.C. §§157 (b)(2)(A)(B)(H) and (O); 28 U.S.C. §§157(c); 28 U.S.C. § 1409(a); |
|---|

| **NATURE OF SUIT** |
|---|
| (Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.) |

**FRBP 7001(1) – Recovery of Money/Property**
- ☐ 11-Recovery of money/property - §542 turnover of property
- ☐ 12-Recovery of money/property - §547 preference
- ☒ 13-Recovery of money/property - §548 fraudulent transfer
- ☒ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
- ☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
- ☐ 31-Approval of sale of property of estate and of a co-owner – §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
- ☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
- ☐ 51-Revocation of confirmation

**FR3P 7001(6) – Dischargeability**
- ☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- ☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
- ☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

(continued next column)

**FRBP 7001(6) – Dischargeability (continued)**
- ☐ 61-Dischargeability - §523(a)(5), domestic support
- ☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
- ☐ 63-Dischargeability - §523(a)(8), student loan
- ☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
- ☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
- ☐ 71-Injunctive relief – imposition of stay
- ☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
- ☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
- ☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
- ☐ 01-Determination of removed claim or cause

**Other**
- ☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
- ☒ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☒ Check if this case involves a substantive issue of state law | □ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| □ Check if a jury trial is demanded in complaint | Demand: <$150,000.00 |

Other Relief Sought
Punitive damages, interest, costs, attorneys fees, and expenses and such other and further relief as the Court deems just and
proper. The Trustee requests that the payment of the filing fee be deferred until the conclusion of this case.

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>  SUSAN J. ALLEN | BANKRUPTCY CASE NO.<br>  22-30067(AMN) | |
| DISTRICT IN WHICH CASE IS PENDING<br>CONNECTICUT | DIVISION OFFICE<br>NEW HAVEN | NAME OF JUDGE<br>NEVINS |
| **RELATED ADVERSARY PROCEEDING (IF ANY)** | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br><br>  January 25, 2024 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br><br>  Paige M. Vaillancourt, Esq. | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs and Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**NEW HAVEN DIVISION**

| | | |
|---|---|---|
| In re: | : | |
|     SUSAN J. ALLEN | : | Case No. 22-30067(AMN) |
|     Debtor | : | |
| | : | Chapter 7 |
| KARA S. RESCIA, CHAPTER 7 | : | |
| BANKRUPTCY TRUSTEE | : | |
| | : | |
|     Plaintiff, | : | |
| | : | |
| v. | : | Adversary Proceeding No. |
| | : | |
| EK REAL ESTATE FUND, I, LLC | : | |
| | : | |
|     and | : | |
| | : | |
| EASYKNOCK, INC. | : | |
| | : | |
|     Defendants. | : | |
| | : | |

**<u>COMPLAINT</u>**

**<u>JURISIDICTION AND VENUE</u>**

1.    This complaint initiates an adversary proceeding pursuant to §§ 544, 548(a)(1)(B), 550(a) and 551 of the United States Bankruptcy Code; Connecticut General Statute § 42-110a, *et seq.*; 11 U.S.C. §§ 101-1330 ("Bankruptcy Code"); and Federal Rule of Bankruptcy Procedure 7001(1).  The complaint seeks to avoid and recover a fraudulent transfer of the Debtor's property made to or for the benefit of the Defendants, as well as money and punitive damages pursuant to Conn. Gen. Stat. § 42-110(g)(a) and costs and attorneys fees pursuant to Conn. Gen. Stat. § 42-110(g)(d).

2.    This Court has jurisdiction, under 28 U.S.C. §§ 157 and 1334(b), of the subject matter of this proceeding because the claims asserted herein arise under Chapter 7 of the Bankruptcy Code and are related to a case pending under the Bankruptcy Code in the United States

1

Bankruptcy Court for the District of Connecticut, New Haven Division (the "Bankruptcy Court").

3.  The matters set forth in Counts I, II, V, and VI are core proceedings pursuant to 28 U.S.C. §§ 157(b)(2)(A)(B)(H) and (O).

4.  The matters set forth in Counts II and IV are non-core proceedings pursuant to 28 U.S.C. § 157(c) as those Counts set forth claims for relief under the common law and statutes of the State of Connecticut and are related to a case under Title 11.

5.  Pursuant to 28 U.S.C. § 1409(a), venue of this adversary proceeding in the Bankruptcy Court is proper because the Debtor's case is pending in this district and division.

## PARTIES

6.  The Plaintiff, Kara S. Rescia, is the duly appointed Chapter 7 Trustee for the bankruptcy estate of Susan J. Allen ("Plaintiff" or "Trustee").  The Trustee has a usual place of business of Rescia Law, P.C., 5104A Bigelow Commons, Enfield, Connecticut 06082.

7.  The Defendant, EK Real Estate Fund, I, LLC ("Defendant EK Real Estate"), is a Delaware limited liability company with a primary place of business located at 215 Park Avenue South, Suite 1713-1718, New York, New York 10003 and a domestic agent with an address of 225 Asylum Street, 20th Floor, Hartford, Connecticut 06103.

8.  The Defendant, EasyKnock, Inc. ("Defendant EasyKnock"), is a Delaware corporation with a primary place of business located at 215 Park Avenue South, Suite 1713, New York, New York 10003 and a service address of 111 W. 33rd Street, Suite 1901, New York, New York 10120.

## FACTS

9.  On February 11, 2022 (the "Petition Date"), Susan J. Allen (the "Debtor") filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code.

10. On that date, the Trustee was duly appointed and is currently serving in that capacity.

2

11.  The Debtor acquired the real property located at 57 Broadview Terrace, Meriden, Connecticut 06450 (the "Property") by Quitclaim Deed recorded on August 16, 2018 in Volume 5328 at Page 246 of the City of Meriden land records.

12.  The Debtor solely owned the Property.

13.  On February 28, 2020, which date is within two years prior to the Petition Date, the Debtor, by Warranty Deed recorded on March 12, 2020 in Volume 5376 at Page 845 of the City of Meriden land records, transferred the Property to Defendant EK Real Estate for less than reasonably equivalent value (the "Fraudulent Transfer").

14.  Defendant EasyKnock operates the company through which the Debtor effectuated the Fraudulent Transfer. Defendant EasyKnock advertises a variety of sale-leaseback "products" on its website and through web-based advertisements which, in part, purport to provide consumers debt relief solutions.

15.  Upon information and belief, the Defendants use deceptive marketing tactics to entice consumers into these sale-leaseback products. The Defendants advertise these products as alternatives to home equity loans that do not require a minimum credit score. The Defendants use paid advertisements to target consumers seeking home equity loans. These products are not loans. The Defendants purchase real estate with equity and lease it back to the consumer. Said advertisements and Defendant EasyKnock's website misrepresent the amount of actual cash and value a consumer will receive through the transaction.

16.  The Debtor entered into a contract with Defendant EK Real Estate for such a product called "Sell and Stay." A copy of the Sell and Stay Contract Summary with the Residential Real Estate Sales Agreement, which governs the terms and conditions of the Fraudulent Transfer; the Residential Real Estate Option Agreement, which governs the Option and Option Exercise Prices, as defined and discussed infra (the "Option Agreement"); and the Sell and Stay Lease Agreement, which governs the terms and conditions of the leaseback

3

of the Property to the Debtor, as discussed infra (the "Lease Agreement") is attached hereto as Exhibit A (collectively, the "Sell and Stay Agreements").

17. Although the Sell and Stay Agreements are by and between the Debtor and Defendant EK Real Estate and Defendant EK Real Estate is the record owner of the Property, all notices are to the attention of Defendant EasyKnock and the Agreements use the names of the Defendants interchangeably. For example, the Sell and Stay Contract Summary states, "By purchasing the [Property], EasyKnock becomes the owner of the Property. Upon entering into a Lease Agreement with EasyKnock, you will become the tenant of EasyKnock . . . ." Accordingly, the Defendants are referred to collectively and interchangeably throughout this Complaint.

## Value of the Property and Consideration

18. Defendant EK Real Estate allegedly purchased the Property for the gross sum of $174,000. The Sell and Stay Contract Summary states that this sum consisted of an option to repurchase or sell the Property, discussed more fully infra, valued at $112,000 and cash proceeds of $61,000 plus a $1,000 deposit held in escrow. An Addendum, which is attached hereto as Exhibit B, amends the consideration to consist of an $85,000 option and cash proceeds of $88,000 with no deposit (the "Addendum"). The Addendum, dated February 27, 2020, was executed approximately one month after the original contract and one day before the closing, which occurred on February 28, 2020. A copy of the closing statement is attached hereto as Exhibit C.

19. A historical comparative market analysis obtained by the Trustee, which was done after a physical inspection of the interior and exterior of the Property, indicates that the Property had a fair market value of $200,000 at the time of the Fraudulent Transfer. This a $26,000 difference from the Defendants' purchase price.

20.     A comparative market analysis obtained by the Trustee, which was based on a previous physical inspection of the interior and exterior of the Property, indicates that the Property has a current fair market value of $265,000.

21.     At the time of the Fraudulent Transfer, there was no mortgage encumbering the Property.

22.     At the time of the Fraudulent Transfer, the only encumbrance against the Property was $6,328.78 due to the City of Meriden Tax Collector for past-due real estate taxes. This debt was paid at closing.

23.     The Debtor received the sum of $51,533.39 in cash at the time of closing. This sum is a $36,466.61 difference from the cash proceeds consideration provided for in the Addendum.

24.     The Defendants charged the Debtor for certain rent holdbacks and rent credits totaling $12,850.90, which were used to offset a portion of her monthly rent for the first year.

25.     The total benefit the Debtor received at the time of closing from the tax payment to the Meriden Tax Collector, cash, and rent holdbacks and rent credits is $70,713.07.

26.     The Debtor did not receive the full benefit of a repair holdback in the amount of $7,000, a portion of which is currently being held by the Defendants. Based on information received by the Trustee from the Defendants, the Defendants, after assessing the Property before the Fraudulent Transfer, charged the Debtor this sum for what it described as "repairs for health, fire, and safety reasons" which were a condition of closing. Upon information and belief, none of those repairs were completed at the time the Trustee began discussions with Defendants' counsel, but a portion of them have now been completed.

27.     The Defendants charged the Debtor a $5,610 closing cost credit to cover all closing costs of both the buyer and the seller, which costs actually totaled $5,909.26. These closing costs included a $2,200 origination charge for a loan the Defendants obtained in order to purchase the Property from the Debtor; appraisal, processing, underwriting, and document preparation fees for said loan; and prepaid interest for said loan. These closing costs also

5

included title insurance fees, other title and recording fees, and attorneys fees for the Defendants' closing attorney.

## The Option Agreement

28. The Debtor also received an option to purchase the Property back from the Defendants or sell the Property to a third party (the "Option"), which is governed by the Option Agreement. The Defendants valued the Option at $85,000 at the time of closing, pursuant to the Addendum (the "Alleged Option Value").

29. The Trustee has not received any reliable information to support how the Defendants arrived at the Alleged Option Value.

30. The Alleged Option Value is not the same as the Option Exercise Price, which is the amount the Debtor must pay to the Defendants in order to exercise her rights under the Option Agreement (the "Option Exercise Price"). For example, immediately upon closing, the Option Exercise Price was $93,450, an $8,450 difference from the $85,000 Alleged Option Value. This is due to a fee the Defendants require the Debtor to pay to them in order to exercise the Option (the "Option Fee"). The Option Fee is built into the Option Exercise Price.

31. Pursuant to the Option Agreement, after providing written notice to the Defendants, the Debtor can exercise the Option in one of two ways. First, the Debtor can solicit the sale of the Property to a third-party purchaser. If the purchaser is a third party, the Debtor receives the gross purchase price of the Property from the third-party purchaser, less the current Option Exercise Price; real estate brokers' commissions; and any expenses accrued due to the Defendants pursuant to the Lease Agreement, which includes any expense paid by the Defendants except for homeowners' insurance, real estate taxes, and homeowners association fees. Second, the Debtor can repurchase the Property back from the Defendants. If the purchaser is the Debtor, the Debtor must pay the current Option Exercise Price to the

Defendants plus any real estate brokers' commissions and any expenses accrued due to the Defendants pursuant to the Lease Agreement.

32.     The Option Exercise Price and the associated fee charged by the Defendants increases over time as follows:

    a.   Year One    $93,450 (includes $8,450 fee)

    b.   Year Two    $95,786.25 (Option Fee increase of $2,336.25)

    c.   Year Three    $100,479.78 (Option Fee increase of $4,693.53)

    d.   Year Four    $109,623.44 (Option Fee increase of $9,143.66)

    e.   Year Five    $119,599.17 (Option Fee increase of $9,975.73).

33.     Upon information and belief, the Debtor is currently in Year 4.

34.     If the Debtor defaults under the Lease Agreement, the Defendants can elect to sell the Property to a third-party purchaser. In such an instance, the Debtor would receive the net proceeds pursuant to the Option Agreement.

35.     Should the Debtor fail to exercise the Option before what is referred to as the Option Expiration Date in the Option Agreement, the Defendants can elect to sell the Property to any third-party buyer of its choosing at any time. The Option Expiration Date is the same as the Lease Agreement expiration. Meaning, should the Defendants choose not to renew the Debtor's lease and should the Debtor be unable to exercise the Option at that time, the Defendants can sell the Property out from under the Debtor and displace the Debtor from her former home.

36.     It is also unclear what will occur when the five year contract period expires.

37.     The Option is illusory. It provides nominal value to the Debtor under the pretense of giving the Debtor the benefit of growing equity in the Property. However, the Debtor must pay a sum in excess of the cash and other consideration she received at closing in order to exercise the Option. Upon information and belief, the Debtor would need to obtain a

7

mortgage in order to exercise the Option. The Debtor had no mortgage payments at the time of the Fraudulent Transfer. The Debtor has paid the Defendants an estimated total of $65,894.63 in rent to date, which includes the rent holdback sums.

**The Lease Agreement**

38. Further, the Debtor's rent for the first year under the Sell and Stay Agreements was $1,028 per month. This sum was amended to $1,315 per month under the Addendum. Pursuant to the Addendum, the Debtor's monthly rent for the first year would be offset by $615 each month from the rent holdback credited by the Debtor at closing. This brought the Debtor's actual monthly amount due to $700. After the rent holdback was exhausted, the Debtor's actual monthly amount due jumped from $700 to $1,348. Pursuant to the Lease Agreement, the Debtor currently pays $1,542.73 per month in rent.

39. The Debtor's monthly rent increases as follows:

    a. Year One     $1,315 consisting of $700 due monthly and $615 from rent holdback

    b. Year Two     $1,348

    c. Year Three     $1,414.05

    d. Year Four     $1,542.73

    e. Year Five     $1,683.12.

40. This rent scheme is predatory. It requires tenants to double their actual monthly rent payments after the first year, positioning them to default under the Lease Agreement.

41. Additionally, pursuant to the Sell and Stay Contract Summary, the Debtor is obligated to reimburse the Defendants from any proceeds payable pursuant to the Option Agreement for any and all repairs or replacements undertaken by the Defendants in order to maintain the safety and habitability of the Property. It is unclear whether the Defendants may pursue the Debtor for any such repairs should those proceeds be insufficient to cover the cost of said repairs or replacements.

## The Bankruptcy Estate's Cause of Action

42.   The Debtor was unrepresented during all negotiation and execution of the Sell and Stay Agreements with the Defendants, as well as at the closing.

43.   Accordingly, upon information received and documentation reviewed by the Trustee, the Defendants provided little or no benefit to the Debtor as consideration for the Fraudulent Transfer.

44.   At the time of the Fraudulent Transfer, the Debtor was insolvent or it rendered the Debtor insolvent.

45.   Based on the testimony of the Debtor, the Debtor's Schedules and Statements, and other information provided to the Trustee, the Debtor had approximately $75,000 in general unsecured debt at the time of the Fraudulent Transfer.

46.   At the time of the Fraudulent Transfer, the Debtor had unreasonably small capital and nominal assets, other than the Property.

47.   At the time of the Fraudulent Transfer, the Debtor was unable to pay her debts as they became due.

48.   As a result, the Bankruptcy Estate is entitled set aside and recover the Fraudulent Transfer.

49.   On April 18, 2022, the Trustee recorded an Affidavit of Facts Relating to Title or Interest in Real Estate Pursuant to Section 47-12a of the Connecticut General Statutes in Book 5461 at Page 60 of the City of Meriden land records.

50.   On June 15, 2022, the Trustee sent a demand letter to the Defendants for turnover of the Fraudulent Transfer in the amount of $192,285.32. The Trustee was subsequently contacted by counsel for the Defendants who provided information to support certain other value provided to the Debtor at the time of the Fraudulent Transfer. Accordingly, on August 17, 2022, the Trustee amended the demand to the Defendants to the amount of $129,357.83.

51.    Since that date, the Trustee and her counsel had been communicating with various counsel representing the Defendants and had been working cooperatively to come to a resolution of this matter, including a release of the Affidavit of Facts. Upon information and belief, the Defendants plan to sell the Property in the near future.

52.    However, counsel for the Defendants have stopped responding to Trustee's counsel. The last communication received from counsel for the Defendants was on November 29, 2023.

53.    To date, the Defendants have not paid the demanded sum to the Trustee nor has provided sufficient evidence to show any additional value was provided to the Debtor in exchange for the Property.

54.    The Trustee is aware of two other bankruptcy cases filed in this District which involve debtors entering into similar agreements with the Defendants.

55.    The Attorney General for the Commonwealth of Massachusetts recently prohibited the Defendants from doing business within its borders as part of a settlement agreement resulting from litigation against the Defendants for unfair and deceptive trade practices. A copy of the press release from the Office of the Attorney General for the Commonwealth of Massachusetts and the Assurance of Discontinuance are attached hereto as Exhibit D.

## COUNT I

### FRAUDULENT TRANSFER CLAIM
### AGAINST EK REAL ESTATE FUND, I, LLC
### PURSUANT TO 11 U.S.C. § 548(a)(1)(B)

56.    The Trustee repeats, realleges, and incorporates by reference Paragraphs 1 through 55 above with the same force and effect as if fully set forth herein.

57.    The Fraudulent Transfer constitutes a "transfer" as that term is defined in 11 U.S.C. § 101(54)(D).

58.    The Fraudulent Transfer was made two years prior to the Petition Date.

59.     The Debtor received less than reasonably equivalent value in exchange for the Fraudulent Transfer.

60.     At the time of the Fraudulent Transfer, the Debtor was insolvent or became insolvent as a result of the Fraudulent Transfer.

61.     At the time of the Fraudulent Transfer, the Debtor was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital.

62.     At the time of the Fraudulent Transfer, the Debtor intended to incur, or believed that she would incur, debts that would be beyond her ability to pay as such debts matured.

63.     Defendant EK Real Estate Fund effectuated the Fraudulent Transfer for its benefit.

64.     The Fraudulent Transfer constitutes a fraudulent transfer avoidable by the Trustee pursuant to 11 U.S.C. § 548(a)(1)(B) of the Bankruptcy Code.

## COUNT II

### FRAUDULENT TRANSFER CLAIM
### AGAINST EASYKNOCK, LLC
### PURSUANT TO 11 U.S.C. § 548(a)(1)(B)

65.     The Trustee repeats, realleges, and incorporates by reference Paragraphs 1 through 64 above with the same force and effect as if fully set forth herein.

66.     The Fraudulent Transfer constitutes a "transfer" as that term is defined in 11 U.S.C. § 101(54)(D).

67.     The Fraudulent Transfer was made two years prior to the Petition Date.

68.     The Debtor received less than reasonably equivalent value in exchange for the Fraudulent Transfer.

69.     At the time of the Fraudulent Transfer, the Debtor was insolvent or became insolvent as a result of the Fraudulent Transfer.

70.     At the time of the Fraudulent Transfer, the Debtor was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital.

71.     At the time of the Fraudulent Transfer, the Debtor intended to incur, or believed that she would incur, debts that would be beyond her ability to pay as such debts matured.

72.     Defendant EasyKnock effectuated the Fraudulent Transfer for its benefit.

73.     The Fraudulent Transfer constitutes a fraudulent transfer avoidable by the Trustee pursuant to 11 U.S.C. § 548(a)(1)(B) of the Bankruptcy Code.

<u>**COUNT III**</u>

<u>**VIOLATION OF CONNECTICUT UNFAIR TRADE PRACTICES ACT (CUTPA)**</u>
<u>**AGAINST EK REAL ESTATE FUND, I, LLC**</u>
<u>**PURSUANT TO CONN. GEN. STAT. § 42-110a, *et seq.***</u>

74.     The Trustee repeats, realleges, and incorporates by reference Paragraphs 1 through 73 above with the same force and effect as if fully set forth herein.

75.     The Connecticut Unfair Trade Practices Act ("CUTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). The CUTPA definition of "trade or commerce" includes "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real or personal or mixed, and any other article, commodity, or thing of value in this state." Conn. Gen. Stat. § 42-110a.

76.     "A violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy." *Web Press Servs. Corp. v. New London Motors, Inc.*, 203 Conn. 342, 355, 525 A.2d 57 (1987). It is not necessary for a defendant to have intent or knowledge to find it violated CUTPA. *See Web Press Servs. Corp.*, 203 Conn. at 362–63.

> In determining whether a practice is unfair and violates CUTPA, Connecticut courts examine '(1) [w]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, competitors, or other businesspersons. . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three.'

*Walker v. Peoples United Bank*, 305 F.Supp.3d 365, 380–81 (D. Conn. 2018) (quoting *Ulbrich v. Groth*, 310 Conn. 375, 409, 78 A.3d 76 (2013). The defendant must have engaged in a prohibited act and the plaintiff must have suffered an injury as a result of it. *Abrahams v. Young & Rubicam, Inc.*, 240 Conn. 300, 306, 692 A.2d 709 (1997).

77. "Under Connecticut law, punitive damages may be awarded on a CUTPA claim if the evidence 'reveal[s] a reckless indifference to the rights of others or an intentional and wanton violation of those rights.'" *Fabri v. United Technologies International, Inc.*, 387 F.3d 109, 124 (2d Cir. 2004) (*quoting Gargano v. Heyman*, 203 Conn. 616, A.2d 1343, 1347 (1987)).

78. The Property is located in Connecticut.

79. The acts or practices forming the basis of this claim, including the Fraudulent Transfer and the rental scheme, took place and are taking place within the State of Connecticut. Defendant EK Real Estate is therefore engaged in trade or commerce in the State of Connecticut.

80.     Defendant EK Real Estate engaged in acts or practices which deprived the Debtor of an ownership interest in real property for which she had no mortgage.

81.     Defendant EK Real Estate engaged in acts or practices which rendered the Debtor insolvent.

82.     Defendant EK Real Estate engaged in acts or practices which led to the necessity of the Debtor's bankruptcy filing.

83.     Defendant EK Real Estate continues to engage in acts or practices which prevent the Debtor from attaining financial stability.

84.     Defendant EK Real Estate engaged and engages in these acts or practices with reckless indifference to the rights the Debtor or with an intentional and wanton violation of those rights.

85.     These acts or practices offend public policy and fall within a penumbra of established concepts of unfairness.

86.     These acts or practices are immoral, unethical, unfair, oppressive, or unscrupulous.

87.     These acts or practices have caused and continue to cause substantial financial injury to the Debtor.

88.     Accordingly, the Trustee is entitled to recover money and punitive damages pursuant to Conn. Gen. Stat. § 42-110(g)(a) and costs and attorneys fees pursuant to Conn. Gen. Stat. § 42-110(g)(d) on behalf of the Bankruptcy Estate.

## COUNT IV

## VIOLATION OF CONNECTICUT UNFAIR TRADE PRACTICES ACT (CUTPA) AGAINST EASYKNOCK, LLC PURSUANT TO CONN. GEN. STAT. § 42-110a, *et seq.*

89.     The Trustee repeats, realleges, and incorporates by reference Paragraphs 1 through 88 above with the same force and effect as if fully set forth herein.

90.     The Property is located in Connecticut.

91.     The acts or practices forming the basis of this claim, including the Fraudulent Transfer and rental scheme, took place and are taking place within the State of Connecticut. Defendant EasyKnock is therefore engaged in trade or commerce in the State of Connecticut.

92.     Defendant EasyKnock engaged in acts or practices which deprived the Debtor of an ownership interest in real property for which she had no mortgage.

93.     Defendant EasyKnock engaged in acts or practices which rendered the Debtor insolvent.

94.     Defendant EasyKnock engaged in acts or practices which led to the necessity of the Debtor's bankruptcy filing.

95.     Defendant EasyKnock continues to engage in acts or practices which prevent the Debtor from attaining financial stability.

96.     Defendant EasyKnock engaged and engages in these acts or practices with reckless indifference to the rights the Debtor or with an intentional and wanton violation of those rights.

97.     These acts or practices offend public policy and fall within a penumbra of established concepts of unfairness.

98.     These acts or practices are immoral, unethical, unfair, oppressive, or unscrupulous.

99.     These acts or practices have caused and continue to cause substantial financial injury to the Debtor.

100.    Accordingly, the Trustee is entitled to recover money and punitive damages pursuant to Conn. Gen. Stat. § 42-110(g)(a) and costs and attorneys fees pursuant to Conn. Gen. Stat. § 42-110(g)(d) on behalf of the Bankruptcy Estate.

## COUNT V

### AUTOMATIC PRESERVATION OF AVOIDED TRANSFERS
### 11 U.S.C. § 551

101.    The Trustee repeats, realleges, and incorporates by reference Paragraphs 1 through 100

above with the same force and effect as if fully set forth herein.

102.    Pursuant to § 551 of the Bankruptcy Code, any transfer avoided under §§ 544 and 548 of

the Bankruptcy Code is preserved for the benefit of the Bankruptcy Estate.

## COUNT VI

### LIABILITY OF TRANSFEREE OF AVOIDED TRANSFERS
### 11 U.S.C. § 550(a)

103.    The Trustee repeats, realleges, and incorporates by reference Paragraphs 1 through 102

above with the same force and effect as if fully set forth herein.

104.    Pursuant to § 550(a) of the Bankruptcy Code, the Trustee may recover an amount

equivalent to the value of the Transfers pursuant to §§ 544 and 548 of the Bankruptcy Code

from the Defendants for the benefit of the Bankruptcy Estate.

### ADDITIONAL RELIEF REQUESTED
### DEFERRAL OF PAYMENT OF FILING FEE

The Debtor's Bankruptcy Estate presently does not contain any funds with which to pay

the required filing fee in connection with the filing of this Complaint. Accordingly, the Trustee

respectfully requests that the payment of such filing fee be deferred until such time as the Trustee

recovers funds (from any source) in connection with the underlying Chapter 7 case.

### STATEMENT CONCERNING ENTRY OF
### FINAL ORDERS OR JUDGMENT

Pursuant to Fed. R. Bankr. P. 7008, Kara S. Rescia, Chapter 7 Trustee for the Bankruptcy

Estate of Susan J. Allen hereby consents to entry of final orders or judgment by the Bankruptcy

Court.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff, Kara S. Rescia, Trustee, respectfully requests that the Court enter Judgment in favor of the Trustee and against the Defendants as follows:

1. Pursuant to 11 U.S.C. §§ 544, 548(a)(1)(b), 550(a), and 551:

    a. An avoidance of the Fraudulent Transfer, as defined herein;

    b. An order directing that the Fraudulent Transfer be set aside; and

    c. Recovery of the Fraudulent Transfer, as defined herein, or the value thereof, from the Defendants EasyKnock, Inc. and EK Real Estate Fund, I, LLC for the benefit of the Bankruptcy Estate of Susan J. Allen;

2. Money damages;

3. Attorney's fees;

4. Pre-judgment interest and costs;

5. As to Counts III and IV, pursuant to Conn. Gen. Stat. § 42-110a, *et seq.*:

    a. Money damages; and

    b. Punitive damages pursuant to Conn. Gen. Stat. § 42-110(g)(a);

    c. Costs and attorneys fees pursuant to Conn. Gen. Stat. § 42-110(g)(d); and

6. Such other relief as the Court deems just and proper.

KARA S. RESCIA, TRUSTEE
OF THE BANKRUPTCY ESTATE
OF SUSAN J. ALLEN

BY HER COUNSEL,

Dated: January 25, 2024

By: /s/ Paige M. Vaillancourt
Paige M. Vaillancourt, Esq. #30742
Kara S. Rescia, Esq. #18001
Rescia Law, P.C.
5104A Bigelow Commons
Enfield, CT 06082
Tel No. (860) 452-0052
Email paige@ctmalaw.com
Email kara@ctmalaw.com

Ver 4.3 (SS)

02/04/2020

## Sell and Stay® Contract Summary

**General Information**

This is a complex transaction governed by detailed legal documentation. You are strongly encouraged to consult with an attorney. EasyKnock can work directly with your attorney to complete the transaction.

The transaction you are considering is composed of four main components (collectively the "Transaction Documents"):

- The Residential Real Estate Sales Agreement (the "Purchase Agreement")
- Residential Lease Agreement (the "Lease Agreement")
- Residential Real Estate Option Agreement (the "Option Agreement")
- Transaction Risk Factors ("the "Risk Factors")

Only the Purchase Agreement will be signed in this document package, all other components of the Transaction Documents are included as exhibits to the Purchase Agreement and will be signed at closing. Any term not defined herein shall have the definition attributed to it in the underlying Transaction Documents.

By purchasing the home located at 57 Broadview Ter (the "Property"), EasyKnock becomes the owner of the Property. Upon entering into a Lease Agreement with EasyKnock, you will become the tenant of EasyKnock and you will have certain rights, including an option to sell the property to a third-party (the "Option Purchaser") entitling you to direct the resale of the property (the "Sell & Stay Option"), as more fully described in the Option Agreement.

**1. Selling Your House To EasyKnock: Understanding the Residential Real Estate Sales Agreement**

As specified in section 2 of the Purchase Agreement, you are receiving cash proceeds consisting of $61000 (plus $1,000 currently being held in escrow as the contract deposit) and an option value of $112000, for a total consideration of $174000 (collectively the "Consideration"). Part of your cash proceeds will be used to pay closing costs, which total to $5610, transfer/stamp taxes of an amount to be finalized at closing and a processing fee of $4350, as set forth in section 3 (ESCROW) of the Purchase Agreement.

Simply put, the Consideration is a legal term for the compensation you receive for selling your home and consists of a cash and option value component. "Deposit" is money that EasyKnock immediately makes available towards closing costs (such as paying for the appraisal and inspection). "Funding Amount" is the cash consideration that EasyKnock will wire to the escrow agent at closing to be used for the following:

- Payoff any existing debt on the property (e.g. mortgages, liens, back taxes, etc., if applicable)
- Payment of closing costs (if applicable, paragraph 3 of the sales agreement)
- Payment of EasyKnock processing fee (if applicable, paragraph 3 of the sales agreement)
- Payment of the first month of rent (if applicable)
- Payment of rent holdback (if applicable)
- Payment of security deposit (if applicable)
- Payment of any transfer taxes and a prorated portion of any property taxes assessed for the year

After the above items are satisfied, you will receive the residual Funding Amount at closing via wire.

You acknowledge that EasyKnock is not extending credit or making a loan of any kind to you or on your behalf.

At closing, in addition to the Funding Amount and any applicable cash proceeds, you will receive a copy of the Lease Agreement, Option Agreement, and Transaction Risk Factors to complete and sign.

## 2. Renting Your House from EasyKnock: Understanding the Sell & Stay Residential Lease Agreement

At closing, you will be signing a one-year lease. Tenant will pay EasyKnock monthly Rent (the "Rent") in the amount of $1028 for the duration of the Lease Agreement. Rent is due no later than the first of the month. Please note: The above amount is the gross rent amount before any applicable holdback payments are applied. See section 4(b) (RENT HOLDBACK) of the Lease Agreement for more details.

Provided that the Sell & Stay Lease Agreement is in full force and effect, no Event of Default remains uncured and all Rent has been paid current, The Lease Agreement automatically renews upon expiration unless notice pursuant to the Lease Agreement is given by either parties.

The Rent is fixed for the first year, then increases annually by either 2.5% or an amount reflected by the increase in the cost of living as measured by the Consumer Price Index (whichever is greater).

The Rent is required to be paid on a monthly basis, unless you have prepaid a certain number of months in advance in accordance with the Rent Holdback.

The Landlord will repair or replace items as needed at Landlord's cost and expense in order to maintain the safety and habitability of the premises. Any expenses that are paid by the Landlord during the tenancy, except for real estate taxes, homeowners association dues and owner's property insurance, will be accrued and deducted from the proceeds payable upon option exercise pursuant section 2(b) of the Option Agreement.

You are strongly encouraged to purchase renter's insurance. EasyKnock does not insure the contents of the home.

Subject to approval from EasyKnock, you may sublease to an immediate family member (e.g. son, daughter, grandson, or granddaughter) subject to approval from EasyKnock.

If you default on your lease; for example, failure to pay rent after being provided appropriate notice, the Default may result in the Option Counterparty selling the property pursuant to 2(c)(vi) of the Option Agreement. In such case, you are still entitled to the Third-Party Purchaser Option Price pursuant to section 2(c)(vi) of the Option Agreement.

### 3. Exercising the Sell & Stay Option: Understanding the Residential Real Estate Option Agreement

The Option Agreement gives you the right to direct EasyKnock to sell the Property to the Option Purchaser, who may be either a third-party or yourself.

As specified in your offer letter and the Residential Real Estate Option Agreement in section 1(c), your Option Exercise Price will be $65100, and every year after the first year the option exercise price will compound and increase by either Two and One-Half percent (2.5%); or an amount reflected by the increase in the cost of living as measured by the Consumer Price Index (whichever is greater).

If you wish to direct EasyKnock to sell the Property to a third party, you may initiate the process by contacting EasyKnock. You will control the sale process including choosing the asking price and agreeing to the final sale price. You may also select a real estate agent to list and market the property, but you are solely responsible for any fees or commissions paid to the real estate agent. When you inform EasyKnock you would like EasyKnock to accept an offer, EasyKnock will sign the Purchase Agreement, open an escrow and start the closing process. When the sale of the Property closes, you will receive the proceeds of the sale pursuant to section 2(b)(i) of the Option Agreement.

It is important to understand that the housing market and property condition will impact the outcome of a sale to another purchaser including the possibility that you may not be able to find anyone willing to purchase the property. EasyKnock, as

the owner and landlord, does not guarantee that the you will receive any specified sum with respect to the exercise of the Sell & Stay Option and does not guarantee that you will be able to sell, assign or transfer the lease, option or any of your rights under the lease or the option to a third-party. The appraisal you receive on your home during the initial purchase by EasyKnock will likely not be the same price that the home will sell for to a third-party.

If you wish to repurchase the Property yourself, you may initiate the process by contacting EasyKnock. You will pay to the Option Counterparty the Option Holder Purchase Option Price pursuant to section 2(b)(ii).

EasyKnock does not guarantee that you will be able to or have the means to pay the Option Exercise Price at any point in time. At closing, upon payment of the Option Exercise Price and any additional sums pursuant to section 2(b)(i) of the Option Agreement, the title will transfer to the person indicated in the new purchase agreement and the existing lease will terminate.

**4. Understanding the Transaction Risk Factors**

At closing, you will be asked to initial each disclosure in the Transaction Risk Factors and attest that you have read and understand the Transaction Risk Factors. You should carefully review the risk factors with an attorney.

# Residential Real Estate Sales Agreement

**This Residential Real Estate Sales Agreement (the "Agreement")** made as of _01/29/2020_ between Susan Allen, an individual, residing at 57 Broadview Ter; Meriden, Connecticut 06450 (hereinafter collectively referred to as the **"SELLER"**), and EK Real Estate Fund I, LLC, a Delaware limited liability company, or its successors and assigns (hereinafter referred to as the **"BUYER"**). Each of SELLER and BUYER shall be referred to herein as a **"Party"** and collectively, as the **"Parties"**.

## W I T N E S S E T H :

1. **PROPERTY.** The SELLER, in consideration of the Purchase Consideration hereinafter specified, hereby agrees to sell and convey, and the BUYER hereby agrees to purchase the real property commonly known as 57 Broadview Ter; Meriden, Connecticut 06450 and specifically described in Schedule A attached hereto (the "Premises") subject only to the encumbrances and exceptions to title set forth or referred to in Paragraph 9(e) and Schedule A (legal description and exceptions, if any) attached hereto.

2. **CONSIDERATION.** The consideration for the purchase of the Premises is $174000 ("Purchase Consideration"), which the BUYER agrees to pay as follows:

|  |  |  |
|---|---|---|
| (a) | Upon the signing of this Agreement, payable to the Escrow Agent (as defined below) as set forth in Paragraph 3 below, receipt of which is acknowledged, subject to collection (the "Deposit"). If the Deposit or any portion thereof was paid to a third party prior to execution of this Agreement, BUYER directs that such amount be sent immediately to the Escrow Agent for handling per Paragraph 3 below and such amount be credited toward the Deposit: | $1000 |
| (b) | Upon delivery of the deed, by wire or by official cashier's or bank check drawn by and upon a federally-regulated or Connecticut state-chartered bank, or a bank that is a member of the New York Clearing House, the proceeds of which are immediately available (the "Cash Funding"): | $61000 |
| (c) | Subject to the terms and conditions of this Agreement and that certain Residential Real Estate Option Agreement ("Option Agreement") between BUYER AND SELLER which shall be executed on the Closing Date, the agreed upon value of the Option Agreement being granted to the SELLER (the "Option Value"): | $112000 |
|  | **TOTAL PURCHASE CONSIDERATION:** | **$174000** |

The consideration set forth in Paragraph 2(c) is subject to change is not guaranteed to be available or to be paid to SELLER if certain conditions and requirements set forth in this Agreement are not met.

3. **ESCROW.** BUYER'S attorney (the "Escrow Agent") shall hold the Deposit in Paragraph 2(a), above, in escrow until closing of title or sooner termination of this Agreement in accordance with its terms, and shall pay over or apply the Deposit in accordance with the terms of this paragraph.  The Escrow Agent shall hold the Deposit in an account for the benefit of the Parties.  At the closing of title as contemplated hereunder, the Deposit shall be paid by the Escrow Agent to or as directed by the SELLER.  If for any reason the closing does not occur and either Party gives notice to the Escrow Agent pursuant to Paragraph 30 demanding payment of the Deposit, then the Escrow Agent shall give prompt notice of such demand to the other Party. If the Escrow Agent does not receive from such other Party notice of an objection to the proposed payment within seven (7) business days after giving such notice, the Escrow Agent is hereby authorized and directed to make such payment in accordance with the notice.  If the Escrow Agent receives such notice of objection within said seven (7) business day period, or if for any other reason the Escrow Agent in good faith shall elect not to make such payment, then the Escrow Agent may continue to hold such amount until otherwise directed by notice from the Parties to this Agreement or a final, non-appealable judgment, order or decree of a court of competent jurisdiction.  However, the Escrow Agent shall have the right at any time to deposit the Deposit and the interest thereon, if any, with a court of competent jurisdiction where the Premises is located and shall give notice of such deposit to SELLER and BUYER.  Upon such deposit or other disbursement in accordance with the terms of this Paragraph 3, the Escrow Agent shall be relieved and discharged of all further obligations and responsibilities hereunder.

The Parties acknowledge that the Escrow Agent is acting solely as a stakeholder at their request and for their convenience and that the Escrow Agent shall not be liable to either Party for any act or omission on its part unless taken or suffered in bad faith, on account of gross negligence, or in willful disregard of this Agreement on the part of the Escrow Agent.  SELLER and BUYER agree, jointly and severally (with right of contribution) to defend (by counsel selected by the Escrow Agent), indemnify and hold the Escrow Agent harmless from and against all costs, claims and expenses (including reasonable attorney's fees) incurred in connection with the performance of the Escrow Agent's duties hereunder, except with respect to acts or omissions taken or suffered by the Escrow Agent in bad faith, on account of gross negligence, or in willful disregard of this Agreement on the part of the Escrow Agent.  In the event the Deposit is deposited with a court of competent jurisdiction pursuant to the terms herein, the Parties to this Agreement hereby authorize the Escrow Agent to deduct the reasonable costs and attorney's fees associated with an action of interpleader.

The Escrow Agent may act or refrain from acting in respect of any matter referred to herein in full reliance upon and with the advice of counsel which may be selected by it (including any member of its firm) and shall be fully protected in so acting or refraining from acting upon the advice of such counsel.

The Escrow Agent acknowledges receipt of the Deposit by check or wire, subject to collection and the Escrow Agent's agreement to the provisions of this paragraph by signing in the place indicated on the signature page of this Agreement.

Escrow Agent or any member of its firm shall be permitted to act as counsel for BUYER in any dispute as to the disbursement of the Deposit or any other dispute between the Parties whether or not the Escrow Agent is in possession of the Deposit and/or continues to act as the Escrow Agent. The Parties waive claim to a conflict regarding this paragraph.

Escrow Agent shall have no liability for any loss of the Deposit occurring on account of FDIC limits for sums insured on deposit, except if caused by the gross negligence or willful misconduct of Escrow Agent.

It is specifically understood and agreed that at closing, BUYER shall tender to SELLER official, cashier's or bank checks drawn on a federally-regulated or a Connecticut state-chartered bank, or a bank that is a member of the New York Clearing House, the proceeds of which are immediately available, or wired funds. All checks shall be made payable to SELLER'S attorney as trustee for SELLER, unless otherwise directed in writing by SELLER or SELLER'S counsel for the balance of the Purchase Consideration due at closing as set forth in this Agreement less the amounts of all mortgage payoffs. Additionally, BUYER'S attorney shall tender separate bank or treasurer's check(s) to SELLER for payoff of SELLER'S mortgage obligations.

On or before ten (10) calendar days before closing, SELLER shall provide BUYER with written directions for each mortgage payoff stating the name of payee and the total amount of payoff together with a copy of the associated payoff statement(s). SELLER shall calculate the total payoff amount (including applicable per diems, late charges, etc.) that shall be in an amount sufficient to pay the mortgage in full. SELLER shall be responsible for obtaining the mortgage payoff letter, and preparing the mortgage payoff package(s) and transmittal(s). Immediately after closing, SELLER'S attorney or the title company, as the case may be, shall wire or hand deliver or send via overnight carrier the payoff funds and package to the SELLER'S lender(s).

**At closing, SELLER shall pay $4350 to EasyKnock, Inc. as a processing fee and $5610 of third-party closing costs to be used at BUYERS's discretion to pay for closing costs** including but not limited to: title examination, appraisal, property inspection, attorney fees, underwriting fees, title insurance premiums, escrow agent, closing/processing fees, recording fees, deed preparation, survey costs, and, if allowed by lender (if applicable), other costs to close, including escrows and prepaid items. For the avoidance of doubt, third-party closing costs are not inclusive of any transfer or stamp taxes that must be paid by SELLER in accordance with local laws. BUYER shall pay any additional fees and closing costs, insurance premiums, or escrow amounts to fulfill the requirements to close this transaction.

**4. FIXTURES**.

(a)  Included in this sale, for the aforesaid Purchase Consideration, are the following items, all of which items the SELLER represents are owned by SELLER, not leased, and free from security interests, liens, and other encumbrances, insofar as any of them were located on the Premises at the time of BUYER'S inspection: refrigerators, freezers, ranges, built-in microwave ovens, dishwashers, heating, cooling, electrical and plumbing systems and fixtures, window or sleeve heating or air conditioning units, washing machines, dryers, mirrors, electric light fixtures, installed wall to wall carpeting, security system, stove, storm windows and doors, screens and screen doors, window shades, venetian blinds, curtain rods, awnings, any affixed satellite dish(es), weathervanes, mail box(es), all pool equipment, garage door openers with remotes, and existing plants and shrubbery.

(b)    Specifically **excluded** from the sale are:

_____

(c)    The following fixtures are leased or subject to a security interest, lien, or other encumbrance:

_____

**5. MUNICIPAL CONTINGENCY and TITLE CONTINGENCY**

(a) BUYER's obligations are contingent upon BUYER obtaining "reasonably satisfactory title" and "reasonably satisfactory municipal searches" to be completed no later than fifteen (15) business days from the execution date of this Agreement ("Title and Municipal Date").  In the event one or both such searches are not reasonably satisfactory to the BUYER, BUYER shall have the right to terminate this Agreement by giving written notice as provided in Paragraph 30 of such termination on or prior to the Title and Municipal Date. Upon receipt of such notice, SELLER shall return all Deposit monies as soon as practicable as paid and, upon delivery of such funds, this Agreement shall terminate.

(b) For the purposes of this Paragraph 5, "reasonably satisfactory title" shall mean: (i) title which conforms to Schedule A and (ii) does not contain any restrictions on the use of the property which would significantly impair BUYER's stated intended use and enjoyment of the Property.  Utility easements, so long as the same are limited to bringing service to the Property, shall not be deemed to impair the use and enjoyment of the Property.

(c) For the purposes of this Paragraph 5, a "reasonably satisfactory municipal search", if any, shall mean a search showing matters of public record which: (i) materially conform to the listing provided to BUYER by SELLER'S agent, (ii) conform to such facts that a physical inspection of the property shall reveal, (iii) do not reveal any unpermitted work or open permits requiring final municipal approval that are not likely to be cured by SELLER prior to closing and (iv) are internally consistent (for example, the assessor's records are consistent with health department records as to number of bedrooms in the home).

(d) Nothing in this Paragraph 5 shall limit the Parties' remedies as otherwise provided in this Agreement.

**6. CONDITION OF PREMISES**.  The Parties agree that this transaction is subject to the BUYER doing an inspection of said Premises within twenty (20) days of the execution of this Agreement and is satisfied with the physical condition thereof and agrees to accept at closing the Premises in the condition that the Premises were disclosed to be or were in as of the date of BUYER's initial home inspection, reasonable wear and tear excepted.

**7. DEED AND SELLER CLOSING EXPENSES.**  The SELLER, on receiving the total Purchase Consideration, shall, at the SELLER's cost and expense, execute, acknowledge, and deliver to the BUYER, or BUYER's permitted assigns, the full covenant General Warranty Deed (or appropriate Fiduciary's Deed) in recordable form, to convey to the BUYER, or BUYER's permitted assigns, the fee simple title to the Premises, free of all encumbrances except as hereinafter provided.  The SELLER shall thereupon pay all real estate conveyance taxes and shall complete and deliver to the BUYER the conveyance tax forms, and the same shall be filed by SELLER or by the title company. SELLER shall also pay all existing loans and/or liens affecting the Premises, including all penalties, release preparation costs, and applicable recording costs; any accrued and/or outstanding association dues or fees; fee (if any) to obtain lien payoff/estoppel letters/statement of accounts from any and all associations, property management companies, mortgage holders or other liens affecting the Premises; SELLER's closing fee, document preparation fee and/or attorney's fees; fee for preparation of deed; notary fee on deed; and financial institution (bank, credit union, etc.) wire transfer fee or commercial courier service fee related to the disbursement of any lien payoff(s). SELLER additionally agrees to permit any withholdings and/or to pay any additional sum due as is required under the Foreign Investment in Real Property Tax Act. Failure to do so will constitute a default by SELLER. In the event SELLER is subject to tax withholding as required by the Foreign Investment in Real Property Tax Act, (hereinafter "FIRPTA"), SELLER additionally agrees that such tax withholding must be collected from SELLER by BUYER's closing agent at the time of closing. In the event SELLER is not subject to FIRPTA, SELLER shall be required as a condition of closing, to sign appropriate affidavits certifying that SELLER is not subject to FIRPTA. It is SELLER's responsibility to seek independent tax advice or counsel prior to the Closing Date regarding such tax matters.

8.**CLOSING**. The deed shall be delivered to the Escrow Agent at such location as may be designated by BUYER or BUYER's lending institution, within **thirty (30) days from the execution date of this Agreement** at 10:00 A.M. or sooner by mutual agreement of the Parties hereto (the "Closing Date").

9.**TITLE.**

(a) If, upon the Closing Date, the SELLER shall be unable to deliver or cause to be delivered a deed or deeds conveying marketable title to the Premises as hereinafter provided, subject only to the items set forth in Schedule A and Paragraph 9(e) hereof, then the SELLER shall be allowed a reasonable

postponement of closing not to exceed thirty (30) calendar days, within which to perfect title. If at the end of said time the SELLER is still unable to deliver or cause to be delivered a deed or deeds conveying a marketable title to the Premises, subject as aforesaid, the BUYER (i) may elect to accept such title as the SELLER can convey, without modification of the Purchase Consideration, or (ii) may reject such title. Upon such rejection, all sums paid on account hereof, together with any nonrefundable expenses actually incurred by the BUYER in the aggregate not to exceed the cost of an A.L.T.A. Homeowner's Policy (or the equivalent thereof) based on the amount of the Purchase Consideration shall be paid to the BUYER without interest thereon. Upon receipt of such payment, this Agreement shall terminate and the Parties hereto shall be released and discharged from all further claims and obligations hereunder. SELLER shall be entitled to require BUYER to provide reasonable proof of payment of said expenses.

(b) The title herein required to be furnished by the SELLER shall be marketable, subject only to the items set forth in Schedule A and Paragraph 9(e) hereof, and the marketability thereof shall be determined in accordance with the laws of the state of Connecticut from time to time in effect. Any and all defects, in or encumbrances against, the title which are not deemed to impair marketability under the laws of the state of Connecticut shall not constitute valid objections on the part of the BUYER, provided the SELLER furnishes any affidavits or other instruments which may be required by the applicable statutes. The title must be insured at standard premiums by Buyer's title insurance company.

(c) The SELLER represents that the Premises and the present use thereof are not in violation of any governmental rules, codes, permits, regulations or limitations, unless same have become legally nonconforming, and there are no violations of any enforceable restrictive covenant, agreement or condition subject to which title to the Premises is to be conveyed in accordance with the terms hereof. Between the date of this Agreement and the Closing Date as set forth in Paragraph 9, the SELLER will not do anything or allow anything to be done on or about the Premises which will result in any such violation. The SELLER represents that SELLER has not received any notice of zoning or building violations and that there has been no attempt to enforce same against the SELLER during the time in which the SELLER has owned the Premises. SELLER represents that SELLER has no knowledge of any special assessments levied or to be levied against the Premises which are not yet a lien on the Premises and has no knowledge of any existing improvements or work done on the Premises which may result in special taxes or assessments to be paid thereon.

(d) Notwithstanding anything to the contrary contained in this Agreement, in the event the SELLER after due diligence cannot obtain a release for any existing mortgage on the Premises at the time of the closing of title from the holder of said mortgage, or any assignee thereof, either because said holder will not release the mortgage without first receiving payment or because the holder has delayed in sending the attorney for the SELLER the release of mortgage, then BUYER and SELLER agree to close title notwithstanding the absence of the release of mortgage, provided the attorney for the SELLER furnishes

the attorney for the BUYER, at the closing, with (a) a written payoff statement and a copy of the payoff check or wire form evidencing that payment of the unreleased mortgage is to be made in full at the time of the closing and (b) a fully-executed  undertaking and indemnity to make said payment in the form annexed hereto, and further provided that a title insurance company reasonably satisfactory to the BUYER will issue a fee policy at no additional premium which takes no exception for said mortgage or mortgages or which provides affirmative coverage against loss or damage by reason of said unreleased mortgage or mortgages.

SELLER shall exercise due diligence to obtain any such release or releases and will upon receipt thereof immediately record the same and forward a copy or copies thereof to BUYER's attorney with recording information.  If SELLER has not obtained such release within sixty (60) calendar days after closing, Seller shall give to BUYER's attorney an affidavit as required by law, together with the necessary recording fee. This provision shall survive the closing.

(e)  The Premises will be conveyed to and accepted by the BUYER subject to:

(i)  Any and all zoning and/or building restrictions, limitations, regulations, ordinances, and/or laws; any and all building lines; and all other restrictions, limitations, regulations, ordinances and/or laws imposed by any governmental authority and any and all other provisions of any governmental restrictions, limitations, regulations, ordinances and/or laws, provided the Premises are not in violation of same at the time of closing.

(ii)  Real property taxes and any and all existing tax payments that are a lien, but not due and payable as of the Closing Date; the BUYER shall by acceptance of the deed assume and agree to pay, any and all such tax payments, liens and assessments which may on or after the Closing Date be assessed, levied against or become a lien on the Premises.

(iii)  Any state of facts which a survey and/or physical inspection of the Premises might reveal, provided same do not render title unmarketable or uninsurable as determined under Paragraph 9(b) hereof (such exception is for purposes of this Agreement only and shall not be included in the deed, unless it was in the deed which SELLER received upon purchasing the property).

(iv)  Common law, riparian or littoral rights of others and/or other rights, if any, in and to any natural watercourse or body of water flowing through or adjoining the Premises, and all statutory and other rights of others in and to any such watercourse or body of water.

(v) Unless otherwise specifically agreed between the Parties in writing, any municipal assessment other than taxes (such as for sewers and the like) shall be paid on a current basis by the SELLER and

the balance assumed by the BUYER at closing.

(vi) Such encumbrances as shown on Schedule A, if any.

**10. COSTS.** All sums paid by BUYER on account of this Agreement, including, without limitation, inspection and engineering fees, the reasonable expenses of the examination of title set forth in Paragraph 9 of this Agreement, and any survey of the Premises shall be the responsibility of Seller.

**11. BROKER(S)**. The Parties hereto agree that there are no brokers. This Agreement is consummated by the SELLER in reliance on the representation of the BUYER that no broker or agent brought the Premises to the BUYER's attention or was, in any way, a procuring cause of this sale and purchase. The SELLER represents to the BUYER that no broker or agent has any exclusive sale or exclusive agency listing on the Premises. The Parties hereto (jointly and severally, if more than one) hereby agree to indemnify and hold each other harmless against any liability by reason of the claim of any broker or agent for a commission on account of this sale, provided that it is adjudged by a court of competent jurisdiction that a commission is due by reason of such other broker or agent being the procuring cause of this sale on behalf of the BUYER. Said indemnity to include all costs of defending any such claim, including reasonable attorney's fees. In the event of any such claim, the Party having notice of such claim shall promptly notify the Party without notice of same who shall have the right, but not the obligation, to assume the defense of such claim. The provisions of this Paragraph shall survive the closing.

**12. APPORTIONMENT**. All *ad valorem* taxes (including, without limitation, real estate taxes, school taxes, municipal utility district taxes, and special district taxes), fire district taxes, sewer taxes, sewer assessments and sewer use charges or other municipal assessments, water charges, rents, service contracts, dues and ordinary assessments of private associations, and common charges, if any, together with interest thereon, if any, shall be apportioned over the fiscal period for which levied as of the Closing Date. All adjustments shall be apportioned based upon a 365-day year and the actual number of days in the month in which the closing occurs. Condominium special assessments due and payable prior to closing shall be SELLER's responsibility. Any errors or omissions in computing apportionment or other adjustments at closing shall be corrected within a reasonable time following the closing, not to exceed six (6) months. The provisions of this Paragraph shall survive the closing.

**13. RISK OF LOSS.** The risk of loss or damage by fire or other casualty to the buildings on the Premises until the time of the delivery of the deed is assumed by the SELLER. Throughout the period between the date of this Agreement and the delivery of the deed, SELLER shall continue to carry the existing fire and extended coverage insurance on the buildings on the Premises. In the event that such loss or damage does occur prior

to the delivery of the deed to BUYER, the SELLER shall be allowed a reasonable time thereafter, not to exceed thirty (30) calendar days from such loss or damage, within which to repair or replace such loss or damage to BUYER's reasonable satisfaction.  In the event the SELLER does not repair or replace such loss or damage to BUYER's reasonable satisfaction within said time, the BUYER shall have the option:

(a) of terminating this Agreement, in which event all sums paid on account hereof, together with any nonrefundable expenses actually incurred by the BUYER will be paid by Seller.  Upon receipt of such payment, this Agreement shall terminate and the Parties hereto shall be released and discharged from all further claims and obligations hereunder.  SELLER shall be entitled to require BUYER to provide reasonable proof of payment of said expenses; or

(b) of accepting a deed conveying the Premises in accordance with all the other provisions of this Agreement upon payment or credit for the Purchase Consideration and of receiving an assignment of all insurance moneys recovered or to be recovered on account of such loss or damage, to the extent they are attributable to loss or damage to any property included in this sale together with the amount of the deductible withheld from payment, less the amount of any moneys actually expended by the SELLER on any repairs to said property.

The SELLER shall not be responsible for loss or damage to trees or other plantings due to natural causes.

## 14. AFFIDAVITS/1099 REPORTING:

(a) The SELLER agrees to execute, at the time of closing of title;

(1)  an affidavit, (i) verifying the non-existence of mechanics' and materialmen's lien rights, (ii) verifying the non-existence of any tenants' rights, other than as set forth herein, (iii) verifying the non-existence of any leases or security interests in personal property and fixtures being sold with the Premises (except as disclosed in Section 4(c) above), and (iv) updating to the extent of SELLER's knowledge, any available survey, together with any other affidavit reasonably requested by the BUYER's lender or title company as to facts within SELLER's knowledge; and, if true,

(2) a certificate affirming that SELLER is not a "foreign person" pursuant to Internal Revenue Code §1445, or a withholding certificate from I.R.S. If SELLER is unable to provide an affidavit affirming same, the Parties agree to comply with all applicable laws including all relevant provisions under Internal Revenue Code §1445, et. seq., as amended.

(b)   Unless otherwise provided, the BUYER agrees to execute and file a Form 1099 Report in connection with the Purchase and Sale of Real Estate as may be applicable to the transaction contemplated herein, and the SELLER must provide information relevant thereto.

**15. STATUTORY NOTICES/WAIVER.** The SELLER gives notice to the BUYER of any statutory notices of waivers required by statute or regulation, including, without limitation, that the lead paint contingency granted pursuant to §42 USC 4852d as set forth in the Lead Paint Disclosure report attached to this Agreement has been waived or has been satisfied, and that the BUYER has no further testing period for lead paint.  If a residential dwelling was built on the Premises prior to 1978, and BUYER receives a Disclosure of Information on Lead Based Paint and Lead Based Paint Hazards after mutual acceptance, BUYER may rescind this Agreement at any time up to three (3) days thereafter.

**16. SMOKE DETECTOR/CARBON MONOXIDE AFFIDAVIT.** At closing of title, SELLER shall leave the existing smoke alarms and carbon monoxide detectors in place and in working order and, SELLER represents that SELLER is not aware of any defects with respect to same.

**17. MAINTENANCE.** The house, grounds and facilities of the Premises shall be maintained by the SELLER between the date of BUYER's signing hereof and the date in which the SELLER no longer occupies the Premises as an owner.  Maintenance shall include, but not be limited to, the mowing of lawns, the raking of fallen leaves, the removal of fallen trees and large branches (except in uncultivated areas), and the removal of snow and ice from walks and driveways.  Additionally, the SELLER while in possession of the Premises as an owner shall be responsible for maintaining all electrical and mechanical systems, plumbing and perform or have performed all structural repairs at SELLER's own cost and expense.  In the event there is a pool that has been opened on the Premises, SELLER shall continue to perform normal maintenance of same.

**18. DELIVERY OF PREMISES.** The Parties have agreed that, on or prior to the Closing Date, the SELLER and BUYER  will enter into a Lease Agreement  (the "Lease Agreement") and the Option Agreement, whereby SELLER will continue to occupy the Premises as a tenant of the BUYER pursuant to the terms of the Lease Agreement and the Option Agreement, which is attached hereto as Exhibit "A" and "B" respectively.

**19. DEFAULT.** If (a) BUYER is in material default hereunder, or, (b) on or before the Closing Date as set forth herein, BUYER indicates that BUYER is unable or unwilling to perform, and provided SELLER stands ready to perform SELLER's obligations, SELLER's sole and exclusive remedy shall be the right to terminate this Agreement by written notice pursuant to Paragraph 30 to BUYER or BUYER's attorney and the Escrow Agent and SELLER shall retain the Deposit as reasonable liquidated damages for BUYER's inability or unwillingness to perform.  In the event  such written notice of termination of this Agreement is given by SELLER, the Premises shall be free of any claims or interest of the BUYER therein by virtue of this

Agreement, provided neither Party objects to same within five (5) business days of receipt of notice of termination.

It is the intention of the Parties hereto freely to make an advance provision on the date of this Agreement for such liquidated damages in order (a) to avoid controversy, delay and expense, and (b) to specify now a reasonable amount agreeable to both for compensation to the SELLER for losses which may not be readily ascertainable or quantifiable, such as any of the following which might be necessary to place SELLER in the position SELLER would have been in had BUYER made timely performance:  costs of carrying, maintaining, insuring and protecting the Premises; loss of interest income on the proceeds; loss of optimum market time, value and conditions; the uncertainty, delay, expense and inconvenience of finding a substitute BUYER; additional commissions, fees, taxes and borrowing expenses to meet obligations entered into in anticipation of performance.

In the event closing has not taken place within thirty (30) calendar days following the Closing Date as it may be extended pursuant to the provisions hereof, through no fault of the non-delaying Party, the delaying Party shall be deemed in default.  If SELLER is in material default hereunder, BUYER shall have such remedies as BUYER shall be entitled to at law or in equity, including, but not limited to, specific performance.

**20. PROPERTY CONDITION DISCLOSURE FORM.**  SELLER shall deliver to BUYER all disclosures and property condition reports required by applicable state and federal laws, in the time frame, form, and content required thereby. If the SELLER discovers, after his delivery of a disclosure statement to a BUYER, a material inaccuracy in any disclosure statement or the disclosure is rendered inaccurate in a material way by the occurrence of some event or circumstance, SELLER shall correct promptly the inaccuracy by delivering a corrected disclosure statement to BUYER or make reasonable repairs necessitated by the occurrence before closing. BUYER understands that the Seller's Property Condition Disclosure statement is not intended to replace a professional home inspection. BUYER understands and agrees that the Seller's Property Condition Disclosure statement contains statements made solely by SELLER

**21.  DELIVERY OF DOCUMENTS.**  Upon BUYER'S request, the SELLER shall deliver to the BUYER prior to closing any documents, informational materials, building plans and any surveys in the SELLER's possession pertaining to the Premises, the appliances and the systems on or within the Premises.

**22.  RIGHT TO WITHDRAW.**  This Agreement shall not be considered or construed as an offer by the SELLER.  The SELLER reserves the right to withdraw this proposed Agreement at any time prior to the signature by both Parties hereto and receipt by the Escrow Agent, of the full payment of the Deposit set forth

herein, and delivery of a fully executed Agreement to the BUYER at the address provided in Paragraph 30 or via electronic signature.

23. **ASSIGNMENT**.  This Agreement and BUYER'S rights hereunder may be assigned by BUYER to an affiliate of BUYER without the consent of SELLER.

24. **ACCEPTANCE OF DEED.**  The delivery and acceptance of the deed herein described shall be deemed to constitute full compliance with all the terms, conditions, covenants and representations contained herein, or made in connection with this transaction, except as may herein be expressly provided and except for the warranties of title.

25. **REPRESENTATIONS**. Unless otherwise specified herein, none of the representations made in this Agreement including all attachments shall survive delivery of the deed, and all representations by SELLER are made to the best of SELLER's knowledge and belief and without duty of inquiry.  SELLER shall have an affirmative obligation to notify BUYER if any of the representations in this Agreement or any attachment are no longer true.  Except in the event of an intentional misrepresentation, if BUYER discovers prior to the closing of title any material representation contained in this Agreement or any attachment to be untrue, the remedy of the Parties shall be those available to them in the event of a valid defect in or objection to title, as set forth in Paragraph 9, above.  In the event of an intentional misrepresentation, BUYER shall have available all rights in either law or equity.

26. **SELLER'S REPRESENTATIONS.**  SELLER represents and warrants to BUYER, as follows:

(a) SELLER is not presently, nor has SELLER been, a debtor(s) in a bankruptcy proceeding in which the bankruptcy court presently has continuing jurisdiction over SELLER's assets.

(b) The Premises is not in the hands of a receiver or other liquidating agent.

(c) SELLER is the sole owner, in fee, of the Premises.

(d) There are no leases, options to purchase or lease, rights of first offer or rights of first refusal, or rights to possess affecting the Premises and no person, other than Seller, has any rights or possessory interest in the Premises.

(e) The execution, delivery and performance of this Agreement in accordance with its terms, does not violate any material contract, agreement, commitment, order, judgment or decree to which SELLER is a party or by which it is bound.

(f) SELLER has the right, power and authority to make and perform SELLER's obligations under this Agreement and this Agreement is a valid and binding obligation of Seller enforceable against Seller in accordance with its terms, subject to bankruptcy, reorganization and other similar laws affecting the enforcement of creditors' rights generally.

(g) SELLER has not received any written notice of condemnation proceedings being brought against the Premises and SELLER has no knowledge that any such proceedings are threatened.

(h) SELLER has not received written notice of and has no knowledge of any action, suit, arbitration, unsatisfied order or judgment, government investigation or proceeding pending against SELLER with respect to the Premises which if adversely determined could have a material adverse effect on the Premises or interfere with the consummation of the transaction contemplated by this Agreement.

(i) SELLER is not, and is not acting directly or indirectly for or on behalf of, any person, group, entity or nation named by any Executive Order of the United States Treasury Department as a terrorist, "Specifically Designated National and Blocked Persons," or other banned or blocked person, entity, nation or transaction pursuant to any law, order, rule or regulation that is enforced or administered by the Office of Foreign Assets Control and SELLER is not engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction, directly or indirectly, on behalf of any such person, group, entity, or nation.

(j) There are no mechanic's liens against SELLER with respect to the Premises and no work has been performed or is otherwise in progress on the Premises by or on behalf of SELLER that could result in a mechanic's lien being filed against the Premises.

(k) There have been no leaks into or out of the Premises in the last twenty four (24) months.

(l) That as of the date of Closing, the basement will be free of standing water and dry.

(m) SELLER has no knowledge of any violation, and has received no notice of any violation, of any applicable environmental laws with respect to the Premises or any portion thereof.  SELLER has not, nor to the best of SELLER's knowledge has any other person, used, generated, stored, dumped, released, buried, dispersed or emitted any hazardous materials at, on, under or onto the Premises, nor are there any underground tanks at, on or under the Premises, nor are there any violations of environmental laws with respect to the current use of the Premises.

(n) There are no restrictions on the Premises, whether by HOA/Co-op bylaws or deed restrictions, that prevent the Premises from being leased or encumbered by an option in accordance with the Lease Agreement and Option Agreement attached hereto as Exhibit "A" and "B" respectively.

The representations set forth in this Paragraph shall survive the closing of title.

**27. EFFECT; ASSIGNMENT**. This Agreement shall be binding upon and inure to the benefit of the heirs, executors, administrators, successors, and permitted assigns of the respective Parties. SELLER acknowledges that BUYER would not enter into this Agreement but for its assessment of SELLER's financial condition, creditworthiness, and other characteristics specific to SELLER, and therefore SELLER agrees not to assign any of its rights or obligations under this Agreement without the prior written consent of BUYER.

**28. COSTS OF ENFORCEMENT**. Except as otherwise expressly provided herein, in the event of any litigation brought to enforce any material provision of this Agreement, the prevailing Party shall be entitled to recover its reasonable attorneys' fees and court costs, including interest as may be provided by law, from the other Party.

**29. GENDER.** In all references herein to any Parties, persons, entities or corporations, the use of any particular gender or the plural or singular number is intended to include the appropriate gender or number as the text of the within Agreement may require.

**30. COUNTERPARTS/FACSIMILE/ELECTRONIC MAIL/NOTICES.** This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original, and all of which when taken together shall constitute one and the same Agreement. The Parties hereto agree that this Agreement may be transmitted between them or their respective attorneys by facsimile or electronic mail and, upon evidence of receipt of same, shall constitute delivery of this Agreement. The Parties intend that faxed or electronic signatures constitute original signatures and that an Agreement containing the signatures (original, facsimile or electronic) of all the Parties is binding on the Parties once sent via facsimile or via electronic mail or delivered to the other Party's counsel.

All notices under this Agreement shall be in writing and shall be delivered or sent by email, facsimile transmission, certified mail, or by overnight courier, addressed to the attorney for the respective Party, and if SELLER has not retained an attorney, to SELLER at the Premises address. Notice signed by the respective attorneys shall be deemed sufficient within the meaning of this paragraph without the signature of the Parties themselves. Electronic signatures of the Parties and of the attorneys for the Parties on this Agreement, notices, or amendments to this Agreement shall be deemed to have the full force and effect of an original signature.

Each Party authorizes their attorney, if any, as attorney-in-fact to execute all documents as may be required to effectuate the terms and conditions of this Agreement, once executed by the Parties, including documents that may be reasonably requested and related to BUYER's lender's requirements.

| Notices to the SELLER shall be sent to: | Susan Allen<br>57 Broadview Ter<br>Meriden, Connecticut 06450<br>███████████ |
|---|---|
| | |

| Notices to the BUYER shall be sent to: | EK Real Estate Fund I, LLC<br>c/o EASYKNOCK, INC.<br>215 Park Ave South<br>Suite 1713-1718<br>New York, NY 10003<br>Attn: Benjamin Black<br><br>███████████████ |
| --- | --- |

**31. ENTIRE AGREEMENT.** All prior understandings, agreements, representations and warranties, oral and written, between SELLER and BUYER are merged in this Agreement and specified riders or attachments hereto. This Agreement completely expresses the agreement of the Parties, and has been entered into by the Parties after discussion with their respective attorneys and after full investigation, neither Party relying upon any statement made by anyone else that is not set forth in this Agreement. Neither this Agreement nor any provision hereof may be waived, changed or canceled except by a written instrument signed by both Parties.

**32. GOVERNING LAW AND VENUE.** This Agreement shall be governed, construed and interpreted by, through and under the laws of the state in which the Premises is located, without giving effect to that state's conflicts of laws principles.

**33. CAPTIONS.** The captions preceding the paragraphs in this Agreement are for ease of reference only and shall be deemed to have no effect whatsoever on the meaning or construction of the provisions of this Agreement.

**34. SEVERABILITY.** The invalidity or unenforceability of any one or more provisions of this Agreement shall not render any other provision invalid or unenforceable. In lieu of any invalid or unenforceable provision, there shall be added automatically a valid and enforceable provision as similar in terms to such invalid or unenforceable provision as may be possible.

(SIGNATURE PAGES TO FOLLOW)

IN WITNESS WHEREOF, the Parties to these presents have hereunto set their hands and seals, as of the day first above written.

**SELLER'S SIGNATURE:**

By:    *Susan Allen*

Name:  Susan  Allen

**BUYER'S SIGNATURE:**

EK Real Estate Fund I, LLC, or its assignee

By:    *Benjamin Black*

Name: Benjamin Black

Title: President

**ACCEPTANCE OF ESCROW**          DATED:_____

**I HEREBY ACCEPT RECEIPT OF THE DEPOSIT AS SPECIFIED IN PARAGRAPH 2, SUBJECT TO COLLECTION, AND THE UNDERSIGNED AGREES TO ACT IN ACCORDANCE WITH THE PROVISIONS OF PARAGRAPH 3 OF THIS AGREEMENT.**

**ESCROW AGENT:**

_____

By:      _____
Name:  _____
Title:   _____

# SCHEDULE A

LEGAL DESCRIPTION

Map/Lot: 0313-0274-0020-0000

# Residential Lease Agreement

**1. LEASE AGREEMENT, PARTIES & PROPERTY**: This lease (the **"Lease Agreement"**) is made on _____ between EK Real Estate Fund I, LLC (the **"Landlord"**) and Susan Allen an individual (the **"Tenant"**). Each of Landlord and Tenant shall be referred to herein as a **"Party"** and collectively, as the **"Parties."** Landlord leases to Tenant the following real property being, lying and situated in Meriden, Connecticut such real property having a street address of 57 Broadview Ter (the **"Property"**).

**2. TERM:** Unless earlier terminated pursuant to the terms and conditions of this Lease Agreement, the term of this Lease Agreement shall commence on the first (1st) day of the month (the "Commencement Date") following the date this Lease Agreement is signed by Tenant (the "Initial Term").This Lease Agreement shall expire at 11:59 PM on _____ which is one (1) day prior to the date which is one year after the date of the Initial Term (the "Expiration Date") if this is a Sell and Stay Lease.

**3. AUTOMATIC RENEWAL AND NOTICE OF TERMINATION:**

So long as no Event of Default (as defined in Paragraph 23) remains uncured, this Lease Agreement automatically renews for an additional year unless Tenant provides Landlord written notice of termination not less than 30 days before the Expiration Date or such time as may be required by state law, or a new Lease Agreement term is otherwise agreed to by the Parties in writing. Time is of the essence for providing notice of termination (strict compliance with dates by which notice must be provided is required). The date on which rent is due does not apply to the requirement for providing written notice of termination.

**4. RENT**

A. Monthly Rent: Tenant will pay Landlord monthly Rent in the amount of $1028 during this Lease Agreement (the **"Rent"**).  Rent is due no later than the first of the month.

B. Rent Holdback: At signing, Tenant shall pay $0 of Rent in advance (the "Rent Holdback"), which covers 0 months of Rent. Furthermore, $0 from the Rent Holdback shall be used each month as a credit towards each monthly Rent payment (for example, the monthly Rent of $1028 shall be paid (a) $1028 by Tenant, and (b) $0 from the Rent Holdback). Any unused portion of the Rent Holdback shall be applied to a subsequent Renewal Term, and any unused portion of the Rent Hold-back shall be returned to Tenant.

C. Method of Payment:

(1) Tenant must pay all Rent timely and without demand, deduction, or offset, except as permitted by law or this Lease Agreement.

(2) Time is of the essence for the payment of Rent (strict compliance with rental due dates is required).

(3) Tenant may not pay Rent in cash, but instead must pay via electronic payment. Electronic payment instructions are provided in the Tenant welcome package you receive after signing this Lease Agreement.

(4) Landlord requires Tenant(s) to pay monthly Rents by one payment.

(5) If Tenant fails to timely pay any amounts due under this Lease Agreement or if any payment of Tenant is not honored by the institution on which it was drawn, Landlord may require Tenant to pay such amount and any subsequent amounts under this Lease Agreement in certified funds. This paragraph does not limit Landlord from seeking other remedies under this Lease Agreement for Tenant's failure to make timely payments with good funds

D. Rent Increases: each year after the first year, Rent shall increase by the greater of:

i. Two and One-Half percent (2.5%); or

ii. An amount reflecting the increase in the cost of living as such increase, if any, is reflected by a change in the "Consumers Price Index for all Urban Consumers" (Revised CPI U) for the region in which the Property is located, as published by the Bureau of Labor Statistics for the U.S. Dept. of Labor (collectively, the "**Consumer Price Index**" or "**CPI**") (the "**Period Increase**").

**5. LATE CHARGES & RETURNED PAYMENT**:

A. If Landlord does not actually receive a Rent payment in the full amount at the designated place of payment by the 5th day of each month at 11:59 p.m., Tenant will pay Landlord for each late payment a late charge equal to the lesser of: (i) $100, or (ii) 5% of the amount of the Rent payment.

B. The Parties agree that the late charge is based on a reasonable estimate of uncertain damages to the Landlord that are incapable of precise calculation and result from late payment of Rent. Landlord's acceptance of a late charge does not waive Landlord's right to exercise remedies under Paragraph 23.

C. Tenant will pay Landlord the lesser of $100 or the maximum amount allowed by Connecticut Law for each payment Tenant tenders to Landlord which is returned or not honored by the institution on which it is drawn for any reason.

**6. APPLICATION OF FUNDS:** Regardless of any notation on a payment, Landlord may apply funds received from Tenant first to any non-rent obligations of Tenant, including but not limited to, late charges, returned payment charges, repairs, and then to Rent.

**7. PETS:**

A. Unless the Parties agree otherwise in writing, Tenant may not permit, even temporarily, any pet on the Property (including but not limited to any mammal, reptile, bird, fish, rodent, or insect). An assistance animal is not considered a pet.

B. If Tenant violates this Paragraph 7 or any agreement to keep a pet on the Property, Landlord may take all or any of the following action:

(1) declare Tenant to be in default of this Lease Agreement and exercise Landlord's remedies under Paragraph 23;

(2) charge Tenant, as additional Rent, $100 for the first day and $20 per day thereafter per pet for each day Tenant violates the pet restrictions;

(3) remove or cause to be removed any unauthorized pet and deliver it to appropriate local authorities by providing at least 24-hour written notice to Tenant of Landlord's intention to remove the unauthorized pet; and

(4) charge to Tenant the Landlord's cost to:

(a) remove any unauthorized pet;

(b) exterminate the Property for fleas and other insects;

(c) clean and deodorize the Property's carpets and drapes; and

(d) repair any damage to the Property caused by the unauthorized pet.

C. When taking any action under this paragraph Landlord will not be liable for any harm, injury, death, or sickness to any pet.

**8. CHARGES TO TENANT:**

A. Landlord may charge Tenant for:

(1) damage to the Property, other than normal wear and tear, caused by Tenant, or any guest or invitee of Tenant;

(2) costs for which Tenant is responsible to clean, deodorize, exterminate, and maintain the Property;

(3) unpaid or accelerated rent;

(4) unpaid late charges;

(5) unpaid utilities and utility expenses Landlord incurs to maintain utilities to the Property as required by this Lease Agreement;

(6) unpaid pet charges;

(7) replacing unreturned keys, garage door openers, security devices, or other components;

(8) the removal of unauthorized locks or fixtures installed by Tenant;

(9) Landlord's cost to access the Property if made inaccessible by Tenant;

(10) missing or burned-out light bulbs and fluorescent tubes (at the same location and of the same type and quality that are in the Property on the Commencement Date);

(11) packing, removing, and storing abandoned Property, if permitted by applicable state law;

(12) removing abandoned or illegally parked vehicles, if permitted by applicable state law;

(13) costs of reletting (as defined in Paragraph 23), if Tenant is in default;

(14) attorney's fees, costs of court, costs of service, and other reasonable costs incurred in any legal proceeding against Tenant if Landlord is the prevailing party;

(15) mailing costs associated with sending notices to Tenant for any violations of this Lease Agreement;

(16) any other unpaid charges or fees or other items for which Tenant is responsible under this Lease Agreement;

(17) cost to restore walls, flooring, landscaping or any alteration to the Property not approved in writing by Landlord;

(18) damages to the Property caused by smoking, including but not limited to stains, burns, odors, and removal of debris; and

(19) costs to rekey certain security devices, as provided in Paragraph 17.

B. Such charges must be paid within 10 days after Landlord makes written demand.

## 9. UTILITIES:

A. Tenant will pay all connection fees, service fees, usage fees, and all other costs and fees for all utilities to the Property (for example, electricity, gas, water, wastewater, garbage, telephone, alarm monitoring systems, cable, and Internet connections).

B. Unless provided by Landlord, Tenant must, at a minimum, keep the following utilities on, if available, at all times this Lease Agreement is in effect: gas; electricity; water; wastewater; and garbage services.

Notice: Before signing this Lease Agreement, Tenant should determine if all necessary utilities are available to the Property and are adequate for Tenant's use.

## 10. USE AND OCCUPANCY:

A. Additional Occupants: Other than immediate family members (e.g., son, daughter, father, mother, brother, sister, grandparent, grandson, or granddaughter), Tenant shall not allow any other person to occupy the Property for more than ten (10) days per year, without Landlord's prior written consent, and providing further that it does not violate any governmental rules or regulations.

B. Subletting and Short Team Rentals: Tenant may only sublet the Property to an immediate family member (e.g. son, daughter, grandson, or granddaughter), subject to Landlord's prior written consent. Tenant may not list the Property on Airbnb or any platform that would allow Tenant to collect payment from someone using the Property.

C. Phone Numbers and E-mail: Tenant must promptly inform Landlord of any changes in Tenant's phone numbers (home, work, and mobile) and e-mail not later than 5 days after a change.

D. HOA Rules: Tenant must comply with any owners' association rules or restrictive covenants affecting the Property. Tenant will reimburse Landlord for any fines or other charges assessed against Landlord for violations by Tenant of any owners' association rule or restrictive covenant, and any resulting administrative fees assessed by Landlord's agents or any other entity as provided by law.

E. Prohibitions: Unless otherwise authorized by Landlord in writing, Tenant may not install or permit any of the following on the Property, even temporarily: a spa, hot tub, above-ground pool, trampoline, or any item which causes a suspension or cancellation of insurance coverage or an increase in insurance premiums. Tenant may not permit any part of the Property to be used for: (1) any activity which is a nuisance, offensive, noisy, or dangerous; (2) the repair of any vehicle; (3) any business of any type, including but not limited to child and pet care; (4) any activity which violates any zoning ordinance, owners association rule, or restrictive covenant; (5) any illegal or unlawful activity; or (6) activity that obstructs, interferes with, or infringes on the rights of other persons near the Property.

F. Guests: Tenant may not permit any guest to stay on the Property longer than the amount of time permitted by any owners' association rule or restrictive covenant, or 10 days without Landlord's written permission, whichever is less.

G. Common Areas: Landlord is not obligated to pay any non-mandatory or user fees for Tenant's use of any common areas or facilities (for example, pool or tennis courts).

**11. PARKING RULES:**   Tenant may permit vehicles to be parked only in drives, garages, designated common parking areas, or in the street if not prohibited by law or an owners' association. In accordance with applicable state and local laws, Landlord may have towed, at Tenant's expense: (a) any vehicle parked in violation of this paragraph or any additional parking rules made part of this Lease Agreement; or (b) any vehicle parked in violation of any law, local ordinance, or owners' association rule. Tenant must promptly inform Landlord of any changes in Tenant's vehicle information (type, year, make, model, and license plate number including state) not later than 5 days after a change.

**12. ACCESS BY LANDLORD:**

A. Advertising: Landlord may prominently display a "For Sale" or "For Lease" or similarly worded sign on the Property if a default under this Lease Agreement has occurred. Landlord or Landlord's contractor may

take interior or exterior photographs or images of the Property and use the photographs or images in any advertisements.

B. Access: Upon reasonable notice, at reasonable times, as prescribed by state law, Landlord may enter the Property to inspect, repair or to show it to prospective purchasers, tenants or lenders. Tenant shall provide Landlord with keys to all locks for the Property. Tenant shall not change any locks or add any locks to the Property without obtaining Landlord's consent, and if given, Tenant shall provide keys to Landlord for these locks.

C. Trip Charges: If Landlord or Landlord's agents have made prior arrangements with Tenant to access the Property and are denied or are not able to access the Property because of Tenant's failure to make the Property accessible (including, but not limited to, any, guest or invitee of Tenant, pet, or security device prohibiting access to any area of the Property), Landlord may charge Tenant a trip charge of $100.

D. Keybox: A keybox is a locked container placed on the Property holding a key to the Property. The keybox is opened by a special combination, key, or programmed access device so that persons with the access device may enter the Property, even in Tenant's absence. The keybox is a convenience but involves risk (such as unauthorized entry, theft, property damage, or personal injury). Neither the Association of REALTORS® nor MLS requires the use of a keybox.

(1) Tenant authorizes Landlord, Landlord's property manager, and Landlord's broker to place on the Property a keybox containing a key to the Property.

(2) Tenant may withdraw Tenant's authorization to place a keybox on the Property by providing written notice to Landlord and paying Landlord a fee of $150 as consideration for the withdrawal. Landlord will remove the keybox within a reasonable time after receipt of the notice of withdrawal and payment of the required fee. Removal of the keybox does not alleviate Tenant's obligation to make the Property available for showings as indicated in Paragraph 12B.

(3) If Landlord or Landlord's agents are denied or are not able to access the Property after first attempting to contact Tenant, Landlord may charge Tenant a trip charge as provided in Paragraph 12C.

(4) Landlord, the property manager, and Landlord's broker are not responsible to Tenant, Tenant's guests, family, or invitees for any damages, injuries, or losses arising from use of the keybox unless caused by Landlord, the property manager, or Landlord's broker.

## 13. MOVE-IN CONDITION:

A. Tenant hereby affirms that, as of the Commencement Date, the Property is fit for human habitation and for the uses reasonably intended by the parties and that no condition exists which would be dangerous, hazardous or detrimental to the life, health or safety of its occupants. Landlord makes no express or implied warranties as to the Property's condition. Tenant agrees to accept the Property AS-IS.

B. Tenant will complete an Inventory and Condition Form, noting any damages to the Property, and deliver it to Landlord within 5 days after the Commencement Date. If Tenant fails to timely deliver the Inventory and Condition Form, the Property will be deemed to be free of damages, unless otherwise expressed in this Lease Agreement. The Inventory and Condition Form is not a request for repairs. Tenant must direct all requests for repairs in compliance with Paragraph 16.

## 14. MOVE-OUT:

A. Move-Out Condition: When this Lease Agreement ends, Tenant will surrender the Property in the same condition as when received, normal wear and tear excepted. Tenant will leave the Property in a clean condition free of all trash, debris, and any personal property. Tenant may not abandon the Property.

B. Definitions:

(1) "*Normal wear and tear*" means deterioration that occurs without negligence, carelessness, accident, or abuse.

(2) "*Surrender*" occurs when all occupants have vacated the Property, in Landlord's reasonable judgment, and one of the following events occurs:

(a) the date Tenant specifies as the move-out or termination date in a written notice to Landlord has passed; or

(b) Tenant returns keys and access devices that Landlord provided to Tenant under this Lease Agreement."

(3) "*Abandonment*" occurs when all of the following occur:

(a) All occupants have vacated the Property, in Landlord's reasonable judgment;

(b) Tenant is in breach of this Lease Agreement by not timely paying Rent; and

(c) Landlord has delivered written notice to Tenant, by affixing it to the inside of the main entry door or if the Landlord is prevented from entering the Property by affixing it to the outside of the main entry door, stating that Landlord considers the Property abandoned, and Tenant fails to respond to the affixed notice by the time required in the notice, which will not be less than 2 days from the date the notice is affixed to the main entry door.

C. Personal Property Left After Move-Out:

(1) If Tenant leaves any personal property in the Property after surrendering or abandoning the Property Landlord may:

(a) dispose of such personal property in the trash or a landfill;

(b) give such personal property to a charitable organization; or

(c) store and sell such personal property by following procedures in applicable law (the Connecticut "Property Code").

(2) Tenant must reimburse Landlord all Landlord's reasonable costs under Paragraph 14C(1) for packing, removing, storing, and selling the personal property left in the Property after surrender or abandonment.

(3) Notwithstanding the foregoing, state law shall govern the disposition of Tenant's property should any provisions of this paragraph conflict with the laws of the state of Connecticut.

## 15. PROPERTY MAINTENANCE:

A. Tenant's General Responsibilities: Tenant, at Tenant's expense, must:

(1) keep the Property clean and sanitary;

(2) promptly dispose of all garbage in appropriate receptacles;

(3) supply and change heating and air conditioning filters at least once a month, if applicable;

(4) supply and replace all light bulbs, fluorescent tubes, and batteries for smoke alarms, carbon monoxide detectors, garage door openers, ceiling fan remotes, and other devices (of the same type and quality that are in the Property on the Commencement Date);

(5) maintain appropriate levels of necessary chemicals or matter in any water softener;

(6) take action to promptly eliminate any dangerous condition on the Property;

(7) take all necessary precautions to prevent broken water pipes due to freezing or other causes;

(8) replace any lost or misplaced keys;

(9) pay any periodic, preventive, or additional extermination costs desired by Tenant, including treatment for bed bugs, unless otherwise required by law;

(10) remove any standing water;

(11) know the location and operation of the main water cut-off valve and all electric breakers and how to switch the valve or breakers off at appropriate times to mitigate any potential damage; and

(12) promptly notify Landlord, in writing, of all needed repairs.

B. Yard Maintenance:

(1) *"Yard"* means all lawns, shrubbery, bushes, flowers, gardens, trees, rock or other landscaping, and other foliage on or encroaching on the Property or on any easement appurtenant to the Property, and does not include common areas maintained by an owners' association.

(2) *"Maintain the yard"* means to perform activities such as, but not limited to: (a) mowing, fertilizing, and trimming the yard; (b) controlling pests and weeds in the yard; and (c) removing debris from the yard; and keeping the sidewalks and driveway areas free of snow and ice.

(3) Unless prohibited by ordinance or other law, Tenant will water the yard at reasonable and appropriate times.

(4) Tenant, at Tenant's expense, will maintain the yard.

C. Pool/Spa Maintenance: Any pool or spa on the Property will be maintained according to a Pool/Spa Maintenance Addendum.

D. Prohibitions: If Tenant installs any fixtures on the Property, authorized or unauthorized, such as additional smoke alarms, additional carbon monoxide detectors, locks, alarm systems, cables, satellite dishes, or other fixtures, such fixtures will become the property of the Landlord. Except as otherwise permitted by law, this Lease Agreement, or in writing by Landlord, Tenant may not:

(1) remove any part of the Property or any of Landlord's personal property from the Property;

(2) remove, change, add, or rekey any lock;

(3) make holes in the woodwork, floors, or walls, except that a reasonable number of small nails may be used to hang pictures in sheetrock and grooves in paneling;

(4) permit any water furniture on the Property;

(5) install additional phone or video cables, outlets, antennas, satellite receivers, or alarm systems;

(6) alter, replace or remove flooring material, paint, or wallpaper;

(7) install, change, or remove any: fixture, appliance, or non-real-property item;

(8) keep or permit any hazardous material on the Property such as flammable or explosive materials;

(9) keep or permit any material or item which causes any liability or fire and extended insurance coverage to be suspended or canceled or any premiums to be increased;

(10) dispose of any environmentally detrimental substance (for example, motor oil or radiator fluid) on the Property;

(11) cause or allow any lien to be filed against any portion of the Property; or

(12) disconnect or intentionally damage any carbon monoxide detector, or otherwise violate any local ordinance requiring a carbon monoxide detector in the Property.

E. Failure to Maintain: If Tenant fails to comply with this Paragraph 15 or any Pool/Spa Maintenance Addendum, Landlord may, in addition to exercising Landlord's remedies under Paragraph 23, perform whatever action Tenant is obligated to perform and Tenant must immediately reimburse Landlord the reasonable expenses that Landlord incurs plus any administrative fees assessed by Landlord's agents or any other entity as provided by law.

F. Smoking: Smoking by Tenant, Tenant's guests, family, or invitees is not permitted on the Property (including, but not limited to, the garage or outdoor areas of the Property). If smoking does occur on the Property, Tenant will be in default and:

(1) Landlord may exercise Landlord's remedies under Paragraph 23; and

(2) Landlord may charge Tenant for damages to the Property caused by smoking, including but not limited to stains, burns, odors, and removal of debris.

## 16. REPAIRS:

A. Repair Requests: All requests for repairs must be in writing and delivered to Landlord.  If Tenant is delinquent in Rent at the time a repair notice is given, Landlord is not obligated to make the repair. In the event of an emergency related to the condition of the Property that materially affects the physical health or safety of an ordinary tenant, Tenant may call the property manager at (646) 891-5938.

B. NOTICE: If Landlord fails to repair a condition that materially affects the physical health or safety of an ordinary tenant as required by this Lease Agreement or the Connecticut Property Code, Tenant may be entitled to exercise remedies of such property code. If Tenant follows the procedures under those sections, the following remedies may be available to Tenant: (1) terminate the Lease Agreement and obtain an appropriate refund; (2) have the condition repaired or remedied; (3) deduct from the Rent the cost of the repair or remedy; and (4) obtain judicial remedies. Do not exercise these remedies without consulting an attorney or carefully reviewing the procedures under the applicable sections.

C. Completion of Repairs:

(1) Tenant may not repair or cause to be repaired any condition, regardless of the cause, without Landlord's permission. All decisions regarding repairs, including the completion of any repair, whether to repair or replace the item, and the selection of contractors, will be at Landlord's sole discretion.

(2) Landlord is not obligated to complete a repair on a day other than a business day unless required to do so by the Connecticut Property Code.

D. Payment of Repair Costs:

(1) Except as otherwise specified in this Lease Agreement, Landlord will pay to repair or remedy conditions in the Property in need of repair if Tenant complies with the procedures for requesting repairs as described in this Paragraph 16. This includes, but is not limited to, repairs to the following items not caused by Tenant or Tenant's negligence:

    (a) heating and air conditioning systems;

    (b) water heaters;

    (c) water penetration from structural defects; or

    (d) washer, dryer, range, refrigerator, dishwasher and garbage disposal.

(2) Landlord will NOT pay to repair the following items unless caused by Landlord's negligence:

    (a) conditions caused by Tenant, an Occupant, or any guest or invitee of Tenant;

    (b) damage from windows or doors left open;

    (c) damage from wastewater stoppages caused by foreign or improper objects in lines that exclusively serve the Property; and

    (d) items that are cosmetic in nature with no impact on the functionality or use of the item.

E. Trip Charges: If a repair person is unable to access the Property after making arrangements with Tenant to complete the repair, Tenant will pay any trip charge the repair person may charge, which amount may be different from the amount stated in Paragraph 12C.

F. Advance Payments and Reimbursements: Landlord may require advance payment of repairs or payments under this Paragraph 16 for which Tenant is responsible. Tenant must promptly reimburse Landlord the amounts under this Paragraph 16 for which Tenant is responsible.

## 17. SECURITY DEVICES AND DOOR LOCKS

A. All notices or requests by Tenant for rekeying, changing, installing, repairing, or replacing security devices must be in writing. Installation of additional security devices or additional rekeying or replacement

of security devices desired by Tenant may be paid by Tenant in advance in accordance with Paragraph 8A(7) of this Lease Agreement and may be installed only by contractors authorized by Landlord.

B. If Tenant vacates the Property in breach of this Lease Agreement, Landlord may rekey any or all security devices and charge tenant for the reasonable costs incurred by Landlord therefor.

**18. SMOKE ALARMS:** The Property will be equipped with smoke alarms in certain locations. Requests for additional installation, inspection, or repair of smoke alarms must be in writing. Disconnecting or intentionally damaging a smoke alarm or removing a battery without immediately replacing it with a working battery may subject Tenant to civil penalties and liability for damages and attorney fees.

**19. LIABILITY**: Unless caused by Landlord, Landlord is not responsible to Tenant, Tenant's guests, family, or occupants for any damages, injuries, or losses to person or property caused by fire, flood, water leaks, ice, snow, hail, winds, explosion, smoke, interruption of utilities, theft, burglary, robbery, assault, vandalism, other persons, condition of the Property, environmental contaminants (for example, carbon monoxide, asbestos, radon, lead-based paint, mold, fungus, etc.), or other occurrences or casualty losses. Unless prohibited by law, Tenant will promptly reimburse Landlord for any damages, injuries, or losses to person or property caused by Tenant, Tenant's guests, any occupants, or any pets or assistance animals, including cost of repairs or service to the Property.

**20. HOLDOVER**: If Tenant fails to vacate the Property at the time this Lease Agreement ends Tenant will pay Landlord Rent for the holdover period and indemnify Landlord and prospective tenants for damages, including but not limited to lost Rent, lodging expenses, costs of eviction, and attorneys' fees. Rent for any holdover period will be the lesser of the maximum amount allowed under Connecticut law, or three (3) times the monthly Rent, calculated on a daily basis, and will be immediately due and payable daily without notice or demand.

**21. SUBORDINATION**: This Lease Agreement and Tenant's leasehold interest are and will be subject, subordinate, and inferior to: (i) any lien or encumbrance now or later placed on the Property by Landlord; (ii) all advances made under any such lien or encumbrance; (iii) the interest payable on any such lien or encumbrance; (iv) any and all renewals and extensions of any such lien or encumbrance; (v) any restrictive covenant; (vi) the rights of any owners' association affecting the Property; and (vii) the Option Agreement between Landlord and Tenant covering the Property.

**22. CASUALTY LOSS OR CONDEMNATION**:

A. The Connecticut Property Code governs the rights and obligations of the parties regarding a casualty loss to the Property. Any proceeds, payment for damages, settlements, awards, or other sums paid because of a casualty loss to the Property will be Landlord's sole property. For the purpose of this Lease Agreement, any condemnation of all or a part of the Property is a casualty loss.

B. Fire & Casualty: In the case of fire damage or other damage to the Property, the Landlord may either (i) repair the Property within a reasonable time, or (ii) terminate the Lease Agreement, in each case as permitted under Connecticut Property Code.

**23. DEFAULT**:

A. If Landlord fails to comply with this Lease Agreement, Tenant may seek any relief provided by law.

B. If Tenant fails to timely pay all amounts due under this Lease Agreement or otherwise fails to comply with this Lease Agreement, Tenant will be in default (an **"Event of Default"**) and:

(1) Landlord may terminate Tenant's right to occupy the Property by providing Tenant with the greater of at least 5 days written notice to pay or vacate or for non-monetary defaults such notice period as may be required by the laws of the state of Connecticut;

(2) all unpaid Rents which are payable during the remainder of this Lease Agreement or any renewal period will be accelerated without notice or demand;

(3) Landlord may exercise any rights under this Lease Agreement or the laws of the state of Connecticut; and

(4) Tenant will be liable for:

(a) any lost Rent;

(b) Landlord's cost of reletting the Property including but not limited to leasing fees, advertising fees, utility charges, and other fees reasonably necessary to re-rent the Property;

(c) repairs to the Property, beyond ordinary wear and tear, for which Tenant is responsible under this Lease Agreement;

(d) all Landlord's costs associated with eviction of Tenant, including but not limited to attorney's fees, court costs, costs of service, witness fees, and prejudgment interest;

(e) all Landlord's costs associated with collection of amounts due under this Lease Agreement, including but not limited to collection fees, late charges, and returned check charges; and

(f) any other recovery to which Landlord may be entitled by law.

C. Notice to vacate under Paragraph 23B(1) may be by any means permitted by the laws of the state of Connecticut.

D. If Tenant vacates the Property in breach of this Lease Agreement, Landlord may rekey any or all security devices and charge tenant the reasonable costs incurred by Landlord therefor, as provided in Paragraph 17.

E. Landlord will attempt to mitigate any damage or loss caused by Tenant's breach by attempting to relet the Property to acceptable tenants and reducing Tenant's liability accordingly.

**24. EARLY TERMINATION:** This Lease Agreement begins on the Commencement Date and ends on the Expiration Date unless: (i) renewed under Paragraph 3; (ii) extended by written agreement of the Parties; (iii) terminated earlier under Paragraph 23, by agreement of the Par`ties, applicable law, or this Paragraph 24; or (iv) an option to purchase the Property is exercised, in which case (A) this Lease Agreement shall terminate upon such exercise or sale if the Tenant becomes the owner of the Property, and (B) Landlord shall have the right to terminate this Lease Agreement upon written notice to Tenant if Tenant does not become the owner of the Property.  Tenant is not entitled to early termination due to voluntary or involuntary job or school transfer, changes in marital status, loss of employment, loss of co-tenants, changes in health, purchase of property, or death. Tenants may have special statutory rights to terminate the Lease Agreement early in certain situations involving family violence, military deployment or transfer, or certain sex offenses or stalking, according to the laws of the state of Connecticut.

A. Special Statutory Rights Tenants may have special statutory rights to terminate this Lease Agreement early in certain situations involving family violence, military deployment or transfer, or certain sex offenses or stalking.

(1) Military: If Tenant is or becomes a servicemember or a dependent of a servicemember, or a member of the Connecticut National Guard or United States Reserve Forces Tenant may terminate this lease pursuant to the Connecticut statutory provisions attached to this Lease Agreement.

(2) Family Violence: Tenant may terminate this lease if Tenant provides Landlord with a copy of a  court order describing protection of Tenant or an occupant from family violence committed by a co-tenant. If the family violence is committed by someone other than a cotenant or co-occupant of the Property, Tenant must give written notice of termination 30 days prior to the effective date of the notice.

(3) Sex Offenses or Stalking: Tenant may have special statutory rights to terminate this lease in certain situations involving certain sexual offenses or stalking, if the Tenant provides Landlord with the

documentation required.

**25. ASSIGNMENT BY LANDLORD**:

A. Assignment: Landlord may assign this Lease Agreement in Landlord's sole discretion. If Tenant is given written notice of assignment of this Lease Agreement or Rent payable hereunder, including the name and address of the assignee, then, Tenant shall not terminate this Lease Agreement or make any abatement in the Rent payable hereunder for any default on the part of the Landlord without first giving notice, in the manner provided elsewhere in this Lease Agreement for the giving of notices, to the assignee of this Lease Agreement, specifying the default in reasonable detail, and affording such assignee a reasonable opportunity to make performance, at its election, for and on behalf of the Landlord, except that, (A) such assignee shall have at least thirty (30) days to cure the default; (B) if such default cannot be cured with reasonable diligence and continuity within thirty (30) days, such assignee shall have any additional time as may be reasonably necessary to cure the default with reasonable diligence and continuity; and (C) if the default cannot reasonably be cured without such assignee having obtained possession of the Property, such assignee shall have such additional time as may be reasonably necessary under the circumstances to obtain possession of the Property and thereafter to cure the default with reasonable diligence and continuity.

B. Survivorship: So long as Tenant pays the Rent and there exists no Event of Default under any terms of this Lease Agreement, Tenant may peacefully occupy the Property during the Term. Tenant's rights under this Agreement shall survive an assignment of this Agreement, or an involuntary transfer of title by the Landlord, including any transfer caused by bankruptcy or dissolution of the Landlord.

**26. ATTORNEY'S FEES**: Any person who is a prevailing Party in any legal proceeding brought under or related to the transactions described in this Lease Agreement is entitled to recover prejudgment interest, reasonable attorney's fees, costs of service, and all other costs of the legal proceeding from the non-prevailing Party.

**27. REPRESENTATIONS**: Tenant's statements in this Lease Agreement and any application for rental are material representations. Each Party to this Lease Agreement represents that he or she is of legal age to enter into a contract. If Tenant makes a misrepresentation in this Lease Agreement or in an application for rental, Tenant is in default.

**28. ADDENDA:** Incorporated into this Lease Agreement are the following addenda, exhibits and other information:

☐ Connecticut Addendum
☐ Additional Amenities Addendum
☐ Lead-Based Paint Addendum
☐ Owners Association Rules
☐ Pet Agreement
☐ Pool/Spa Addendum

**29. NOTICES:** All notices under this Lease Agreement must be in writing and are effective when hand-delivered, sent by mail, or sent by electronic transmission to:

| The Property Manager: | EK Real Estate Fund I, LLC, c/o Stephanie Andrew<br>215 Park Avenue South, 17th Floor<br>New York, NY 10003<br>Attn: Notice Administrator |
|---|---|
| Or | |
| | tenant@easyknock.com |
| | |
| To the Tenant: | Susan Allen<br>57 Broadview Ter<br>Meriden, Connecticut 06450 |
| Or | |
| | ███████████ |

Each notice or communication shall be deemed to have been given as of the date so mailed or delivered as the case may be, except in the case of e-mail, which will be will be deemed delivered and given for all purposes on the sent date, but only if the receiving Party has confirmed its receipt by return e-mail.

**30. AGREEMENT OF PARTIES:**

   A. Entire Agreement: There are no oral agreements between Landlord and Tenant. This Lease Agreement contains the entire agreement between Landlord and Tenant as to leasing the Property and may not be

changed except by written agreement. Tenant has conducted his or her own investigation and has not relied on any oral statements or promises not contained in this Lease Agreement. Any current or prior understandings, statements, representations, and agreements, oral or written, including, but not limited to, renderings or representations contained in brochures, advertising or sales materials and oral statements of sales representatives, if not specifically expressed in this Lease Agreement are void and have no effect. Tenant acknowledges and agrees that tenant has not relied on any such representations.

B. Binding Effect: This Lease Agreement is binding upon and inures to the benefit of the Parties to this Lease Agreement and their respective heirs, executors, administrators, successors, and permitted assigns. Tenant acknowledges that Landlord would not enter into this Lease Agreement but for its assessment of Tenant's financial condition, creditworthiness, and other characteristics specific to Tenant, and therefore Tenant agrees not to assign any of its rights or obligations under this Lease Agreement without the prior written consent of Landlord.

C. Joint and Several: All Tenants are jointly and severally liable for all provisions of this Lease Agreement. Any act or notice to, refund to, or signature of, any one or more of the Tenants regarding any term of this Lease Agreement, its extension, its renewal, or its termination is binding on all Tenants executing this Lease Agreement.

D. Waiver: Landlord's past delay, waiver, or non-enforcement of a rental due date or any other right will not be deemed to be a waiver of any other breach by Tenant or any other right in this Lease Agreement.

E. Severable Clauses: Should a court find any clause in this Lease Agreement unenforceable; the remainder of this Lease Agreement will not be affected and all other provisions in this Lease Agreement will remain enforceable.

F. Controlling Law: The laws of the State of Connecticut govern the interpretation, validity, performance, and enforcement of this Lease Agreement.

## 31. INFORMATION:

A. Future inquiries about this Lease Agreement, rental payments, and security deposits should be directed to the person listed for receipt of notices for Landlord under Paragraph 29.

B. It is Tenant's responsibility to determine, before signing this Lease Agreement, if: (i) all services (e.g., utilities, connections, schools, and transportation) are accessible to or from the Property; (ii) such services are sufficient for Tenant's needs and wishes; and (iii) Tenant is satisfied with the Property's condition.

C. Unpaid Rent and any unpaid amount under this Lease Agreement are reportable to credit reporting agencies.

D. Landlord is not obligated to respond to any requests for Tenant's rental and payment history from a mortgage company or other prospective landlord until Tenant has given notice of termination of this Lease Agreement and Tenant is not in breach of this Lease Agreement.

E. If all occupants over 18 years of age die during this Lease Agreement, Landlord may: (i) permit the person named below to access the Property at reasonable times in Landlord's or Landlord's agent's presence; (ii) permit the named person to remove Tenant's personal property; and (iii) refund the security deposit, less deductions, to the named person.

Name:
Phone:
Address:
E-mail:

F. The Property will be managed by: EK Real Estate Fund I, LLC, c/o Stephanie Andrew. Phone: 646-918-5976  Address: 215 Park Avenue South, Suite 1713/1718 New York, NY 10003  E-mail: tenant@easyknock.com

G. This Lease Agreement is negotiable between the Parties. This Lease Agreement is binding upon final acceptance. READ IT CAREFULLY. If you do not understand the effect of this Lease Agreement, consult your attorney BEFORE signing.

LANDLORD'S SIGNATURE:

EK Real Estate Fund I, LLC, or its assignee

By:

Name: Benjamin Black

Title: President



TENANT'S SIGNATURE:

By:

Print Name:  Susan  Allen




*For Landlord's Use:*

On _____* (*date*), Landlord provided a copy of the Lease Agreement, signed by all Parties, to Susan  Allen (Tenant)**.**

*Note: Landlord must provide at least one copy of the Lease Agreement to at least one Tenant **no later than three business days** after the date the Lease Agreement is signed by each Party to the Lease Agreement. Additionally, if more than one Tenant is a Party to the Lease Agreement, no later than three business days after the date the Landlord receives a written request for a copy of a Lease Agreement from a Tenant who has not already received one as required above, the Landlord must provide a copy to the requesting tenant. Landlord may provide the copy of the Lease Agreement in: (1) a paper format; (2) an electronic format if requested by the Tenant; or (3) by e-mail if the Parties have communicated by e-mail regarding the Lease Agreement.*

Document Ref: LHJCU-BIB4S-EJM2V-5JG6B

# Residential Real Estate Option Agreement

This residential real estate option agreement (the **"Option Agreement"**) is made on _____, between EK Real Estate Fund I, LLC (**"Option Counterparty"**) and Susan Allen, an individual (the **"Option Holder"**).

Each of Option Counterparty and Option Holder shall be referred to herein as a **"Party"** and collectively, as the **"Parties."**

WHEREAS, the Option Counterparty is the fee owner of certain real property being, lying and situated in Meriden, Connecticut such real property having a street address of 57 Broadview Ter (the **"Property"**).

WHEREAS, the Option Counterparty has purchased the Property for cash consideration and this Option Agreement, the receipt and sufficiency of which has been acknowledged by the Option Holder and the Option Counterparty.

WHEREAS, a lease agreement has been signed (dated _____) by Susan Allen and EK Real Estate Fund I, LLC with respect to the Property (the "Lease Agreement").

WHEREAS, the value of the Option Agreement is directly tied to the Lease Agreement, the performance of the tenant's obligations under the Lease Agreement, and the expenses incurred by the Option Counterparty with respect to the Property, pursuant to section 1 and 2 of this Option Agreement.

WHEREAS, this Option Agreement grants the Option Holder an option to effect the sale of the Property to a third party, all upon the terms and conditions of this Option Agreement, and subject to rights conveyed under the Lease Agreement.

NOW, THEREFORE, for and in consideration of the covenants and obligations contained herein, the Parties hereto hereby agree as follows:

## 1. OPTION EXERCISE PRICE & ACCRUAL OF PROPERTY EXPENSES

a) <u>Term</u>: Unless earlier terminated or extended pursuant to the terms and conditions of this Option Agreement, the Purchase Option shall terminate on the date (the "**Option Expiration Date**") that the Lease Agreement terminates. Option Counterparty, in its sole discretion, may extend the Option Expiration Date past the date that the Lease Agreement terminates. Any modifications to the Option Expiration Date must be in writing and signed by Option Holder and Option Counterparty.

b) <u>Extensions and Option Expiration Date Modifications</u>: This Option Agreement shall be extended for the same duration as any extensions under the Lease Agreement.  Option Holder may separately covenant with Option Counterparty to modify the term and Option Expiration Date of this Option Agreement. Any modifications must be in writing and signed by both Parties.

c) <u>Option Exercise Price</u>: $65100 shall be the "**Option Exercise Price.**"

d) <u>Renewal Period Increase</u>: Each year after the first year, the Option Exercise Price shall increase by the greater of:

    i.   Two and One-Half percent (2.5%); or

    ii.   An amount reflecting the increase in the cost of living as such increase, if any, is reflected by a change in the regional index of all items in which the property is located for the "Consumers Price Index for all Urban Consumers" (Revised CPI U) published by the Bureau of Labor Statistics of the U.S. Dept. of Labor (collectively, the "Consumer Price Index" or "CPI")(the "Renewal Period Increase")

e) <u>Accrued Expenses</u>: All expenses incurred by the Option Counterparty in maintaining the Property (collectively the "Accrued Expenses") must be paid in full on the Closing Date (as defined in section 2(a) (ii))  pursuant to section 2(b).  For the avoidance of doubt, Accrued Expenses shall include every item of expense paid by the Option Counterparty with respect to the Property, except for property taxes, owner's property insurance and any HOA dues (not including any assessments), if applicable. An itemized list of Accrued Expenses as of the date of this Option Agreement is set out in Schedule A. The Option Counterparty shall maintain an updated copy of Schedule A and must provide the most up to date copy of Schedule A to the Option Holder upon written request.


## 2. PURCHASE OPTION

On or before the Option Expiration Date, the Option Holder shall have the right to exercise this Option Agreement and have the Option Counterparty convey the Property to a third party (an **"Option Purchaser"**), subject to the terms and conditions of this Option Agreement. This right shall be referred to herein as the **"Purchase Option."**

a) <u>Option Exercise & Notice</u>:

    i. *Notice*: Option Holder may initiate exercise of the Purchase Option only by delivering a written notice of intention to exercise to the Option Counterparty prior to the Option Expiration Date,

pursuant to the notice requirements of section 9. The notice shall contain the terms of the proposed sale to the Option Purchaser, including purchase price and the estimated Closing Date.

ii. Option Exercise: The Purchaser Option shall be deemed to be exercised upon the date of the closing of the sale and transfer of title to the Property by the Landlord to the Option Purchaser (the "Closing Date").

b) <u>Closing Date Proceeds</u>:

    i. If Third Party: On the Closing Date, if the Option Purchaser is not Option Holder, the Option Holder shall receive the following amount (the "Third Party Purchaser Option Price") pursuant to Section 2(c)(iv):

        A. The gross purchase price paid by the Option Purchaser to Option Counterparty; less

        B. The Option Exercise Price of $65100, subject to any relevant Renewal Period Increase(s) as set forth in section 1(d) of this Option Agreement; less

        C. Real estate brokers' commissions if applicable, and any prorations as will be defined in the purchase agreement with the Option Purchaser; less

        D. All Accrued Expenses due to Option Counterparty as of the Closing Date.

    ii. If Option Holder: On the Closing Date, if the Option Purchaser is the Option Holder, the Option Holder shall pay to the Option Counterparty the following amount (the "Option Holder Purchase Option Price"):

        A. The Option Exercise Price of $65100, subject to any relevant Renewal Period Increase(s) as set forth in section 1(d) of this Option Agreement; plus

        B. Real estate brokers' commissions if applicable, and any prorations as will be defined in the purchase agreement with the Option Purchaser; plus

        C. All Accrued Expenses due to Option Counterparty as of the Closing Date.

**The Option Counterparty does not guarantee, and it does not represent or warrant, that Option Holder shall receive any certain Third Party Purchaser Option Price.**

**The Option Counterparty does not guarantee, and it does not represent or warrant that Option Holder shall be able to obtain a loan or other means sufficient to be able to purchase the Property prior to Option Expiration Date. The Option Counterparty is under no obligation to provide the Option Holder with a loan to pay the Option Holder Purchase Option Price.  If the Option Holder desires, but does not have the means to, purchase the Property prior to Option Expiration Date, then the Option Holder will only be able to receive the Third Party Purchaser Option Exercise Price (if any), pursuant to section 2(b)(i) above.**

c) <u>Additional Option Terms</u>:

i. _Option Protection_: The Purchase Option will expire at 11:59 PM on the Option Expiration Date. Following the Option Expiration Date, Option Counterparty may elect to sell the Property under the Option Expiration Procedure, pursuant to section 2(c)(vi). For the avoidance of doubt, if Option Holder does not exercise the Purchase Option before the Option Expiration Date, the Option Holder is still entitled to receive the Third Party Purchaser Option Price (if any) at such time as the Property is sold by the Option Counterparty pursuant to such Option Expiration Procedure.

ii. _Option Counterparty Consent for Third Party Sales_:  Option Counterparty must consent in writing to any exercise of the Purchase Option that results in the sale of the Property to a third party. Such consent may be withheld if the proceeds of the sale are not sufficient to cover the Option Exercise Price, Accrued Expenses and closings costs payable to the Option Counterparty, pursuant to section 2(b)(i), or the transfer would violate an applicable law or regulation, such as a sale of the Property to a sanctioned individual on the OFAC list.

iii. _Option Holder Purchase Restriction_: Option Holder may not be the Option Purchaser.

iv. _Third Party Purchaser Option Price Payment_: On the Closing Date any Third Party Purchaser Option Price shall be paid by Option Counterparty into an escrow account designated by Option Counterparty. Payment of any Third Party Purchaser Option Price shall be made from such escrow to the Option Holder within five (5) business days after Option Counterparty has confirmed that the Property is vacant, and the tenant under the Lease Agreement is no longer in possession of the Property.

v. _Agreement Termination_: If the Option Holder exercises the Purchase Option, or the Property is sold by the Option Counterparty, pursuant to section 2(c)(vi) below, this Option Agreement shall expire on the Closing Date or the date on which completion of the Option Expiration Procedure occurs and all rights and obligations of the Parties shall terminate as of the Closing Date or the date on which completion of the Option Expiration Procedure occurs, except those which expressly survive termination of this Option Agreement.

vi. _Option Expiration Procedure_: After the Option Expiration Date, the Option Counterparty may sell the Property to an Option Purchaser of its choosing at any time and the timing of such sale shall be at Option Counterparty's discretion (the **"Option Expiration Procedure"**).  For the avoidance of doubt, Option Holder shall be entitled to the Third Party Purchaser Option Price (if any) pursuant to section 2(b)(i) in the event of a sale of the Property pursuant to the Option Expiration Procedure.  To effect the Option Expiration Procedure, Option Counterparty shall be entitled to sell the Property in any manner in its sole discretion, including, without limitation, listing and selling the Property through an online auction platform, such as ten-x.com, and all fees associated therewith shall reduce the Third Party Option Purchaser Price (if any) payable to the Option Holder by such amount. The Option Holder expressly assumes the risk that the timing or manner of sale of the Property during the Option Expiration Procedure will not be conducted in a manner that maximizes the Third Party Option Purchaser Price (if any) payable to the Option Holder upon sale of the Property.  For the avoidance of doubt, in no event is Option Counterparty required to sell the Property in an expedient manner, and the Option Counterparty may choose to sell the Property at such time as determined in the sole discretion of the Option

Counterparty. After the Option Expiration Date Accrued Expenses will continue to accrue pursuant to section 1(d).

vii. _Lease Agreement Obligations_:  The payment and performance in full of all obligations of the tenants under the Lease Agreement, including the payment of all past due rent and any applicable lease extension fees, shall be an express condition to Option Counterparty conveying the property to the Option Purchaser.

d) Examples

Option Purchaser Example #1 (if Third Party): By way of example only, if the Option Exercise Price is $200,000, and the Option Holder requests the Option Counterparty to sell the Property to an Option Purchaser who is not the Option Holder for the sum of $375,000 prior to the Option Expiration Date, Option Counterparty has incurred $10,000 in Accrued Expenses related to the Property and incurs broker commission costs of $20,000, the Third Party Purchaser Option Price payable to Option Holder would be $145,000 ($375,000 purchase price paid by Option Purchaser to Option Counterparty, less $200,000 Option Exercise Price, less $10,000 in Accrued Expenses and $20,000 closing costs).

Option Purchaser Example #2 (if Option Holder): By way of example only, if the Option Exercise Price is $200,000, and Option Holder desires to purchase the Property from Option Counterparty prior to the Option Expiration Date, Option Counterparty has incurred $10,000 in Accrued Expenses related to the Property and Option Counterparty incurs closing costs totaling $10,000, the amount Option Holder shall be required to pay Option Counterparty at the closing of the transfer of title to Option Holder for the Option Holder Purchase Option Price would be a total of $220,000 ($200,000 Option Exercise Price, plus $10,000 in Accrued Expenses and $10,000 in closing costs).

Option Purchaser Example #3 (Property Value Decline): By way of example only, if the Option Exercise Price is $200,000, the Option Expiration Date has passed, and the Option Counterparty chooses to sell the house to Third Party Purchaser for $150,000, which is the fair market value of the Property at the time of the sale because of a decline in the housing market, then the Option Holder will not receive any proceeds from sale of the home because the proceeds of the sale did not exceed the Option Exercise Price and any Accrued Expenses.


## 3. INSURANCE

Option Counterparty's Insurance Proceeds: Option Counterparty will maintain, for its benefit, homeowner's insurance. Option Holder shall have no rights in or to any insurance proceeds received or obtained by Option Counterparty as a result of a casualty or loss to the extent they are applied to restore the Property.

In the event insurance proceeds are not applied to the restoration of the Property, such as may be the case upon a determination that the Property is a total loss, then the Purchase Option shall expire, the Option Counterparty shall dispose of the Property pursuant to the Option Expiration Procedure specified in Section 2(c)(vi) and the Option Holder shall be entitled to any amounts realized from insurance proceeds and the disposition of the Property that exceed the sum of the Option Exercise Price and Accrued Expenses, as follows: (i) any insurance proceeds received or obtained after Option Counterparty has been repaid for all of its fees and expenses, including attorneys' fees, incurred in obtaining such proceeds, and (ii) any proceeds that may be obtained by Option Counterparty from the sale of the Property minus any costs incurred by Option Counterparty to consummate such a sale.

By way of example only, if the Option Exercise Price is $200,000 and there are $10,000 in Accrued Expenses, and Option Counterparty receives $300,000 in insurance proceeds for a casualty or loss and chooses not to restore the Property, then the Purchase Option expires.  Further to this example, Option Counterparty has spent $5,000 to recover the insurance proceeds, and has sold the Property for $50,000 while incurring $10,000 in costs in doing so, then Option Holder shall be entitled to a payment of $125,000 ($300,000 insurance proceeds. plus $50,000 in land sale proceeds, less the $200,000 Option Exercise Price, less $10,000 in Accrued Expenses, less $5,000 in recovery costs, less $10,000 in land sale closing costs).

Notwithstanding the foregoing, if the casualty or loss or damage to or destruction of the Property is caused in whole or in part by the reckless negligence or willful misconduct of the Option Holder, its agents, servants, employees, guests and/or invitees, then Option Holder shall not be entitled to any proceeds of insurance as set forth in this section 3.

## 4. SUBORDINATION AND ATTORNMENT

a) Subordination: This Option Agreement is automatically subject and subordinate to the lien, provisions, operation and effect of all mortgages, deeds of trust, ground leases or other security instruments which may now or hereafter encumber the Property (collectively, "**Mortgages**"), to all funds and indebtedness intended to be secured thereby, and to all renewals, extensions, modifications, recastings or refinancings thereof.  The holder of any Mortgage to which this Option Agreement is subordinate shall have the right (subject to any required approval of the holders of any superior Mortgage) at any time to declare the Mortgage to be superior to the Option Agreement and Option Holder shall execute, acknowledge and deliver all documents required by such holder in confirmation thereof.

b) Acknowledgement of Subordination: Option Holder shall, within ten (10) business days after Option Counterparty's request, execute and deliver any requisite or appropriate document confirming the

foregoing subordination. If Option Holder fails timely to do so, then Option Holder appoints the Option Counterparty as the Option Holder's attorney-in-fact to execute any such document for Option Holder. Option Holder waives the provisions of any statute or rule of law now or hereafter in effect which may give or purport to give Option Holder any right to terminate or otherwise adversely affect the Lease Agreement and Option Holder's obligations hereunder in the event any foreclosure proceeding is prosecuted or completed or in the event the Property or Option Counterparty's interest therein is transferred by foreclosure, by deed in lieu of foreclosure or otherwise.

c) Survivorship: Option Holder's rights under this Option Agreement shall survive an assignment of the Lease Agreement, or an involuntary transfer of title by Option Counterparty, including any transfer caused by bankruptcy, default or dissolution of Option Counterparty.

## 5. RECORDING OF AGREEMENT

The Option Holder shall not record this Option Agreement in the public records of any public office without the express and written consent of Option Counterparty, which may be withheld if Option Counterparty reasonably believes such recordation will affect the proceeds that may be obtained following exercise of the Option Expiration Procedure. The written consent requirement under this section 5 is waived in the event of the Option Counterparty's bankruptcy or dissolution.

## 6. INABILITY TO PERFORM

If Option Counterparty is unable to perform any of its obligations to be performed hereunder due to governmental orders, labor strife or inability to secure goods or materials, through no fault on the part of Option Counterparty, this Option Agreement shall not be terminated or cancelled and such inability shall not impact upon Option Counterparty's obligations hereunder.

## 7. DEATH OF OPTION HOLDER

If at any time during the Term, upon death of the Option Holder, this Option Agreement, passes by will or intestate distribution to any person or persons not exceeding three (3) in number (or if to more than three (3) in number, this Option Agreement passes by assignment among themselves to co-legatees or co-distributees not exceeding three (3) in number), then the legatees or distributees may, by assuming the terms of this Option Agreement in writing within two (2) months after the Option Holder's death, become the Option Holder under this Option Agreement.

Document Ref: LHJCU-BIB4S-EJM2V-5JG6B

## 8. ASSIGNMENT

Option Counterparty has the right to freely assign its rights and obligations under this Option Agreement without consent from or notice to the Option Holder. Option Holder may assign this Option Agreement only upon written consent from the Option Counterparty, which may be granted or withheld in the sole and absolute discretion of Option Counterparty.

## 9. NOTICES

Any notice or demand which, under the terms of this Option Agreement or under any statute must or may be given or made by the Parties shall be in writing, and shall be given or made by (i) hand, (ii) overnight courier service, next business day delivery (iii) made by certified mail, return receipt requested, to the addresses set forth below (or in each case to such other address as shall have last been furnished by like notice) or (iv) electronic mail, with proof or confirmation of delivery.  Each notice or communication shall be deemed to have been given as of the date so mailed or delivered as the case may be, except in the case of e-mail, which will be will be deemed delivered and given for all purposes on the sent date, but only if the receiving party has confirmed its receipt by return e-mail.

Notices by the means identified in this section 9 shall be given to:

| The Option Counterparty: | EK Real Estate Fund I, LLC, c/o EasyKnock, Inc. 215 Park Avenue South, 17th Floor New York, NY 10003 Attn: Notice Administrator |
| Or | |
| | tenant@easyknock.com |
| | |
| To the Option Holder: | Susan Allen 57 Broadview Ter Meriden, Connecticut  06450 |
| Or | |
| | ██████████████ |

## 10. GOVERNING LAW

This Option Agreement shall be governed, construed and interpreted by, through and under the laws of the state of Connecticut, without regard to that state's conflicts of laws principles.

## 11. ARBITRATION

a) <u>Arbitration Requirement</u>: Except as provided below OR UNLESS OPTION HOLDER SUBMITS A VALID ARBITRATION/CLASS ACTION WAIVER OPT-OUT NOTICE (AS DESCRIBED BELOW), any and all claims (each, a "Claim") between Option Holder and Option Counterparty will be resolved in binding arbitration rather than in court. Option Holder and Option Counterparty agree to submit to individual arbitration the resolution of any and all Claims by or between Option Holder and Option Counterparty, except that Option Holder and Option Counterparty agree that binding arbitration will not apply to a Party seeking a preliminary injunction, restraining order or other provisional equitable relief in any court whereby such Party may suffer immediate and irreparable harm for which money damages may be inadequate and impossible to calculate (including, but not limited to, a Claim where such Claim will not be subject to the informal dispute resolution procedures described in section 11(b)); provided, however, that, subsequent to obtaining such preliminary injunction, restraining order or other provisional equitable relief, the Claim will then be submitted to arbitration in accordance with section 11. Option Holder and Option Counterparty agree that this Option Agreement affects interstate commerce, and that the enforceability of section 11 will be governed, construed, and enforced, both procedurally and substantively, by the Federal Arbitration Act, 9 U.S.C. sections 1–9. Any arbitration will be administered by the American Arbitration Association ("AAA") pursuant to its then current Commercial Arbitration Rules (the "AAA Rules"), as modified by the terms set forth in section 11.

b) <u>Arbitration Procedure</u>: Any arbitration initiated by Option Holder or Option Counterparty shall be initiated in Connecticut. The AAA Rules, and other information about the AAA, are available at the AAA's website at www.adr.org. A form for initiating arbitration proceedings is available on the AAA's website (https://www.adr.org, but contact the AAA if you have an issue accessing this link) and arbitration proceedings shall be initiated in the location described in this section 11(b). As required by the AAA Rules, if Option Holder initiates the arbitration proceedings, Option Holder must send the original copy of the completed form to Option Counterparty. If the Claim is for $10,000 or less, Option Holder may choose whether the arbitration will be conducted solely based on documents submitted to the arbitrator, through a telephonic hearing, or by an in-person hearing under the AAA Rules. In all cases, Option Holder and Option Counterparty shall exchange documents and other information that Option Holder and Option Counterparty intend to use in the arbitration. The Parties shall select one (1) arbitrator by mutual agreement. Unless Option Holder and Option Counterparty mutually agree otherwise, the arbitrator shall

be an attorney licensed to practice in the location where the arbitration proceeding will be conducted or a retired federal or state judicial officer who presided in the jurisdiction where the arbitration will be conducted. If the Parties cannot agree on an arbitrator, then an arbitrator will be selected using the alternate strike method from a list of five (5) neutral arbitrators provided by AAA. Option Holder will have the option of making the first strike.

c) <u>Class Action Waiver</u>: UNLESS OPTION HOLDER SUBMITS A VALID ARBITRATION/CLASS ACTION WAIVER OPT-OUT NOTICE (AS DESCRIBED IN SECTION 11(d)), OPTION HOLDER AND OPTION COUNTERPARTY AGREE THAT ANY DISPUTE RESOLUTION PROCEEDINGS WHETHER IN ARBITRATION OR IN COURT WILL BE CONDUCTED ONLY ON AN INDIVIDUAL BASIS AND NOT IN A CLASS, CONSOLIDATED OR REPRESENTATIVE ACTION. Option Holder and Option Counterparty expressly agree that any Claim is personal to Option Holder and Option Counterparty, shall only be resolved by an individual arbitration (or individual court proceedings with respect to Claims excluded from mandatory arbitration as described in section 11(d)), and shall in no event be brought as a class arbitration, a class action, or any other representative proceeding. The arbitrator (or court if the Claim is excluded from mandatory arbitration as described in section 11(d)) may only conduct an individual arbitration (or court action if the Claim is excluded from mandatory arbitration as described in section 11(d)), and may not consolidate more than one person's claims and may not preside over any form of representative or class proceeding. If a court or arbitrator determines that this class action waiver is unenforceable in an action between Option Holder and Option Counterparty, then the agreement to arbitrate set forth in section 11 of this Option Agreement will be unenforceable. Neither Option Holder nor Option Counterparty consent to class arbitration.

d) <u>Opt-out</u>: Arbitration and a class action waiver are not mandatory conditions of your contractual relationship with Option Counterparty. If Option Holder does not want to be subject to the arbitration/class action provisions set forth in section 11, Option Holder may opt out of the arbitration/class action provisions by notifying Option Counterparty, in writing, of Option Holder's intent to opt out of the arbitration/class action provisions, either by (a) sending, within thirty (30) days of the date of this Option Agreement, electronic mail to leaseadmin@easyknock.com, stating Option Holder's name and intent to opt out of the arbitration/class action provisions set forth in section 11, or (b) by sending a letter by certified U.S. Mail, return receipt requested, or by any nationally recognized delivery service (e.g., UPS, Federal Express, etc.), or by hand delivery to Option Counterparty's address, set forth in section 9 of this Option Agreement. In order to be effective, the electronic mail or letter, as applicable, must clearly indicate Option Holder's intent to opt-out of the arbitration/class action provisions set forth in section 11, and must be dated and signed. If a letter is used, the envelope containing the signed letter must be post-marked within thirty (30) days of the date this Option Agreement is executed by you in order to constitute a valid opt-out of the arbitration/class action provisions in section 11. Option Holder's writing opting-out of the arbitration/class action provisions, whether sent by (a) or (b) above, will be filed with a copy of this Option

Agreement and maintained by Option Counterparty. Should you not opt-out of the arbitration/class action provisions set forth in section 11 within the thirty (30) day period, Option Holder and Option Counterparty shall be bound by the terms of the arbitration/class action provisions set forth in section 11. Option Holder has the right to consult with counsel of their choice concerning the arbitration/class action provisions set forth in section 11. Option Holder understands that Option Holder will not be subject to retaliation if Option Holder exercises their right to assert claims or opt-out of coverage under the arbitration/class action provisions set forth in section 11.

The provisions of this section 11 survive termination of this Option Agreement.

## 12. ACKNOWLEDGEMENTS

Option Holder understands that this Option Agreement is a complex legal document and that Option Holder may suffer tax consequences as a result of Option Holder's exercise of the Purchase Option or the Option Expiration Procedure under this Option Agreement. Option Holder represents that Option Holder has consulted with any tax or legal consultants Option Holder deems advisable in connection with this Option Agreement and has not received any legal or tax advice from Option Counterparty or any of its representatives with respect the transactions contemplated hereby.

The Parties are executing this Option Agreement voluntarily and without any duress or undue influence. The Parties have carefully read this Option Agreement and have asked any questions needed to understand its terms, consequences, and binding effect and fully understand them and have been given an executed copy. The Parties have sought the advice of an attorney of their respective choice, if so desired, prior to signing this Option Agreement.

**Option Holder has received, initialed, and signed the "Transaction Risk Factors" and acknowledges and understands each risk factor set forth therein.**

## 13. AGREEMENT CONTROLS

In the event a conflict arises between the terms and conditions of this Option Agreement and the underlying contract of sale between Option Holder and Option Counterparty for Option Counterparty's purchase of the Property from Option Holder, and subject to state law, the terms of this Option Agreement shall control.

## 14. ENTIRE AGREEMENT; MODIFICATION

This document sets forth the entire agreement and understanding between the Parties relating to the subject matter herein and supersedes all prior discussions between the Parties. No modification of or amendment to this Option Agreement, nor any waiver of any rights under this Option Agreement, will be effective unless in writing signed by the Party to be charged.

IN WITNESS WHEREOF, Option Counterparty and Option Holder have respectively signed this Option Agreement as of the day and year first above written.

**OPTION COUNTERPARTY'S SIGNATURE:**

EK Real Estate Fund I, LLC, or its assignee

By:

Name: Benjamin Black

Title: President

**OPTION HOLDER'S SIGNATURE:**

By:

Print Name:  Susan  Allen

# SCHEDULE "A"

## LIST OF ACCRUED EXPENSES

### LIST OF REPAIRS/REPLACEMENTS

| AREA OF PROPERTY | DESCRIPTION OF REPAIR/REPLACEMENT |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

As a result of my/our inspection, please be advised that except as otherwise noted, I/we are not requesting the Landlord repair or replace any item, fixture, building system or equipment in the Property. I/we understand and agree that we are taking the Property "as is, where is" and subject to the terms and conditions of the Agreement.

**TENANT SIGNATURE:** **Date:**

# SELL AND STAY TRANSACTION RISK FACTORS

Each seller of a home (the "Property") to EK Real Estate Fund I, LLC ("EasyKnock"), each tenant of the Property after the sale to EasyKnock, and each person who is receiving an option agreement with respect to the Property (referred to as "you") should carefully consider the following risk factors before making the decision to sell the Property, or enter into the lease agreement and option agreement. For purposes of these risk factors, we have assumed that the tenant, option holder, and seller are the same person. If tenant, option holder and/or seller are different, then each risk factor will only be applicable to the transaction specific party (e.g., option agreement specific risk factors will only apply to the option holder). These risk factors are provided for information purposes only. All of the material terms and conditions of the agreement or agreements between you and EasyKnock will be contained in definitive written agreements, including, but not limited to, the option agreement, lease agreement and the residential real estate sales agreement.

1. You are selling the Property to EasyKnock.

Initials _____

2. By selling the Property to EasyKnock, EasyKnock becomes the owner of the Property.

Initials _____

3. By selling the Property to EasyKnock and entering into a lease agreement with EasyKnock, you become the tenant of EasyKnock and EasyKnock becomes your landlord.

Initials _____

4. You acknowledge that EasyKnock is not extending credit or making a loan of any kind to you or on your behalf. YOU HAVE NOT REQUESTED, AND EASYKNOCK HAS NOT OFFERED, TO MAKE YOU A LOAN.

Initials _____

5. By selling the Property, you will no longer own the Property or have any right, title or interest in the Property as an owner.

Initials _____

6. EasyKnock has strongly encouraged you to be represented and advised by an attorney hired and selected by you in connection with your sale of the Property to EasyKnock, entering into a lease agreement with EasyKnock as your landlord, and/or entering into the option

agreement.

Initials _____

7. If you chose not to be represented and advised by an attorney, such failure does not make your sale of the Property to EasyKnock invalid or relieve you of any obligations under any of your agreements with EasyKnock.

Initials _____

8. You understand that, as a result of various factors, including a potential decrease in value of the Property after you sell it to EasyKnock, (a) if you purchase the property from EasyKnock, the purchase price you pay under the terms of the option agreement may be higher than the fair market value of the Property, and (b) if you choose to request EasyKnock to sell the Property to a third party in accordance with the option agreement, you may not receive any cash consideration in connection with any sale of the Property by EasyKnock to a third party. Furthermore, EasyKnock does not guarantee that you will be able to find a third party who will want to buy the Property.

Initials _____

9. You may lose your rights to purchase the property from EasyKnock or to request EasyKnock to sell the Property to a third party, in certain instances, including if the tenant of the Property is in breach of the lease agreement. You understand that if the tenant defaults on the lease agreement, which default may include failing to pay rent and/or failure to comply with other obligations under the lease, EasyKnock will have the right to sell the Property to a third party at such time as EasyKnock determines in its sole discretion pursuant to the terms of the option agreement.

Initials _____

10. Pursuant to the formula set out in section 2 of the option agreement, any item of expense incurred by EasyKnock as owner of the Property (e.g., repairs to the Property), with the exception of property taxes, homeowner's insurance and HOA dues (if applicable), will be added to the option exercise price, and will accordingly decrease the value to be paid to you as the option holder if the Property is sold to a third party, or conversely, increase the amount to be paid by you as the option holder if you exercise your right to purchase the Property.

Initials _____

11. You acknowledge that the only cash compensation that you may receive in connection with the sale of the Property to EasyKnock, lease of the Property from EasyKnock and receipt of an option under the option agreement, may be the cash amount paid to you at the time of

sale of the Property to EasyKnock.

Initials _____

12. You, as tenant, will be required to pay EasyKnock, as landlord, rent on the first (1st) day of each month.  Each year, your rent shall increase by the greater of (i) the amount of any increase in the cost of living, or (ii) 2.5% per year.  You understand that you are required to lease the Property for at least one year, unless you purchase (or request for a third party to purchase and a third party does in fact purchase the Property prior to the expiry of such time period) the Property before the end of that period.

Initials _____

13. As consideration for EasyKnock's purchase of the Property, you will receive a check or wire transfer of funds for an agreed upon amount, a lease to occupy the Property and an option to purchase the Property from EasyKnock or to request EasyKnock to sell the Property to a third party.  You acknowledge and represent that you have determined that the purchase price you will receive is a fair price for the Property and you are not being forced or required to accept an unfair price, including because you are under duress or coercion.

Initials _____

14. You may not be able to purchase the Property from EasyKnock unless you are able to obtain a loan or have other assets from which you are able to pay the purchase price.  EasyKnock does not have any obligation to provide or arrange financing for you to pay the purchase price for the Property.

Initials _____

15. You may not qualify for a loan to purchase the Property under the option.  If you are unable to purchase the Property prior to the expiration of the option, including because you do not have the means to do so, EasyKnock will have the right to sell the Property to a third party pursuant to the terms of the option agreement.

Initials _____

16. In the case of fire damage or other damage to the Property, EasyKnock, in most instances, will not be liable for any loss, damage or expense to any person or property.

Initials _____

17. You should obtain and keep in full force and effect during the entire term of the lease agreement, a renters insurance policy providing coverage for damage or other loss caused by fire or other casualty, including, but not limited to, vandalism, theft, sprinkler leakage, water damage, explosion, and other similar risks, in an amount adequate to cover the full insurable replacement value of all of your personal property in the Property.

Initials _____

18. EasyKnock will maintain a separate owner's property insurance policy on the Property, and you shall have no rights in or to any insurance proceeds received or obtained by EasyKnock as a result of any casualty or loss, other than those rights expressly set forth in section 3 of the option agreement.  If the property is destroyed and EasyKnock chooses not to apply its homeowner's insurance proceeds to restoration of the property, then the option will expire, EasyKnock will sell the Property and the option holder will receive the net proceeds from the insurance and sale of the property after deducting expenses in collecting the insurance and selling the property, as well as the option exercise price and accrued expenses, as such terms are defined in the option agreement.

Initials _____

19. EasyKnock has the right to freely assign its rights and obligations under the lease agreement, the option agreement, any residential real estate sales agreement and any related agreements or documents.

Initials _____

20. You have been advised to consult a tax expert regarding the sale and leasing of the Property contemplated by any agreements executed by you and EasyKnock.

Initials _____

21. EasyKnock does not provide the following services in connection with the sale of your real estate or home: title searches, title examinations, issuance of title certificates or title insurance, legal or accounting services, property surveys, rendering credit reports or appraisals, issuance of home warranties, or the handling of the processing, closing or settlement of real estate. These services are provided by third parties unaffiliated to EasyKnock, and a portion of your transaction cash proceeds are used to pay for such services, as further detailed in the purchase agreement.

Initials _____

22. As reflected in your HUD-1 Settlement Statement, you are receiving cash consideration of $61000 (plus $1,000 currently being held in escrow as the contract deposit) and an option value of $112000, for a total consideration of $174000. Part of your

cash proceeds will be used to pay closing costs, which total to $5610, transfer/stamp taxes of an amount to be finalized at closing and a processing fee of $4350. As specified in your offer letter, the real estate sales agreement and the option agreement, your Option Exercise Price will be $65100, and every year after the first year the option exercise price will compound and increase by either 1) Two and One-Half percent (2.5%); or 2) An amount reflecting the increase in the cost of living as such increase, if any, is reflected by a change in the "Consumers Price Index for all Urban Consumers" (Revised CPI U) for the region in which the Property is located, as published by the Bureau of Labor Statistics for the U.S. Dept. of Labor (collectively, the "Consumer Price Index" or "CPI") (the "Period Increase").

| **Fee Type** | **Amount** |
| --- | --- |
| Closing Costs | $5610 |
| Upfront Fee to EasyKnock | $4350 |
| Option Exercise Price | To exercise the option in the first year, the option holder must pay an option exercise price, which is based on the cash consideration received by the seller from EasyKnock plus 5% of such cash consideration. Every year after the first year, the option exercise price compounds and increases from the price for previous year by either 1) Two and One-Half percent (2.5%); or 2) An amount reflecting the increase in the cost of living as such increase, if any, is reflected by a change in the "Consumers Price Index for all Urban Consumers" (Revised CPI U) for the region in which the Property is located, as published by the Bureau of Labor Statistics for the U.S. Dept. of Labor (collectively, the "Consumer Price Index" or "CPI") (the "Period Increase"). |
| Broker's Fee Upon Sale of Property by EasyKnock | If a broker is used to sell the Property, the typical fee charged by the broker is 6% of the sale price. |

Initials _____

23. You acknowledge that EasyKnock may be compensating persons or entities with respect to the purchase, sale or lease of the Property, including without limitation, mortgage brokers and real estate agents, who may also be the same persons who introduced you to EasyKnock or introduced EasyKnock to you.

Initials _____

24. You acknowledge that you have been advised to read, and have in fact read, the definitive written agreements related to your sale of the Property to EasyKnock, including, but not limited to, the option agreement, lease agreement and the residential real estate sales

agreement.

Initials _____

25. You have been provided with an opportunity to ask EasyKnock any questions that you may have about your sale of the Property to EasyKnock, your lease of the Property from EasyKnock, as well as the option agreement.

Initials _____

26. You have not relied upon EasyKnock to advise you in connection with the sale of the Property to EasyKnock, entering into a lease agreement with EasyKnock as your landlord, and/or entering into the option agreement.

Initials _____

27. You hereby understand and acknowledge the significance and consequence of the transactions which you are contemplating with EasyKnock and represent that the terms of any written agreement which you may enter into with EasyKnock with respect to the purchase, sale and/or lease of the Property are fully understood and voluntarily accepted by you without any coercion or duress, including the purchase price of the Property which you have voluntarily agreed to.

Initials _____

28. The option agreement contains an arbitration and class action waiver provision in section 11, which you can opt out of now or in the future by following the procedure set forth in section 11. Please review section 11 carefully.  If you do not opt out of the arbitration and class action waiver provision, you will not have the right to have a dispute resolved on a class action or similar basis.

Initials _____

This is only a brief description of the risks to which you may be subject with respect to the sale and/or lease of the Property to EasyKnock. You hereby acknowledge and agree that the risks and information set forth above do not contain all material terms which will only be contained in any written agreement which you may enter into with EasyKnock with respect to the purchase, sale and/or lease of the Property.

SELLER:

By:

Name: Susan  Allen

# Signature Certificate

Document Ref.: LHJCU-BIB4S-EJM2V-5JG6B

Document signed by:



**Benjamin Black**

Verified E-mail:
ben@easyknock.com

Date 29 Jan 2020 13:37:45 UTC



**Susan Allen**

Verified E-mail:

Date 04 Feb 2020 23:46:08 UTC

Document completed by all parties on:
04 Feb 2020 23:46:08 UTC

Page 1 of 1



Signed with PandaDoc.com

PandaDoc is the document platform that boosts your
company's revenue by accelerating the way it transacts.



Ver 4.3 (SS)

# Residential Lease Agreement

**1. LEASE AGREEMENT, PARTIES & PROPERTY**: This lease (the **"Lease Agreement"**) is made on 2/28/2020 between EK Real Estate Fund I, LLC (the **"Landlord"**) and Susan Allen, an individual (the **"Tenant"**). Each of Landlord and Tenant shall be referred to herein as a **"Party"** and collectively, as the **"Parties."** Landlord leases to Tenant the following real property being, lying and situated in Meriden, Connecticut such real property having a street address of 57 Broadview Ter (the **"Property"**).

**2. TERM:** Unless earlier terminated pursuant to the terms and conditions of this Lease Agreement, the term of this Lease Agreement shall commence on the first (1st) day of the month (the "Commencement Date") following the date this Lease Agreement is signed by Tenant (the "Initial Term").This Lease Agreement shall expire at 11:59 PM on 02/28/2021____ which is one (1) day prior to the date which is one year after the date of the Initial Term (the "Expiration Date") of this Lease Agreement.

**3. AUTOMATIC RENEWAL AND NOTICE OF TERMINATION:**

So long as no Event of Default (as defined in Paragraph 23) remains uncured, this Lease Agreement automatically renews for an additional year unless Tenant provides Landlord written notice of termination not less than 30 days before the Expiration Date or such time as may be required by state law, or a new Lease Agreement term is otherwise agreed to by the Parties in writing. Time is of the essence for providing notice of termination (strict compliance with dates by which notice must be provided is required). The date on which rent is due does not apply to the requirement for providing written notice of termination.

**4. RENT**

A. Monthly Rent: Tenant will pay Landlord monthly Rent in the amount of $ 1,315 during this Lease Agreement (the **"Rent"**).  Rent is due no later than the first of the month.

B. Rent Holdback: At signing, Tenant shall pay $11,465 of Rent in advance (the "Rent Holdback"), which covers 18 months of Rent. Furthermore, $615 from the Rent Holdback shall be used each month as a credit towards each monthly Rent payment (for example, the monthly Rent of $1,315 shall be paid (a) $700 by Tenant, and (b) $615 from the Rent Holdback). Any unused portion of the Rent Holdback shall be

applied to a subsequent Renewal Term, and any unused portion of the Rent Hold-back shall be returned to Tenant.

C. Method of Payment:

(1) Tenant must pay all Rent timely and without demand, deduction, or offset, except as permitted by law or this Lease Agreement.

(2) Time is of the essence for the payment of Rent (strict compliance with rental due dates is required).

(3) Tenant may not pay Rent in cash, but instead must pay via electronic payment. Electronic payment instructions are provided in the Tenant welcome package you receive after signing this Lease Agreement.

(4) Landlord requires Tenant(s) to pay monthly Rents by one payment.

(5) If Tenant fails to timely pay any amounts due under this Lease Agreement or if any payment of Tenant is not honored by the institution on which it was drawn, Landlord may require Tenant to pay such amount and any subsequent amounts under this Lease Agreement in certified funds. This paragraph does not limit Landlord from seeking other remedies under this Lease Agreement for Tenant's failure to make timely payments with good funds

D. Rent Increases: each year after the first year, Rent shall increase by the greater of:

i. Two and One-Half percent (2.5%); or

ii. An amount reflecting the increase in the cost of living as such increase, if any, is reflected by a change in the "Consumer Price Index for all Urban Consumers" (Revised CPI U) for the region in which the Property is located, as published by the Bureau of Labor Statistics for the U.S. Dept. of Labor (collectively, the "**Consumer Price Index**" or "**CPI**") (the "**Period Increase**").

## 5. LATE CHARGES & RETURNED PAYMENT:

A. If Landlord does not actually receive a Rent payment in the full amount at the designated place of payment by the 5th day of each month at 11:59 p.m., Tenant will pay Landlord for each late payment a late charge equal to the lesser of: (i) $100, or (ii) 5% of the amount of the Rent payment.

B. The Parties agree that the late charge is based on a reasonable estimate of uncertain damages to the Landlord that are incapable of precise calculation and result from late payment of Rent. Landlord's acceptance of a late charge does not waive Landlord's right to exercise remedies under Paragraph 23.

C. Tenant will pay Landlord the lesser of $100 or the maximum amount allowed by Connecticut Law for each payment Tenant tenders to Landlord which is returned or not honored by the institution on which it is drawn for any reason.

**6. APPLICATION OF FUNDS:** Regardless of any notation on a payment, Landlord may apply funds received from Tenant first to any non-rent obligations of Tenant, including but not limited to, late charges, returned payment charges, repairs, and then to Rent.

**7. PETS:**

A. Unless the Parties agree otherwise in writing, Tenant may not permit, even temporarily, any pet on the Property (including but not limited to any mammal, reptile, bird, fish, rodent, or insect). An assistance animal is not considered a pet.

B. If Tenant violates this Paragraph 7 or any agreement to keep a pet on the Property, Landlord may take all or any of the following action:

(1) declare Tenant to be in default of this Lease Agreement and exercise Landlord's remedies under Paragraph 23;

(2) charge Tenant, as additional Rent, $100 for the first day and $20 per day thereafter per pet for each day Tenant violates the pet restrictions;

(3) remove or cause to be removed any unauthorized pet and deliver it to appropriate local authorities by providing at least 24-hour written notice to Tenant of Landlord's intention to remove the unauthorized pet; and

(4) charge to Tenant the Landlord's cost to:

(a) remove any unauthorized pet;

(b) exterminate the Property for fleas and other insects;

(c) clean and deodorize the Property's carpets and drapes; and

(d) repair any damage to the Property caused by the unauthorized pet.

C. When taking any action under this paragraph Landlord will not be liable for any harm, injury, death, or sickness to any pet.

**8. CHARGES TO TENANT:**

A. Landlord may charge Tenant for:

(1) damage to the Property, other than normal wear and tear, caused by Tenant, or any guest or invitee of Tenant;

(2) costs for which Tenant is responsible to clean, deodorize, exterminate, and maintain the Property;

(3) unpaid or accelerated rent;

(4) unpaid late charges;

(5) unpaid utilities and utility expenses Landlord incurs to maintain utilities to the Property as required by this Lease Agreement;

(6) unpaid pet charges;

(7) replacing unreturned keys, garage door openers, security devices, or other components;

(8) the removal of unauthorized locks or fixtures installed by Tenant;

(9) Landlord's cost to access the Property if made inaccessible by Tenant;

(10) missing or burned-out light bulbs and fluorescent tubes (at the same location and of the same type and quality that are in the Property on the Commencement Date);

(11) packing, removing, and storing abandoned Property, if permitted by applicable state law;

(12) removing abandoned or illegally parked vehicles, if permitted by applicable state law;

(13) costs of reletting (as defined in Paragraph 23), if Tenant is in default;

(14) attorney's fees, costs of court, costs of service, and other reasonable costs incurred in any legal proceeding against Tenant if Landlord is the prevailing party;

(15) mailing costs associated with sending notices to Tenant for any violations of this Lease Agreement;

(16) any other unpaid charges or fees or other items for which Tenant is responsible under this Lease Agreement;

(17) cost to restore walls, flooring, landscaping or any alteration to the Property not approved in writing by Landlord;

(18) damages to the Property caused by smoking, including but not limited to stains, burns, odors, and removal of debris; and

(19) costs to rekey certain security devices, as provided in Paragraph 17.

B. Such charges must be paid within 10 days after Landlord makes written demand.

## 9. UTILITIES:

A. Tenant will pay all connection fees, service fees, usage fees, and all other costs and fees for all utilities to the Property (for example, electricity, gas, water, wastewater, garbage, telephone, alarm monitoring systems, cable, and Internet connections).

B. Unless provided by Landlord, Tenant must, at a minimum, keep the following utilities on, if available, at all times this Lease Agreement is in effect: gas; electricity; water; wastewater; and garbage services.

Notice: Before signing this Lease Agreement, Tenant should determine if all necessary utilities are available to the Property and are adequate for Tenant's use.

## 10. USE AND OCCUPANCY:

A. Additional Occupants: Other than immediate family members (e.g., son, daughter, father, mother, brother, sister, grandparent, grandson, or granddaughter), Tenant shall not allow any other person to

occupy the Property for more than ten (10) days per year, without Landlord's prior written consent, and providing further that it does not violate any governmental rules or regulations.

B. Subletting and Short Team Rentals: Tenant may only sublet the Property to an immediate family member (e.g. son, daughter, grandson, or granddaughter), subject to Landlord's prior written consent. Tenant may not list the Property on Airbnb or any platform that would allow Tenant to collect payment from someone using the Property.

C. Phone Numbers and E-mail: Tenant must promptly inform Landlord of any changes in Tenant's phone numbers (home, work, and mobile) and e-mail not later than 5 days after a change.

D. HOA Rules: Tenant must comply with any owners' association rules or restrictive covenants affecting the Property. Tenant will reimburse Landlord for any fines or other charges assessed against Landlord for violations by Tenant of any owners' association rule or restrictive covenant, and any resulting administrative fees assessed by Landlord's agents or any other entity as provided by law.

E. Prohibitions: Unless otherwise authorized by Landlord in writing, Tenant may not install or permit any of the following on the Property, even temporarily: a spa, hot tub, above-ground pool, trampoline, or any item which causes a suspension or cancellation of insurance coverage or an increase in insurance premiums. Tenant may not permit any part of the Property to be used for: (1) any activity which is a nuisance, offensive, noisy, or dangerous; (2) the repair of any vehicle; (3) any business of any type, including but not limited to child and pet care; (4) any activity which violates any zoning ordinance, owners association rule, or restrictive covenant; (5) any illegal or unlawful activity; or (6) activity that obstructs, interferes with, or infringes on the rights of other persons near the Property.

F. Guests: Tenant may not permit any guest to stay on the Property longer than the amount of time permitted by any owners' association rule or restrictive covenant, or 10 days without Landlord's written permission, whichever is less.

G. Common Areas: Landlord is not obligated to pay any non-mandatory or user fees for Tenant's use of any common areas or facilities (for example, pool or tennis courts).

**11. PARKING RULES:**  Tenant may permit vehicles to be parked only in drives, garages, designated common parking areas, or in the street if not prohibited by law or an owners' association. In accordance with applicable state and local laws, Landlord may have towed, at Tenant's expense: (a) any vehicle parked in violation of this paragraph or any additional parking rules made part of this Lease Agreement; or (b) any vehicle parked in violation of any law, local ordinance, or owners' association rule. Tenant must promptly

inform Landlord of any changes in Tenant's vehicle information (type, year, make, model, and license plate number including state) not later than 5 days after a change.

## 12. ACCESS BY LANDLORD:

A. Advertising: Landlord may prominently display a "For Sale" or "For Lease" or similarly worded sign on the Property if a default under this Lease Agreement has occurred. Landlord or Landlord's contractor may take interior or exterior photographs or images of the Property and use the photographs or images in any advertisements.

B. Access: Upon reasonable notice, at reasonable times, as prescribed by state law, Landlord may enter the Property to inspect, repair or to show it to prospective purchasers, tenants or lenders. Tenant shall provide Landlord with keys to all locks for the Property. Tenant shall not change any locks or add any locks to the Property without obtaining Landlord's consent, and if given, Tenant shall provide keys to Landlord for these locks.

C. Trip Charges: If Landlord or Landlord's agents have made prior arrangements with Tenant to access the Property and are denied or are not able to access the Property because of Tenant's failure to make the Property accessible (including, but not limited to, any, guest or invitee of Tenant, pet, or security device prohibiting access to any area of the Property), Landlord may charge Tenant a trip charge of $100.

D. Keybox: A keybox is a locked container placed on the Property holding a key to the Property. The keybox is opened by a special combination, key, or programmed access device so that persons with the access device may enter the Property, even in Tenant's absence. The keybox is a convenience but involves risk (such as unauthorized entry, theft, property damage, or personal injury). Neither the Association of REALTORS® nor MLS requires the use of a keybox.

(1) Tenant authorizes Landlord, Landlord's property manager, and Landlord's broker to place on the Property a keybox containing a key to the Property.

(2) Tenant may withdraw Tenant's authorization to place a keybox on the Property by providing written notice to Landlord and paying Landlord a fee of $150 as consideration for the withdrawal. Landlord will remove the keybox within a reasonable time after receipt of the notice of withdrawal and payment of the required fee. Removal of the keybox does not alleviate Tenant's obligation to make the Property available for showings as indicated in Paragraph 12B.

(3) If Landlord or Landlord's agents are denied or are not able to access the Property after first attempting to contact Tenant, Landlord may charge Tenant a trip charge as provided in Paragraph 12C.

(4) Landlord, the property manager, and Landlord's broker are not responsible to Tenant, Tenant's guests, family, or invitees for any damages, injuries, or losses arising from use of the keybox unless caused by Landlord, the property manager, or Landlord's broker.

## 13. MOVE-IN CONDITION:

A. Tenant hereby affirms that, as of the Commencement Date, the Property is fit for human habitation and for the uses reasonably intended by the parties and that no condition exists which would be dangerous, hazardous or detrimental to the life, health or safety of its occupants.  Landlord makes no express or implied warranties as to the Property's condition. Tenant agrees to accept the Property AS-IS.

B. Tenant will complete an Inventory and Condition Form, noting any damages to the Property, and deliver it to Landlord within 5 days after the Commencement Date. If Tenant fails to timely deliver the Inventory and Condition Form, the Property will be deemed to be free of damages, unless otherwise expressed in this Lease Agreement. The Inventory and Condition Form is not a request for repairs. Tenant must direct all requests for repairs in compliance with Paragraph 16.

## 14. MOVE-OUT:

A. Move-Out Condition: When this Lease Agreement ends, Tenant will surrender the Property in the same condition as when received, normal wear and tear excepted. Tenant will leave the Property in a clean condition free of all trash, debris, and any personal property. Tenant may not abandon the Property.

B. Definitions:

(1) "*Normal wear and tear*" means deterioration that occurs without negligence, carelessness, accident, or abuse.

(2) "*Surrender*" occurs when all occupants have vacated the Property, in Landlord's reasonable judgment, and one of the following events occurs:

(a) the date Tenant specifies as the move-out or termination date in a written notice to Landlord has passed; or

(b) Tenant returns keys and access devices that Landlord provided to Tenant under this Lease Agreement."

(3) "*Abandonment*" occurs when all of the following occur:

(a) All occupants have vacated the Property, in Landlord's reasonable judgment;

(b) Tenant is in breach of this Lease Agreement by not timely paying Rent; and

(c) Landlord has delivered written notice to Tenant, by affixing it to the inside of the main entry door or if the Landlord is prevented from entering the Property by affixing it to the outside of the main entry door, stating that Landlord considers the Property abandoned, and Tenant fails to respond to the affixed notice by the time required in the notice, which will not be less than 2 days from the date the notice is affixed to the main entry door.

C. Personal Property Left After Move-Out:

(1) If Tenant leaves any personal property in the Property after surrendering or abandoning the Property Landlord may:

(a) dispose of such personal property in the trash or a landfill;

(b) give such personal property to a charitable organization; or

(c) store and sell such personal property by following procedures in applicable law (the Connecticut "Property Code").

(2) Tenant must reimburse Landlord all Landlord's reasonable costs under Paragraph 14C(1) for packing, removing, storing, and selling the personal property left in the Property after surrender or abandonment.

(3) Notwithstanding the foregoing, state law shall govern the disposition of Tenant's property should any provisions of this paragraph conflict with the laws of the state of Connecticut.

## 15. PROPERTY MAINTENANCE:
A. Tenant's General Responsibilities: Tenant, at Tenant's expense, must:

(1) keep the Property clean and sanitary;

(2) promptly dispose of all garbage in appropriate receptacles;

(3) supply and change heating and air conditioning filters at least once a month, if applicable;

(4) supply and replace all light bulbs, fluorescent tubes, and batteries for smoke alarms, carbon monoxide detectors, garage door openers, ceiling fan remotes, and other devices (of the same type and quality that are in the Property on the Commencement Date);

(5) maintain appropriate levels of necessary chemicals or matter in any water softener;

(6) take action to promptly eliminate any dangerous condition on the Property;

(7) take all necessary precautions to prevent broken water pipes due to freezing or other causes;

(8) replace any lost or misplaced keys;

(9) pay any periodic, preventive, or additional extermination costs desired by Tenant, including treatment for bed bugs, unless otherwise required by law;

(10) remove any standing water;

(11) know the location and operation of the main water cut-off valve and all electric breakers and how to switch the valve or breakers off at appropriate times to mitigate any potential damage; and

(12) promptly notify Landlord, in writing, of all needed repairs.

B. Yard Maintenance:

(1) *"Yard"* means all lawns, shrubbery, bushes, flowers, gardens, trees, rock or other landscaping, and other foliage on or encroaching on the Property or on any easement appurtenant to the Property, and does not include common areas maintained by an owners' association.

(2) *"Maintain the yard"* means to perform activities such as, but not limited to: (a) mowing, fertilizing, and trimming the yard; (b) controlling pests and weeds in the yard; and (c) removing debris from the yard; and keeping the sidewalks and driveway areas free of snow and ice.

(3) Unless prohibited by ordinance or other law, Tenant will water the yard at reasonable and appropriate times.

(4) Tenant, at Tenant's expense, will maintain the yard.

C. Pool/Spa Maintenance: Any pool or spa on the Property will be maintained according to a Pool/Spa Maintenance Addendum.

D. Prohibitions: If Tenant installs any fixtures on the Property, authorized or unauthorized, such as additional smoke alarms, additional carbon monoxide detectors, locks, alarm systems, cables, satellite

dishes, or other fixtures, such fixtures will become the property of the Landlord. Except as otherwise permitted by law, this Lease Agreement, or in writing by Landlord, Tenant may not:

(1) remove any part of the Property or any of Landlord's personal property from the Property;

(2) remove, change, add, or rekey any lock;

(3) make holes in the woodwork, floors, or walls, except that a reasonable number of small nails may be used to hang pictures in sheetrock and grooves in paneling;

(4) permit any water furniture on the Property;

(5) install additional phone or video cables, outlets, antennas, satellite receivers, or alarm systems;

(6) alter, replace or remove flooring material, paint, or wallpaper;

(7) install, change, or remove any: fixture, appliance, or non-real-property item;

(8) keep or permit any hazardous material on the Property such as flammable or explosive materials;

(9) keep or permit any material or item which causes any liability or fire and extended insurance coverage to be suspended or canceled or any premiums to be increased;

(10) dispose of any environmentally detrimental substance (for example, motor oil or radiator fluid) on the Property;

(11) cause or allow any lien to be filed against any portion of the Property; or

(12) disconnect or intentionally damage any carbon monoxide detector, or otherwise violate any local ordinance requiring a carbon monoxide detector in the Property.

E. Failure to Maintain: If Tenant fails to comply with this Paragraph 15 or any Pool/Spa Maintenance Addendum, Landlord may, in addition to exercising Landlord's remedies under Paragraph 23, perform whatever action Tenant is obligated to perform and Tenant must immediately reimburse Landlord the reasonable expenses that Landlord incurs plus any administrative fees assessed by Landlord's agents or any other entity as provided by law.

F. Smoking: Smoking by Tenant, Tenant's guests, family, or invitees is not permitted on the Property (including, but not limited to, the garage or outdoor areas of the Property). If smoking does occur on the Property, Tenant will be in default and:

(1) Landlord may exercise Landlord's remedies under Paragraph 23; and

(2) Landlord may charge Tenant for damages to the Property caused by smoking, including but not limited to stains, burns, odors, and removal of debris.

## 16. REPAIRS:

A. Repair Requests: All requests for repairs must be in writing and delivered to Landlord.  If Tenant is delinquent in Rent at the time a repair notice is given, Landlord is not obligated to make the repair. In the event of an emergency related to the condition of the Property that materially affects the physical health or safety of an ordinary tenant, Tenant may call the property manager at 646-891-5938.

B. NOTICE: If Landlord fails to repair a condition that materially affects the physical health or safety of an ordinary tenant as required by this Lease Agreement or the Connecticut Property Code, Tenant may be entitled to exercise remedies of such property code. If Tenant follows the procedures under those sections, the following remedies may be available to Tenant: (1) terminate the Lease Agreement and obtain an appropriate refund; (2) have the condition repaired or remedied; (3) deduct from the Rent the cost of the repair or remedy; and (4) obtain judicial remedies. Do not exercise these remedies without consulting an attorney or carefully reviewing the procedures under the applicable sections.

C. Completion of Repairs:

(1) Tenant may not repair or cause to be repaired any condition, regardless of the cause, without Landlord's permission. All decisions regarding repairs, including the completion of any repair, whether to repair or replace the item, and the selection of contractors, will be at Landlord's sole discretion.

(2) Landlord is not obligated to complete a repair on a day other than a business day unless required to do so by the Connecticut Property Code.

D. Payment of Repair Costs:

(1) Except as otherwise specified in this Lease Agreement, Landlord will pay to repair or remedy conditions in the Property in need of repair if Tenant complies with the procedures for requesting repairs as described in this Paragraph 16. This includes, but is not limited to, repairs to the following items not caused by Tenant or Tenant's negligence:

(a) heating and air conditioning systems;

(b) water heaters;

(c) water penetration from structural defects; or

(d) washer, dryer, range, refrigerator, dishwasher and garbage disposal.

(2) Landlord will NOT pay to repair the following items unless caused by Landlord's negligence:

(a) conditions caused by Tenant, an Occupant, or any guest or invitee of Tenant;

(b) damage from windows or doors left open;

(c) damage from wastewater stoppages caused by foreign or improper objects in lines that exclusively serve the Property; and

(d) items that are cosmetic in nature with no impact on the functionality or use of the item.

E. Trip Charges: If a repair person is unable to access the Property after making arrangements with Tenant to complete the repair, Tenant will pay any trip charge the repair person may charge, which amount may be different from the amount stated in Paragraph 12C.

F. Advance Payments and Reimbursements: Landlord may require advance payment of repairs or payments under this Paragraph 16 for which Tenant is responsible. Tenant must promptly reimburse Landlord the amounts under this Paragraph 16 for which Tenant is responsible.

## 17. SECURITY DEVICES AND DOOR LOCKS

A. All notices or requests by Tenant for rekeying, changing, installing, repairing, or replacing security devices must be in writing. Installation of additional security devices or additional rekeying or replacement of security devices desired by Tenant may be paid by Tenant in advance in accordance with Paragraph 8A(7) of this Lease Agreement and may be installed only by contractors authorized by Landlord.

B. If Tenant vacates the Property in breach of this Lease Agreement, Landlord may rekey any or all security devices and charge tenant for the reasonable costs incurred by Landlord therefor.

**18. SMOKE ALARMS:** The Property will be equipped with smoke alarms in certain locations. Requests for additional installation, inspection, or repair of smoke alarms must be in writing. Disconnecting or intentionally damaging a smoke alarm or removing a battery without immediately replacing it with a working battery may subject Tenant to civil penalties and liability for damages and attorney fees.

**19. LIABILITY:** Unless caused by Landlord, Landlord is not responsible to Tenant, Tenant's guests, family, or occupants for any damages, injuries, or losses to person or property caused by fire, flood, water leaks, ice, snow, hail, winds, explosion, smoke, interruption of utilities, theft, burglary, robbery, assault, vandalism, other persons, condition of the Property, environmental contaminants (for example, carbon monoxide, asbestos, radon, lead-based paint, mold, fungus, etc.), or other occurrences or casualty losses. Unless prohibited by

law, Tenant will promptly reimburse Landlord for any damages, injuries, or losses to person or property caused by Tenant, Tenant's guests, any occupants, or any pets or assistance animals, including cost of repairs or service to the Property.

**20. HOLDOVER**: If Tenant fails to vacate the Property at the time this Lease Agreement ends Tenant will pay Landlord Rent for the holdover period and indemnify Landlord and prospective tenants for damages, including but not limited to lost Rent, lodging expenses, costs of eviction, and attorneys' fees. Rent for any holdover period will be the lesser of the maximum amount allowed under Connecticut law, or three (3) times the monthly Rent, calculated on a daily basis, and will be immediately due and payable daily without notice or demand.

**21. SUBORDINATION**: This Lease Agreement and Tenant's leasehold interest are and will be subject, subordinate, and inferior to: (i) any lien or encumbrance now or later placed on the Property by Landlord; (ii) all advances made under any such lien or encumbrance; (iii) the interest payable on any such lien or encumbrance; (iv) any and all renewals and extensions of any such lien or encumbrance; (v) any restrictive covenant; (vi) the rights of any owners' association affecting the Property; and (vii) the Option Agreement between Landlord and Tenant covering the Property.

**22. CASUALTY LOSS OR CONDEMNATION**:

A. The Connecticut Property Code governs the rights and obligations of the parties regarding a casualty loss to the Property. Any proceeds, payment for damages, settlements, awards, or other sums paid because of a casualty loss to the Property will be Landlord's sole property. For the purpose of this Lease Agreement, any condemnation of all or a part of the Property is a casualty loss.

B. Fire & Casualty: In the case of fire damage or other damage to the Property, the Landlord may either (i) repair the Property within a reasonable time, or (ii) terminate the Lease Agreement, in each case as permitted under Connecticut Property Code.

**23. DEFAULT**:

A. If Landlord fails to comply with this Lease Agreement, Tenant may seek any relief provided by law.

B. If Tenant fails to timely pay all amounts due under this Lease Agreement or otherwise fails to comply with this Lease Agreement, Tenant will be in default (an **"Event of Default"**) and:

(1) Landlord may terminate Tenant's right to occupy the Property by providing Tenant with the greater of at least 5 days written notice to pay or vacate or for non-monetary defaults such notice period as may be required by the laws of the state of Connecticut;

(2) all unpaid Rents which are payable during the remainder of this Lease Agreement or any renewal period will be accelerated without notice or demand;

(3) Landlord may exercise any rights under this Lease Agreement or the laws of the state of Connecticut; and

(4) Tenant will be liable for:

(a) any lost Rent;

(b) Landlord's cost of reletting the Property including but not limited to leasing fees, advertising fees, utility charges, and other fees reasonably necessary to re-rent the Property;

(c) repairs to the Property, beyond ordinary wear and tear, for which Tenant is responsible under this Lease Agreement;

(d) all Landlord's costs associated with eviction of Tenant, including but not limited to attorney's fees, court costs, costs of service, witness fees, and prejudgment interest;

(e) all Landlord's costs associated with collection of amounts due under this Lease Agreement, including but not limited to collection fees, late charges, and returned check charges; and

(f) any other recovery to which Landlord may be entitled by law.

C. Notice to vacate under Paragraph 23B(1) may be by any means permitted by the laws of the state of Connecticut.

D. If Tenant vacates the Property in breach of this Lease Agreement, Landlord may rekey any or all security devices and charge tenant the reasonable costs incurred by Landlord therefor, as provided in Paragraph 17.

E. Landlord will attempt to mitigate any damage or loss caused by Tenant's breach by attempting to relet the Property to acceptable tenants and reducing Tenant's liability accordingly.

**24. EARLY TERMINATION:** This Lease Agreement begins on the Commencement Date and ends on the Expiration Date unless: (i) renewed under Paragraph 3; (ii) extended by written agreement of the Parties; (iii) terminated earlier under Paragraph 23, by agreement of the Parties, applicable law, or this Paragraph 24; or (iv) an option to sell the Property is exercised, in which case this Lease Agreement shall terminate upon such sale.  Tenant is not entitled to early termination due to voluntary or involuntary job or school transfer, changes in marital status, loss of employment, loss of co-tenants, changes in health, purchase of property, or death. Tenants may have special statutory rights to terminate the Lease Agreement early in certain situations

involving family violence, military deployment or transfer, or certain sex offenses or stalking, according to the laws of the state of Connecticut.

A. Special Statutory Rights Tenants may have special statutory rights to terminate this Lease Agreement early in certain situations involving family violence, military deployment or transfer, or certain sex offenses or stalking.

(1) Military: If Tenant is or becomes a servicemember or a dependent of a servicemember, or a member of the [Contact.State] National Guard or United States Reserve Forces Tenant may terminate this lease pursuant to the [Contact.State] statutory provisions attached to this Lease Agreement.

(2) Family Violence: Tenant may terminate this lease if Tenant provides Landlord with a copy of a court order describing protection of Tenant or an occupant from family violence committed by a co-tenant. If the family violence is committed by someone other than a cotenant or co-occupant of the Property, Tenant must give written notice of termination 30 days prior to the effective date of the notice.

(3) Sex Offenses or Stalking: Tenant may have special statutory rights to terminate this lease in certain situations involving certain sexual offenses or stalking, if the Tenant provides Landlord with the documentation required.

## 25. ASSIGNMENT BY LANDLORD:

A. Assignment: Landlord may assign this Lease Agreement in Landlord's sole discretion. If Tenant is given written notice of assignment of this Lease Agreement or Rent payable hereunder, including the name and address of the assignee, then, Tenant shall not terminate this Lease Agreement or make any abatement in the Rent payable hereunder for any default on the part of the Landlord without first giving notice, in the manner provided elsewhere in this Lease Agreement for the giving of notices, to the assignee of this Lease Agreement, specifying the default in reasonable detail, and affording such assignee a reasonable opportunity to make performance, at its election, for and on behalf of the Landlord, except that, (A) such assignee shall have at least thirty (30) days to cure the default; (B) if such default cannot be cured with reasonable diligence and continuity within thirty (30) days, such assignee shall have any additional time as may be reasonably necessary to cure the default with reasonable diligence and continuity; and (C) if the default cannot reasonably be cured without such assignee having obtained possession of the Property, such assignee shall have such additional time as may be reasonably necessary under the circumstances to obtain possession of the Property and thereafter to cure the default with reasonable diligence and continuity.

B. Survivorship: So long as Tenant pays the Rent and there exists no Event of Default under any terms of this Lease Agreement, Tenant may peacefully occupy the Property during the Term.  Tenant's rights under this Agreement shall survive an assignment of this Agreement, or an involuntary transfer of title by the Landlord, including any transfer caused by bankruptcy or dissolution of the Landlord.

**26. ATTORNEY'S FEES**: Any person who is a prevailing Party in any legal proceeding brought under or related to the transactions described in this Lease Agreement is entitled to recover prejudgment interest, reasonable attorney's fees, costs of service, and all other costs of the legal proceeding from the non-prevailing Party.

**27. REPRESENTATIONS**: Tenant's statements in this Lease Agreement and any application for rental are material representations. Each Party to this Lease Agreement represents that he or she is of legal age to enter into a contract. If Tenant makes a misrepresentation in this Lease Agreement or in an application for rental, Tenant is in default.

**28. ADDENDA:** Incorporated into this Lease Agreement are the following addenda, exhibits and other information:

☐ Connecticut Addendum
☐ Additional Amenities Addendum
☐ Lead-Based Paint Addendum
☐ Owners Association Rules
☑ Pet Agreement
☐ Pool/Spa Addendum

**29. NOTICES:** All notices under this Lease Agreement must be in writing and are effective when hand-delivered, sent by mail, or sent by electronic transmission to:

The Property Manager:       EK Real Estate Fund I, LLC, c/o Stephanie Andrew
                            215 Park Avenue South, 17th Floor
                            New York, NY 10003
                            Attn: Notice Administrator

Or

tenant@easyknock.com

To the Tenant:                Susan Allen
                              57 Broadview Ter
                              Meriden, Connecticut 06450

Or

███████████████

Each notice or communication shall be deemed to have been given as of the date so mailed or delivered as the case may be, except in the case of e-mail, which will be will be deemed delivered and given for all purposes on the sent date, but only if the receiving Party has confirmed its receipt by return e-mail.

## 30. AGREEMENT OF PARTIES:

A. Entire Agreement: There are no oral agreements between Landlord and Tenant. This Lease Agreement contains the entire agreement between Landlord and Tenant as to leasing the Property and may not be changed except by written agreement. Tenant has conducted his or her own investigation and has not relied on any oral statements or promises not contained in this Lease Agreement. Any current or prior understandings, statements, representations, and agreements, oral or written, including, but not limited to, renderings or representations contained in brochures, advertising or sales materials and oral statements of sales representatives, if not specifically expressed in this Lease Agreement are void and have no effect. Tenant acknowledges and agrees that tenant has not relied on any such representations.

B. Binding Effect: This Lease Agreement is binding upon and inures to the benefit of the Parties to this Lease Agreement and their respective heirs, executors, administrators, successors, and permitted assigns. Tenant acknowledges that Landlord would not enter into this Lease Agreement but for its assessment of Tenant's financial condition, creditworthiness, and other characteristics specific to Tenant, and therefore Tenant agrees not to assign any of its rights or obligations under this Lease Agreement without the prior written consent of Landlord.

C. Joint and Several: All Tenants are jointly and severally liable for all provisions of this Lease Agreement. Any act or notice to, refund to, or signature of, any one or more of the Tenants regarding any term of this Lease Agreement, its extension, its renewal, or its termination is binding on all Tenants executing this Lease Agreement.

D. Waiver: Landlord's past delay, waiver, or non-enforcement of a rental due date or any other right will not be deemed to be a waiver of any other breach by Tenant or any other right in this Lease Agreement.

E. Severable Clauses: Should a court find any clause in this Lease Agreement unenforceable; the remainder of this Lease Agreement will not be affected and all other provisions in this Lease Agreement will remain enforceable.

F. Controlling Law: The laws of the State of Connecticut govern the interpretation, validity, performance, and enforcement of this Lease Agreement.

## 31. INFORMATION:

A. Future inquiries about this Lease Agreement, rental payments, and security deposits should be directed to the person listed for receipt of notices for Landlord under Paragraph 29.

B. It is Tenant's responsibility to determine, before signing this Lease Agreement, if: (i) all services (e.g., utilities, connections, schools, and transportation) are accessible to or from the Property; (ii) such services are sufficient for Tenant's needs and wishes; and (iii) Tenant is satisfied with the Property's condition.

C. Unpaid Rent and any unpaid amount under this Lease Agreement are reportable to credit reporting agencies.

D. Landlord is not obligated to respond to any requests for Tenant's rental and payment history from a mortgage company or other prospective landlord until Tenant has given notice of termination of this Lease Agreement and Tenant is not in breach of this Lease Agreement.

E. If all occupants over 18 years of age die during this Lease Agreement, Landlord may: (i) permit the person named below to access the Property at reasonable times in Landlord's or Landlord's agent's presence; (ii) permit the named person to remove Tenant's personal property; and (iii) refund the security deposit, less deductions, to the named person.

Name: Susan Allen

Phone: ███████████

Address: 57 Broadview Terrace

E-mail:

F. The Property will be managed by: EK Real Estate Fund I, LLC, c/o Stephanie Andrew. Phone: ███ ███ Address: 215 Park Avenue South, Suite 1713/1718 New York, NY 10003  E-mail: tenant@easyknock.com

G. This Lease Agreement is negotiable between the Parties. This Lease Agreement is binding upon final acceptance. READ IT CAREFULLY. If you do not understand the effect of this Lease Agreement, consult your attorney BEFORE signing.

LANDLORD'S SIGNATURE:

EK Real Estate Fund I, LLC, or its assignee

By:   *Benjamin Black*

Name: Benjamin Black

Title: President

TENANT'S SIGNATURE:

By:   *Susan Allen*

Print Name:  Susan Allen

*For Landlord's Use:*

On 2/28/2020* (*date*), Landlord provided a copy of the Lease Agreement, signed by all Parties, to Susan Allen (Tenant).

*Note: Landlord must provide at least one copy of the Lease Agreement to at least one Tenant **no later than three business days** after the date the Lease Agreement is signed by each Party to the Lease Agreement. Additionally, if more than one Tenant is a Party to the Lease Agreement, no later than three business days after the date the Landlord receives a written request for a copy of a Lease Agreement from a Tenant who has not already received one as required above, the Landlord must provide a copy to the requesting tenant. Landlord may provide the copy of the Lease Agreement in: (1) a paper format; (2) an electronic format if requested by the Tenant; or (3) by e-mail if the Parties have communicated by e-mail regarding the Lease Agreement.

# Residential Real Estate Option Agreement

This residential real estate option agreement (the **"Option Agreement"**) is made on  2/28/2020, between EK Real Estate Fund I, LLC (**"Option Counterparty"**) and Susan Allen, an individual (the **"Option Holder"**). Each of Option Counterparty and Option Holder shall be referred to herein as a **"Party"** and collectively, as the **"Parties."**

   WHEREAS, the Option Counterparty is the fee owner of certain real property being, lying and situated in Meriden, Connecticut such real property having a street address of 57 Broadview Ter (the **"Property"**).

   WHEREAS, the Option Counterparty has purchased the Property for cash consideration and this Option Agreement, the receipt and sufficiency of which has been acknowledged by the Option Holder and the Option Counterparty.

   WHEREAS, a lease agreement has been signed by Susan Allen and EK Real Estate Fund I, LLC dated 2/28/2020, with respect to the Property (the "Lease Agreement").

   WHEREAS, the value of the Option Agreement is directly tied to the Lease Agreement, the performance of the tenant's obligations under the Lease Agreement, and the expenses incurred by the Option Counterparty with respect to the Property, pursuant to section 1 and 2 of this Option Agreement.

   WHEREAS, this Option Agreement grants the Option Holder an option to effect the sale of the Property to a third party, all upon the terms and conditions of this Option Agreement, and subject to rights conveyed under the Lease Agreement.

   NOW, THEREFORE, for and in consideration of the covenants and obligations contained herein, the Parties hereto hereby agree as follows:

## 1. OPTION EXERCISE PRICE, RENEWAL PERIOD INCREASES & ACCRUAL OF PROPERTY EXPENSES

a) <u>Term</u>: Unless earlier terminated or extended pursuant to the terms and conditions of this Option Agreement, the Purchase Option shall terminate on the date (the "**Option Expiration Date**") that the Lease Agreement terminates. Option Counterparty, in its sole discretion, may extend the Option Expiration Date past the date that the Lease Agreement terminates. Any modifications to the Option Expiration Date must be in writing and signed by Option Holder and Option Counterparty.

b) <u>Extensions and Option Expiration Date Modifications</u>: This Option Agreement shall be extended for the same duration as any extensions under the Lease Agreement. Option Holder may separately covenant with Option Counterparty to modify the term and Option Expiration Date of this Option Agreement. Any modifications must be in writing and signed by both Parties.

c) <u>Option Exercise Price</u>: $93,450, as adjusted pursuant to section 1(d) and (e) below, shall be the **"Option Exercise Price."**

d) <u>Renewal Period Increase</u>: Each year after the first year, the Option Exercise Price shall increase by the greater of:

    i.   Two and One-Half percent (2.5%); or

    ii.   An amount reflecting the increase in the cost of living as such increase, if any, is reflected by a change in the regional index of all items in which the property is located for the "Consumers Price Index for all Urban Consumers" (Revised CPI U) published by the Bureau of Labor Statistics of the U.S. Dept. of Labor (collectively, the "Consumer Price Index" or "CPI")(the "Renewal Period Increase").

e) <u>Accrued Expenses</u>: All expenses incurred by the Option Counterparty in maintaining the Property (collectively the **"Accrued Expenses"**) must be paid in full on the Closing Date (as defined in section 2(a)(ii)) pursuant to section 2(b). For the avoidance of doubt, Accrued Expenses shall include every item of expense paid by the Option Counterparty with respect to the Property, except for property taxes, owner's property insurance and any HOA dues (not including any assessments), if applicable. An itemized list of Accrued Expenses as of the date of this Option Agreement is set out in Schedule A. The Option Counterparty shall maintain an updated copy of Schedule A and must provide the most up to date copy of Schedule A to the Option Holder upon written request.

## 2. PURCHASE OPTION

On or before the Option Expiration Date, the Option Holder shall have the right to exercise this Option Agreement and have the Option Counterparty convey the Property to the Option Holder or a third party (both an **"Option Purchaser"**), subject to the terms and conditions of this Option Agreement. This right shall be referred to herein as the **"Purchase Option."**

a) <u>Option Exercise & Notice</u>:

i. *Notice*: Option Holder may initiate exercise of the Purchase Option only by delivering a written notice of intention to exercise to the Option Counterparty prior to the Option Expiration Date, pursuant to the notice requirements of section 9. If the Option Purchaser is not the Option Holder, the notice shall contain the terms of the proposed sale to the Option Purchaser, including purchase price and the estimated Closing Date. If the Option Purchaser is the Option Holder, the notice shall contain the estimated Closing Date.

ii. *Option Exercise*: The Purchaser Option shall be deemed to be exercised upon the date of the closing of the sale and transfer of title to the Property by the Landlord to the Option Purchaser (the **"Closing Date"**).

b) <u>Closing Date Proceeds</u>:

i. If Third Party: On the Closing Date, if the Option Purchaser is not Option Holder, the Option Holder shall receive the following amount (the "Third Party Purchaser Option Price") pursuant to Section 2(c)(iv):

A. The gross purchase price paid by the Option Purchaser to Option Counterparty; less

B. The Option Exercise Price of $93,450, subject to any relevant Renewal Period Increase(s) as set forth in section 1(d) of this Option Agreement; less

C. Real estate brokers' commissions if applicable, and any prorations as will be defined in the purchase agreement with the Option Purchaser; less

D. All Accrued Expenses due to Option Counterparty as of the Closing Date.

ii. If Option Holder: On the Closing Date, if the Option Purchaser is the Option Holder, the Option Holder shall pay to the Option Counterparty the following amount (the "Option Holder Purchase Option Price"):

A. The Option Exercise Price of $93,450, subject to any relevant Renewal Period Increase(s) as set forth in section 1(d) of this Option Agreement; plus

B. Real estate brokers' commissions if applicable, and any prorations as will be defined in the purchase agreement with the Option Purchaser; plus

C. All Accrued Expenses due to Option Counterparty as of the Closing Date.

**<u>The Option Counterparty does not guarantee, and it does not represent or warrant, that Option Holder shall receive any certain Third Party Purchaser Option Price.</u>**

**<u>The Option Counterparty does not guarantee, and it does not represent or warrant that Option Holder shall be able to obtain a loan or other means sufficient to be able to purchase the Property prior to Option Expiration Date. The Option Counterparty is under no obligation to provide the Option Holder with a loan to pay the Option Holder Purchase Option Price.  If the Option Holder desires, but does not have the means to, purchase the Property prior to Option Expiration Date, then the Option Holder</u>**

**will only be able to receive the Third Party Purchaser Option Exercise Price (if any), pursuant to section 2(b)(i) above.**

c) <u>Additional Option Terms</u>:

i. *Option Protection*: The Purchase Option will expire at 11:59 PM on the Option Expiration Date. Following the Option Expiration Date, Option Counterparty may elect to sell the Property under the Option Expiration Procedure, pursuant to section 2(c)(vi). For the avoidance of doubt, if Option Holder does not exercise the Purchase Option before the Option Expiration Date, the Option Holder is still entitled to receive the Third Party Purchaser Option Price (if any) at such time as the Property is sold by the Option Counterparty pursuant to such Option Expiration Procedure.

ii. *Option Counterparty Consent for Third Party Sales*: Option Counterparty must consent in writing to any exercise of the Purchase Option that results in the sale of the Property to a third party. Such consent may be withheld if the proceeds of the sale are not sufficient to cover the Option Exercise Price, Accrued Expenses and closings costs payable to the Option Counterparty, pursuant to section 2(b)(i), or the transfer would violate an applicable law or regulation, such as a sale of the Property to a sanctioned individual on the OFAC list.

iii. *Third Party Purchaser Option Price Payment*: On the Closing Date any Third Party Purchaser Option Price shall be paid by Option Counterparty into an escrow account designated by Option Counterparty. Payment of any Third Party Purchaser Option Price shall be made from such escrow to the Option Holder within five (5) business days after Option Counterparty has confirmed that the Property is vacant, and the tenant under the Lease Agreement is no longer in possession of the Property.

iv. *Agreement Termination*: If the Option Holder exercises the Purchase Option, or the Property is sold by the Option Counterparty, pursuant to section 2(c)(vi) below, this Option Agreement shall expire on the Closing Date or the date on which completion of the Option Expiration Procedure occurs and all rights and obligations of the Parties shall terminate as of the Closing Date or the date on which completion of the Option Expiration Procedure occurs, except those which expressly survive termination of this Option Agreement.

v. *Option Expiration Procedure*: After the Option Expiration Date, the Option Counterparty may sell the Property to an Option Purchaser of its choosing at any time and the timing of such sale shall be at Option Counterparty's discretion (the **"Option Expiration Procedure"**). For the avoidance of doubt, Option Holder shall be entitled to the Third Party Purchaser Option Price (if any) pursuant to section 2(b)(i) in the event of a sale of the Property pursuant to the Option Expiration Procedure. To effect the Option Expiration Procedure, Option Counterparty shall be entitled to sell the Property in any manner in its sole discretion, including, without limitation, listing and selling the Property through an online auction platform, such as ten-x.com, and all fees associated therewith shall reduce the Third Party Option Purchaser Price (if any) payable to the Option Holder by such amount. The Option Holder expressly assumes the risk that the timing or manner of sale of the Property during the Option Expiration

Procedure will not be conducted in a manner that maximizes the Third Party Option Purchaser Price (if any) payable to the Option Holder upon sale of the Property.  For the avoidance of doubt, in no event is Option Counterparty required to sell the Property in an expedient manner, and the Option Counterparty may choose to sell the Property at such time as determined in the sole discretion of the Option Counterparty. After the Option Expiration Date Accrued Expenses will continue to accrue pursuant to section 1(d).

vi. _Lease Agreement Obligations_:  The payment and performance in full of all obligations of the tenants under the Lease Agreement, including the payment of all past due rent, shall be an express condition to Option Counterparty conveying the property to the Option Purchaser.

d) Examples

Option Purchaser Example #1(if Third Party): By way of example only, if the Option Exercise Price is $200,000, and the Option Holder requests the Option Counterparty to sell the Property to an Option Purchaser who is not the Option Holder for the sum of $375,000 prior to the Option Expiration Date, Option Counterparty has incurred $10,000 in Accrued Expenses related to the Property and incurs closing costs totaling $20,000, the Third Party Purchaser Option Price payable to Option Holder would be $145,000 ($375,000 purchase price paid by Option Purchaser to Option Counterparty, less $200,000 Option Exercise Price, less $10,000 in Accrued Expenses and $20,000 closing costs).

Option Purchaser Example #2 (if Option Holder): By way of example only, if the Option Exercise Price is $200,000, and Option Holder desires to purchase the Property from Option Counterparty prior to the Option Expiration Date, Option Counterparty has incurred $10,000 in Accrued Expenses related to the Property and Option Counterparty incurs closing costs totaling $10,000, the amount Option Holder shall be required to pay Option Counterparty at the closing of the transfer of title to Option Holder for the Option Holder Purchase Option Price would be a total of $220,000 ($200,000 Option Exercise Price, plus $10,000 in Accrued Expenses and $10,000 in closing costs).

Option Purchaser Example #3 (Property Value Decline): By way of example only, if the Option Exercise Price is $200,000, the Option Expiration Date has passed, and the Option Counterparty chooses to sell the house to Third Party Purchaser for $150,000, which is the fair market value of the Property at the time of the sale because of a decline in the housing market, then the Option Holder will not receive any proceeds from sale of the home because the proceeds of the sale did not exceed the Option Exercise Price and any Accrued Expenses.

## 3. INSURANCE

Option Counterparty's Insurance Proceeds: Option Counterparty will maintain, for its benefit, homeowner's insurance. Option Holder shall have no rights in or to any insurance proceeds received or obtained by Option Counterparty as a result of a casualty or loss to the extent they are applied to restore the Property.

In the event insurance proceeds are not applied to the restoration of the Property, such as may be the case upon a determination that the Property is a total loss, then the Purchase Option shall expire, the Option Counterparty shall dispose of the Property pursuant to the Option Expiration Procedure specified in Section 2(c)(vi) and the Option Holder shall be entitled to any amounts realized from insurance proceeds and the disposition of the Property that exceed the sum of the Option Exercise Price and Accrued Expenses, as follows: (i) any insurance proceeds received or obtained after Option Counterparty has been repaid for all of its fees and expenses, including attorneys' fees, incurred in obtaining such proceeds, and (ii) any proceeds that may be obtained by Option Counterparty from the sale of the Property minus any costs incurred by Option Counterparty to consummate such a sale.

By way of example only, if the Option Exercise Price is $200,000 and there are $10,000 in Accrued Expenses, and Option Counterparty receives $300,000 in insurance proceeds for a casualty or loss and chooses not to restore the Property, then the Purchase Option expires.  Further to this example, Option Counterparty has spent $5,000 to recover the insurance proceeds, and has sold the Property for $50,000 while incurring $10,000 in costs in doing so, then Option Holder shall be entitled to a payment of $125,000 ($300,000 insurance proceeds. plus $50,000 in land sale proceeds, less the $200,000 Option Exercise Price, less $10,000 in Accrued Expenses, less $5,000 in recovery costs, less $10,000 in land sale closing costs).

Notwithstanding the foregoing, if the casualty or loss or damage to or destruction of the Property is caused in whole or in part by the reckless negligence or willful misconduct of the Option Holder, its agents, servants, employees, guests and/or invitees, then Option Holder shall not be entitled to any proceeds of insurance as set forth in this section 3.

## 4. SUBORDINATION AND ATTORNMENT

a) Subordination: This Option Agreement is automatically subject and subordinate to the lien, provisions, operation and effect of all mortgages, deeds of trust, ground leases or other security instruments which may now or hereafter encumber the Property (collectively, "**Mortgages**"), to all funds and indebtedness intended to be secured thereby, and to all renewals, extensions, modifications, recastings or refinancings thereof.  The holder of any Mortgage to which this Option Agreement is subordinate shall have the right (subject to any required approval of the holders of any superior Mortgage) at any time to declare the Mortgage to be superior to the Option Agreement and Option Holder shall execute, acknowledge and deliver all documents required by such holder in confirmation thereof.

b) <u>Acknowledgement of Subordination</u>: Option Holder shall, within ten (10) business days after Option Counterparty's request, execute and deliver any requisite or appropriate document confirming the foregoing subordination.  If Option Holder fails timely to do so, then Option Holder appoints the Option Counterparty as the Option Holder's attorney-in-fact to execute any such document for Option Holder. Option Holder waives the provisions of any statute or rule of law now or hereafter in effect which may give or purport to give Option Holder any right to terminate or otherwise adversely affect the Lease Agreement and Option Holder's obligations hereunder in the event any foreclosure proceeding is prosecuted or completed or in the event the Property or Option Counterparty's interest therein is transferred by foreclosure, by deed in lieu of foreclosure or otherwise.

c) <u>Survivorship</u>: Option Holder's rights under this Option Agreement shall survive an assignment of the Lease Agreement, or an involuntary transfer of title by Option Counterparty, including any transfer caused by bankruptcy, default or dissolution of Option Counterparty.

## 5. RECORDING OF AGREEMENT

The Option Holder shall not record this Option Agreement in the public records of any public office without the express and written consent of Option Counterparty, which may be withheld if Option Counterparty reasonably believes such recordation will affect the proceeds that may be obtained following exercise of the Option Expiration Procedure. The written consent requirement under this section 5 is waived in the event of the Option Counterparty's bankruptcy or dissolution.

## 6. INABILITY TO PERFORM

If Option Counterparty is unable to perform any of its obligations to be performed hereunder due to governmental orders, labor strife or inability to secure goods or materials, through no fault on the part of Option Counterparty, this Option Agreement shall not be terminated or cancelled and such inability shall not impact upon Option Counterparty's obligations hereunder.

## 7. DEATH OF OPTION HOLDER

If at any time during the Term, upon death of the Option Holder, this Option Agreement, passes by will or intestate distribution to any person or persons not exceeding three (3) in number (or if to more than three (3) in number, this Option Agreement passes by assignment among themselves to co-legatees or co-distributees not exceeding three (3) in number), then the legatees or distributees may, by assuming the terms of this Option Agreement in writing within two (2) months after the Option Holder's death, become the Option Holder under this Option Agreement.

## 8. ASSIGNMENT

Option Counterparty has the right to freely assign its rights and obligations under this Option Agreement without consent from or notice to the Option Holder. Option Holder may assign this Option Agreement only upon written consent from the Option Counterparty, which may be granted or withheld in the sole and absolute discretion of Option Counterparty.

## 9. NOTICES

Any notice or demand which, under the terms of this Option Agreement or under any statute must or may be given or made by the Parties shall be in writing, and shall be given or made by (i) hand, (ii) overnight courier service, next business day delivery (iii) made by certified mail, return receipt requested, to the addresses set forth below (or in each case to such other address as shall have last been furnished by like notice) or (iv) electronic mail, with proof or confirmation of delivery.  Each notice or communication shall be deemed to have been given as of the date so mailed or delivered as the case may be, except in the case of e-mail, which will be will be deemed delivered and given for all purposes on the sent date, but only if the receiving party has confirmed its receipt by return e-mail.

Notices by the means identified in this section 9 shall be given to:

The Option Counterparty:  EK Real Estate Fund I, LLC, c/o EasyKnock, Inc.
215 Park Avenue South, 17th Floor
New York, NY 10003
Attn: Notice Administrator

Or

tenant@easyknock.com

To the Option Holder:  Susan Allen
57 Broadview Ter
Meriden, Connecticut  06450

Or

██████████████

## 10. GOVERNING LAW

This Option Agreement shall be governed, construed and interpreted by, through and under the laws of the state of Connecticut, without regard to that state's conflicts of laws principles.

## 11. ARBITRATION

a) <u>Arbitration Requirement</u>: Except as provided below OR UNLESS OPTION HOLDER SUBMITS A VALID ARBITRATION/CLASS ACTION WAIVER OPT-OUT NOTICE (AS DESCRIBED BELOW), any and all claims (each, a "Claim") between Option Holder and Option Counterparty will be resolved in binding arbitration rather than in court.  Option Holder and Option Counterparty agree to submit to individual arbitration the resolution of any and all Claims by or between Option Holder and Option Counterparty, except that Option Holder and Option Counterparty agree that binding arbitration will not apply to a Party seeking a preliminary injunction, restraining order or other provisional equitable relief in any court whereby such Party may suffer immediate and irreparable harm for which money damages may be inadequate and impossible to calculate (including, but not limited to, a Claim where such Claim will not be subject to the informal dispute resolution procedures described in section 11(b)); provided, however, that, subsequent to obtaining such preliminary injunction, restraining order or other provisional equitable relief, the Claim will then be submitted to arbitration in accordance with section 11. Option Holder and Option Counterparty agree that this Option Agreement affects interstate commerce, and that the enforceability of section 11 will be governed by, construed, and enforced, both procedurally and substantively, by the Federal Arbitration Act, 9 U.S.C. sections 1–9. Any arbitration will be administered by the American Arbitration Association ("AAA") pursuant to its then current Commercial Arbitration Rules (the "AAA Rules"), as modified by the terms set forth in section 11.

b) <u>Arbitration Procedure</u>: Any arbitration initiated by Option Holder or Option Counterparty shall be initiated in Connecticut. The AAA Rules, and other information about the AAA, are available at the AAA's website at www.adr.org. A form for initiating arbitration proceedings is available on the AAA's website (https://www.adr.org, but contact the AAA if you have an issue accessing this link) and arbitration proceedings shall be initiated in the location described in this section 11(b). As required by the AAA Rules, if Option Holder initiates the arbitration proceedings, Option Holder must send the original copy of the completed form to Option Counterparty. If the Claim is for $10,000 or less, Option Holder may choose whether the arbitration will be conducted solely based on documents submitted to the arbitrator, through a telephonic hearing, or by an in-person hearing under the AAA Rules. In all cases, Option Holder and Option Counterparty shall exchange documents and other information that Option Holder and Option Counterparty intend to use in the arbitration. The Parties shall select one (1) arbitrator by mutual agreement. Unless Option Holder and Option Counterparty mutually agree otherwise, the arbitrator shall be an attorney licensed to practice in the location where the arbitration proceeding will be conducted or a retired federal or state judicial officer who presided in the jurisdiction where the arbitration will be

conducted. If the Parties cannot agree on an arbitrator, then an arbitrator will be selected using the alternate strike method from a list of five (5) neutral arbitrators provided by AAA. Option Holder will have the option of making the first strike.

c) <u>Class Action Waiver</u>: UNLESS OPTION HOLDER SUBMITS A VALID ARBITRATION/CLASS ACTION WAIVER OPT-OUT NOTICE (AS DESCRIBED IN SECTION 11(d)), OPTION HOLDER AND OPTION COUNTERPARTY AGREE THAT ANY DISPUTE RESOLUTION PROCEEDINGS WHETHER IN ARBITRATION OR IN COURT WILL BE CONDUCTED ONLY ON AN INDIVIDUAL BASIS AND NOT IN A CLASS, CONSOLIDATED OR REPRESENTATIVE ACTION. Option Holder and Option Counterparty expressly agree that any Claim is personal to Option Holder and Option Counterparty, shall only be resolved by an individual arbitration (or individual court proceedings with respect to Claims excluded from mandatory arbitration as described in section 11(d)), and shall in no event be brought as a class arbitration, a class action, or any other representative proceeding. The arbitrator (or court if the Claim is excluded from mandatory arbitration as described in section 11(d)) may only conduct an individual arbitration (or court action if the Claim is excluded from mandatory arbitration as described in section 11(d)), and may not consolidate more than one person's claims and may not preside over any form of representative or class proceeding. If a court or arbitrator determines that this class action waiver is unenforceable in an action between Option Holder and Option Counterparty, then the agreement to arbitrate set forth in section 11 of this Option Agreement will be unenforceable. Neither Option Holder nor Option Counterparty consent to class arbitration.

d) <u>Opt-out</u>: Arbitration and a class action waiver are not mandatory conditions of your contractual relationship with Option Counterparty. If Option Holder does not want to be subject to the arbitration/class action provisions set forth in section 11, Option Holder may opt out of the arbitration/class action provisions by notifying Option Counterparty, in writing, of Option Holder's intent to opt out of the arbitration/class action provisions, either by (a) sending, within thirty (30) days of the date of this Option Agreement, electronic mail to leaseadmin@easyknock.com, stating Option Holder's name and intent to opt out of the arbitration/class action provisions set forth in section 11, or (b) by sending a letter by certified U.S. Mail, return receipt requested, or by any nationally recognized delivery service (e.g., UPS, Federal Express, etc.), or by hand delivery to Option Counterparty's address, set forth in section 9 of this Option Agreement. In order to be effective, the electronic mail or letter, as applicable, must clearly indicate Option Holder's intent to opt-out of the arbitration/class action provisions set forth in section 11, and must be dated and signed. If a letter is used, the envelope containing the signed letter must be post-marked within thirty (30) days of the date this Option Agreement is executed by you in order to constitute a valid opt-out of the arbitration/class action provisions in section 11. Option Holder's writing opting-out of the arbitration/class action provisions, whether sent by (a) or (b) above, will be filed with a copy of this Option Agreement and maintained by Option Counterparty. Should you not opt-out of the arbitration/class action provisions set forth in section 11 within the thirty (30) day period, Option Holder and Option Counterparty

shall be bound by the terms of the arbitration/class action provisions set forth in section 11. Option Holder has the right to consult with counsel of their choice concerning the arbitration/class action provisions set forth in section 11. Option Holder understands that Option Holder will not be subject to retaliation if Option Holder exercises their right to assert claims or opt-out of coverage under the arbitration/class action provisions set forth in section 11.

The provisions of this section 11 survive termination of this Option Agreement.

## 12. ACKNOWLEDGEMENTS

Option Holder understands that this Option Agreement is a complex legal document and that Option Holder may suffer tax consequences as a result of Option Holder's exercise of the Purchase Option or the Option Expiration Procedure under this Option Agreement. Option Holder represents that Option Holder has consulted with any tax or legal consultants Option Holder deems advisable in connection with this Option Agreement and has not received any legal or tax advice from Option Counterparty or any of its representatives with respect the transactions contemplated hereby.

The Parties are executing this Option Agreement voluntarily and without any duress or undue influence. The Parties have carefully read this Option Agreement and have asked any questions needed to understand its terms, consequences, and binding effect and fully understand them and have been given an executed copy. The Parties have sought the advice of an attorney of their respective choice, if so desired, prior to signing this Option Agreement.

**Option Holder has received, initialed, and signed the "Transaction Risk Factors" and acknowledges and understands each risk factor set forth therein.**

## 13. AGREEMENT CONTROLS

In the event a conflict arises between the terms and conditions of this Option Agreement and the underlying contract of sale between Option Holder and Option Counterparty for Option Counterparty's purchase of the Property from Option Holder, and subject to state law, the terms of this Option Agreement shall control.

## 14. ENTIRE AGREEMENT; MODIFICATION

This document sets forth the entire agreement and understanding between the Parties relating to the subject matter herein and supersedes all prior discussions between the Parties. No modification of or amendment to

this Option Agreement, nor any waiver of any rights under this Option Agreement, will be effective unless in writing signed by the Party to be charged.

IN WITNESS WHEREOF, Option Counterparty and Option Holder have respectively signed this Option Agreement as of the day and year first above written.

**OPTION COUNTERPARTY'S SIGNATURE:**

EK Real Estate Fund I, LLC, or its assignee

By:    *Benjamin Black*

Name: Benjamin Black

Title: President

**OPTION HOLDER'S SIGNATURE:**

By:    *Susan Allen*

Print Name: Susan Allen

## SCHEDULE "A"
### LIST OF ACCRUED EXPENSES

### LIST OF REPAIRS/REPLACEMENTS

**AREA OF PROPERTY**                    **DESCRIPTION OF REPAIR/REPLACEMENT**

As a result of my/our inspection, please be advised that except as otherwise noted, I/we are not requesting the Landlord repair or replace any item, fixture, building system or equipment in the Property.I/we understand and agree that we are taking the Property "as is, where is" and subject to the terms and conditions of the Agreement.

**TENANT SIGNATURE:**     *Susan Allen*                    **Date:**     03/03/2020

## TRANSACTION RISK FACTORS

Each seller of a home (the "Property) to EK Real Estate Fund I, LLC ("EasyKnock"), each tenant of the Property after the sale to EasyKnock, and each person who is receiving an option agreement with respect to the Property (referred to as "you") should carefully consider the following risk factors before making the decision to sell the Property, or enter into the lease agreement and option agreement.  For purposes of these risk factors, we have assumed that the tenant, option holder, and seller are the same person.  If tenant, option holder and/or seller are different, then each risk factor will only be applicable to the transaction specific party (e. option agreement specific risk factors will only apply to the option holder).  These risk factors are provided for information purposes only.  All of the material terms and conditions of the agreement or agreements between you and EasyKnock will be contained in definitive written agreements, including, but not limited to, the option agreement, lease agreement and the residential real estate sales agreement.

1. You are selling the Property to EasyKnock.

Initials ____S.A.____

2. By selling the Property to EasyKnock, EasyKnock becomes the owner of the Property.

Initials ____S.A.____

3. By selling the Property to EasyKnock and entering into a lease agreement with EasyKnock, you become the tenant of EasyKnock and EasyKnock becomes your landlord.

Initials ____S.A.____

4. You acknowledge that EasyKnock is not extending credit or making a loan of any kind to you or on your behalf.  YOU HAVE NOT REQUESTED AND EASYKNOCK HAS NOT OFFERED TO MAKE YOU A LOAN.

Initials ____S.A.____

5. By selling the Property, you will no longer own the Property or have any right, title or interest in the Property as an owner.

Initials ____S.A.____

6. EasyKnock has strongly encouraged you to be represented and advised by an attorney hired and selected by you in connection with your sale of the Property to EasyKnock, entering into a lease agreement with EasyKnock as your landlord, and/or entering into the option agreement.

Initials _____

7. If you chose not to be represented and advised by an attorney, such failure does not make your sale of the Property to EasyKnock invalid or relieve you of any obligations under any of your agreements with EasyKnock.

Initials _____

8. You understand that, as a result of various factors, including a potential decrease in value of the Property after you sell it to EasyKnock, (a) if you purchase the property from EasyKnock, the purchase price you pay under the terms of the option agreement may be higher than the fair market value of the Property, and (b) if you choose to request EasyKnock to sell the Property to a third party in accordance with the option agreement, you may not receive any cash consideration in connection with any sale of the Property by EasyKnock to a third party.  Furthermore, EasyKnock does not guarantee that you will be able to find a third party who will want to buy the Property.

Initials _____

9. You may lose your rights to purchase the property from EasyKnock or to request EasyKnock to sell the Property to a third party, in certain instances, including if the tenant of the Property is in breach of the lease agreement. You understand that if the tenant defaults on the lease agreement, which default may include failing to pay rent and/or failure to comply with other obligations under the lease, EasyKnock will have the right to sell the Property to a third party at such time as EasyKnock determines in its sole discretion pursuant to the terms of the option agreement.

Initials _____

10. Pursuant to the formula set out in section 2 of the option agreement, any item of expense incurred by EasyKnock as owner of the Property (e.g., repairs to the Property), with the exception of property taxes, homeowner's insurance and HOA dues (if applicable), will be added to the option exercise price, and will accordingly decrease the value to be paid to you as the option holder if the Property is sold to a third party, or conversely, increase the amount to be paid by you as the option holder if you exercise your right to purchase the Property.

*S.A.*

Initials _____

11. You acknowledge that the only cash compensation that you may receive in connection with the sale of the Property to EasyKnock, lease of the Property from EasyKnock and receipt of an option under the option agreement, may be the cash amount paid to you at the time of sale of the Property to EasyKnock.

Initials _____ *S.A.*

12. You, as tenant, will be required to pay EasyKnock, as landlord, rent on the first (1st) day of each month. Each year, your rent shall increase by the greater of (i) the amount of any increase in the cost of living, or (ii) 2.5% per year. You understand that you are required to lease the Property for at least one year, unless you purchase (or request for a third party to purchase and a third party does in fact purchase the Property prior to the expiry of such time period) the Property before the end of that period.

Initials _____ *S.A.*

13. As consideration for EasyKnock's purchase of the Property, you will receive a check or wire transfer of funds for an agreed upon amount, a lease to occupy the Property and an option to purchase the Property from EasyKnock or to request EasyKnock to sell the Property to a third party. You acknowledge and represent that you have determined that the purchase price you will receive is a fair price for the Property and you are not being forced or required to accept an unfair price, including because you are under duress or coercion.

Initials _____

14. You may not be able to purchase the Property from EasyKnock unless you are able to obtain a loan or have other assets from which you are able to pay the purchase price. EasyKnock does not have any obligation to provide or arrange financing for you to pay the purchase price for the Property.

Initials _____ *S.A.*

15. You may not qualify for a loan to purchase the Property under the option. If you are unable to purchase the Property prior to the expiration of the option, including because you do not have the means to do so, EasyKnock will have the right to sell the Property to a third party pursuant to the terms of the option agreement.

Initials _____ *S.A.*

16. In the case of fire damage or other damage to the Property, EasyKnock, in most instances, will not be liable for any loss, damage or expense to any person or property.

*S.A.*

Initials _____

17. You should obtain and keep in full force and effect during the entire term of the lease agreement, a renters insurance policy providing coverage for damage or other loss caused by fire or other casualty, including, but not limited to, vandalism, theft, sprinkler leakage, water damage, explosion, and other similar risks, in an amount adequate to cover the full insurable replacement value of all of your personal property in the Property.

*S.A.*

Initials _____

18. EasyKnock will maintain a separate owner's property insurance policy on the Property, and you shall have no rights in or to any insurance proceeds received or obtained by EasyKnock as a result of any casualty or loss, other than those rights expressly set forth in section 3 of the option agreement.  If the property is destroyed and EasyKnock chooses not to apply its homeowner's insurance proceeds to restoration of the property, then the option will expire, EasyKnock will sell the Property and the option holder will receive the net proceeds from the insurance and sale of the property after deducting expenses in collecting the insurance and selling the property, as well as the option exercise price and accrued expenses, as such terms are defined in the option agreement.

*S.A.*

Initials _____

19. EasyKnock has the right to freely assign its rights and obligations under the lease agreement, the option agreement, any residential real estate sales agreement and any related agreements or documents.

*S.A.*

Initials _____

20. You have been advised to consult a tax expert regarding the sale and leasing of the Property contemplated by any agreements executed by you and EasyKnock.

*S.A.*

Initials _____

21. EasyKnock does not provide the following services in connection with the sale of your real estate or home: title searches, title examinations, issuance of title certificates or title insurance, legal or accounting services, property surveys, rendering credit reports or appraisals, issuance of home warranties, or the handling of the processing, closing or settlement of real estate. These services are provided by third parties

unaffiliated to EasyKnock, and a portion of your transaction cash proceeds are used to pay for such services, as further detailed in the purchase agreement.

Initials _S.A._ _____

22. As reflected in your HUD-1 Settlement Statement, you are receiving cash consideration of $179,000 (plus $1,000 currently being held in escrow as the contract deposit) and an option value of $90,000, for a total consideration of $270,000. Part of your cash proceeds will be used to pay closing costs, which total to $7,050, transfer/stamp taxes of an amount to be finalized at closing and a processing fee of $6,750. As specified in your offer letter, the real estate sales agreement and the option agreement, your Option Exercise Price will be $189,000, and every year after the first year the option exercise price will compound and increase by either 1) Two and One-Half percent (2.5%); or 2) An amount reflecting the increase in the cost of living as such increase, if any, is reflected by a change in the "Consumers Price Index for all Urban Consumers" (Revised CPI U) for the region in which the Property is located, as published by the Bureau of Labor Statistics for the U.S. Dept. of Labor (collectively, the "Consumer Price Index" or "CPI") (the "Period Increase").Index" or "CPI") (the "Period Increase").

| Fee Type | Amount |
| --- | --- |
| Closing Costs | $5610 |
| Upfront Fee to EasyKnock | $4350 |
| Option Exercise Price | To exercise the option in the first year, the option holder must pay an option exercise price, which is based on the cash consideration received by the seller from EasyKnock plus 5% of such cash consideration. Every year after the first year, the option exercise price compounds and increases from the price for previous year by either 1) Two and One-Half percent (2.5%); or 2) An amount reflecting the increase in the cost of living as such increase, if any, is reflected by a change in the "Consumers Price Index for all Urban Consumers" (Revised CPI U) for the region in which the Property is located, as published by the Bureau of Labor Statistics for the U.S. Dept. of Labor (collectively, the "Consumer Price Index" or "CPI") (the "Period Increase"). |
| Broker's Fee Upon Sale of Property by EasyKnock | If a broker is used to sell the Property, the typical fee charged by the broker is 6% of the sale price. |

Initials _S.A._ _____

23. You acknowledge that EasyKnock may be compensating persons or entities with respect to the purchase, sale or lease of the Property, including without limitation, mortgage brokers and real estate agents, who may also be the same persons who introduced you to EasyKnock or introduced EasyKnock to you.

Initials _S.A._ _____

24. You acknowledge that you have been advised to read, and have in fact read, the definitive written agreements related to your sale of the Property to EasyKnock, including, but not limited to, the option agreement, lease agreement and the residential real estate sales agreement.

Initials _S.A._ _____

25. You have been provided with an opportunity to ask EasyKnock any questions that you may have about your sale of the Property to EasyKnock, your lease of the Property from EasyKnock, as well as the option agreement.

Initials _S.A._ _____

26. You have not relied upon EasyKnock to advise you in connection with the sale of the Property to EasyKnock, entering into a lease agreement with EasyKnock as your landlord, and/or entering into the option agreement.

Initials _S.A._ _____

27. You hereby understand and acknowledge the significance and consequence of the transactions which you are contemplating with EasyKnock and represent that the terms of any written agreement which you may enter into with EasyKnock with respect to the purchase, sale and/or lease of the Property are fully understood and voluntarily accepted by you without any coercion or duress, including the purchase price of the Property which you have voluntarily agreed to.

Initials _S.A._ _____

28. The option agreement contains an arbitration and class action waiver provision in section 11, which you can opt out of now or in the future by following the procedure set forth in section 11. Please review section 11 carefully.  If you do not opt out of the arbitration and class action waiver provision, you will not have the right to have a dispute resolved on a class action or similar basis.

Initials _S.A._____

This is only a brief description of the risks to which you may be subject with respect to the sale and/or lease of the Property to EasyKnock. You hereby acknowledge and agree that the risks and information set forth above do not contain all material terms which will only be contained in any written agreement which you may enter into with EasyKnock with respect to the purchase, sale and/or lease of the Property.

SELLER:

By:    _Susan Allen_

Name: Susan Allen

## PET ADDENDUM

This Pet Addendum is incorporated as part of the lease agreement (the "Lease") dated as of _____ for the property located at 57 Broadview Ter (the "Property"), between Susan Allen, an individual residing at 57 Broadview Ter; Meriden, Connecticut 06450 (hereinafter referred to as the "Tenant"), and EK Real Estate Fund I, LLC, a Delaware limited liability company, or its successors and assigns (hereinafter referred to as the "Landlord"). Each of Tenant and Landlord shall be referred to herein as a "Party" and collectively, as the "Parties".

The Parties hereby acknowledge that the Lease is amended to include the following provisions:

The Tenant is responsible for all damage, including but not limited to walls, floors, carpets or stains that any pet causes, regardless of ownership of said pet and agrees to be liable for any expense incurred by Landlord in restoring the Property because of damage caused by the pet(s). Landlord allows Tenant to have _3_ pet(s) on the Premises consisting of:

Type: ___Dog_____
Breed: ___Siberian Husky_____
Name: ___Ghost_____
Weight: ___55_____

Type: ___Cat_____
Breed: ___Mixed_____
Name: ___Mr Kitty_____
Weight: ___20_____


Type: ___Cat_____
Breed: ___Domestic_____
Name: ___Boo_____
Weight: ___10_____


In the dwelling, such pet(s) (hereinafter referred to as "Pet") will occupy the premises pursuant to the Lease. At the Lease specifically prohibits keeping a Pet without the Landlord's permission, Tenants agree to the following terms and conditions in exchange for Landlord's permission:

1) Tenants agree that they are solely responsible for the maintenance of the above described Pet and agree the Tenant shall have the Pet under control at all times and exercise respective due care. The Tenant Agrees to clean and remove all Pet waste, inside or outside the Property.

2) Tenant agree to keep their Pet restrained, but not tethered, when it is outside their dwelling.

3) Tenant agrees to comply with all applicable laws, ordinances and regulations governing Pets including leash and licensing requirements.

4) The Tenant agree to keep their Pet from being unnecessarily noisy or aggressive and causing any annoyance or discomfort to others and will remedy immediately any complaints made.

5) Tenants agree not to leave their Pet unattended for unreasonable periods of time.

6) Tenants agree to clean up after their Pet and to dispose of their Pet's waste properly and quickly.

7) Tenants agree not to leave food or water for their Pet or any other animal outside their dwelling where it may attract other animals.

8) Tenants agree to provide their Pet with an identification tag that the Pet will wear at all times while on the premises.

9) Tenant agrees not to breed or allow the Pet to reproduce, but if this should occur, the pet's offspring will be placed within eight weeks of birth.

10) Tenant agrees to pay for pest infestation services resulting from any Pet allowed in the property by tenant after termination of occupancy

11) Tenant agrees that the Landlord reserve the right to revoke permission to keep the Pet should the Tenant break this agreement. In such case, Tenant will be given 3 days to remove the pet from the premises.

12) Tenants agree to immediately pay for any damage, loss, or expense caused by their Pet.

13) Tenants agree that this Agreement applies only to the specific Pet described above and that no other pet may be substituted.

14) Any animals on the property not registered under this addendum will be presumed to be strays and will be disposed of according to law, at the option of the Landlord.

Agreed and acknowledged:

LANDLORD'S SIGNATURE:

EK Real Estate Fund I, LLC, or its assignee

By:  *Benjamin Black*

Name: Benjamin Black

Title: President

TENANT'S SIGNATURE:

# Signature Certificate

Document Ref.: HLXFX-AD5WG-TN3CW-VZPWS

Document signed by:



**Benjamin Black**
Verified E-mail:
benjamin@easyknock.com

*Benjamin Black*

Date: 02 Mar 2020 15:53:02 UTC

**Susan Allen**
Verified E-mail:

*Susan Allen*

Date: 03 Mar 2020 17:51:43 UTC

Document completed by all parties on:
03 Mar 2020 17:51:43 UTC

Page 1 of 1



Signed with **PandaDoc.com**

PandaDoc is the document platform that boosts your
company's revenue by accelerating the way it transacts.



By:    *Susan Allen*

Print Name:  Susan Allen

# ☰ HELLOSIGN

## Audit Trail

| | |
|---|---|
| **TITLE** | 57 Broadview Ter, Meriden, CT 06450 || 114360009969 |
| **FILE NAME** | ClosingStatementC...3-4-2020_13-6.pdf |
| **DOCUMENT ID** | 98b5058af1786086e885ebc4a76eb9841aeafa65 |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Completed |

## Document History

| | | |
|---|---|---|
| ↗ **SENT** | **03 / 04 / 2020** 19:29:49 UTC | Sent for signature to Benjamin Black (benjamin@easyknock.com) and Susan Allen ▮▮▮▮▮▮▮▮▮▮ from orders@spruce.co IP: ▮▮▮▮▮▮▮ |
| ◉ **VIEWED** | **03 / 04 / 2020** 19:37:10 UTC | Viewed by Benjamin Black (benjamin@easyknock.com) IP: ▮▮▮▮▮▮▮ |
| ◉ **VIEWED** | **03 / 04 / 2020** 20:20:37 UTC | Viewed by Susan Allen ▮▮▮▮▮▮▮▮ IP: ▮▮▮▮▮▮▮ |
| ↙ **SIGNED** | **03 / 04 / 2020** 19:37:25 UTC | Signed by Benjamin Black (benjamin@easyknock.com) IP: ▮▮▮▮▮▮▮ |
| ↙ **SIGNED** | **03 / 04 / 2020** 20:23:52 UTC | Signed by Susan Allen ▮▮▮▮▮▮▮▮ IP: ▮▮▮▮▮▮▮ |
| ✓ **COMPLETED** | **03 / 04 / 2020** 20:23:52 UTC | The document has been completed. |

# 1st ADDENDUM TO CONTRACT
## Between
## EK Real Estate Fund I, LLC and
## Susan Allen
## dated 2/27/2020

*EXHIBIT*
*"B"*

---

Re: Seller(s): Susan Allen

Buyer(s): EK Real Estate Fund I, LLC


Contract Date: 1/29/2020


Property: 57 Broadview Ter; Meriden, Connecticut 06450


The parties hereby agree to amend said contract as follows:

1. Section 2 in the Purchase Agreement shall be amended to reflect:
   1. 2b "Cash Funding" shall be amended to $88,000
   2. 2c "Option Value" shall be amended to $85,000
   3. Total Purchase Consideration shall be amended to $174000
2. Section 4 in the Residential Lease Agreement shall be amended to reflect
   1. Monthly Rent: Tenant will pay Landlord monthly Rent in the amount of $1,315 during this Lease Agreement (the "**Rent**"). Rent is due no later than the first of the month.
   **Rent Holdback**: At signing, Tenant shall pay $11,465 of Rent in advance (the **"Rent Holdback"**), which covers 18 months of Rent. Furthermore, $615 shall be used each month as a credit towards each monthly Rent payment (for example, the monthly rent of $1,315 shall be paid (a) $700 by Tenant, and (b) $615 from the Rent Hold-back). Any unused portion of the Rent Holdback shall be applied to a subsequent Renewal Term, and any unused portion of the Rent Holdback shall be returned to Tenant.
3. Section 1c In the Residential Real Estate Option Agreement shall be amended to reflect the "Option Exercise Price" as $ 93,450.


SELLER

*Susan Allen*

_____          02/27/2020
                                 _____
By: Susan Allen                  Date


BUYER

_____        _____

By: EK Real Estate Fund I, LLC                    Date

Name: Benjamin Black

Title: President

**EXHIBIT "C"**

| American Land Title Association | ALTA Settlement Statement - Combined |
| --- | --- |
| | Adopted 05-01-2015 |

File No./Escrow No.: CT-SAL-SPR-116726
Officer/Escrow Officer:

**Holler Law Firm, LLC**
**185 Plains Road**
**Suite 100W**
**Milford, CT 06461**
**(203)301-4333**



| | |
| --- | --- |
| Property Address: | 57 BROADVIEW TERRACE |
| | MERIDEN, CT 06450 (NEW HAVEN) |
| Borrower: | EK REAL ESTATE FUND I, LLC |
| | 215 Park Ave South |
| | Suite 1713-1718 |
| | New York, NY 10003 |
| Seller: | SUSAN ALLEN |
| | 57 Broadview Terrace |
| | Meriden, CT 06450 |
| Settlement Date: | 2/28/2020 |

| Seller | | Description | Borrower | |
| --- | --- | --- | --- | --- |
| Debit | Credit | | Debit | Credit |
| | | **Deposits, Credits, Debits** | | |
| | $174,000.00 | Sale Price of Property | $174,000.00 | |
| $4,350.00 | | Processing Fee to EK Real Estate I, LLC | | $4,350.00 |
| $85,000.00 | | Option Agreement to EK Real Estate I, LLC | | $85,000.00 |
| $5,610.00 | | Closing Cost Credit to EK Real Estate I, LLC | | $5,610.00 |
| $1,315.00 | | March Rent to EK Real Estate fund I, LLC | | $1,315.00 |
| $7,000.00 | | Repair Holdback | | $7,000.00 |
| $11,465.00 | | Rent Holdback | | $11,465.00 |
| | | **Prorations** | | |
| | $848.07 | City/Town Taxes 1/1/2020 to 2/28/2020 @ $1,345.22/Quarter | $848.07 | |
| $70.90 | | Feb Rent 1/1/2020 to 2/28/2020 | | $70.90 |
| | | **Payoffs** | | |
| $6,328.78 | | Unpaid tax and fees to Meriden Tax Collector | | |
| | | **New Loans** | | |
| | | Loan Amount | | $94,000.00 |
| | | Our origination charge $2,200.00 | $2,200.00 | |
| | | Appraisal Fee to LendingOne, LLC ISAOA / ATIMAc/o ISGN Fulfillment Agency, LLC (POC $645.00 by EK Real Estate Fund I, LLC) | | |
| | | Processing Fee to LendingOne, LLC ISAOA / ATIMAc/o ISGN Fulfilment Agency, LLC | $100.00 | |
| | | Underwritting Fee to LendingOne, LLC ISAOA / ATIMAc/o ISGN Fulfilment Agency, LLC | $350.00 | |
| | | Document Prpe to LendingOne, LLC ISAOA / ATIMAc/o ISGN Fulfilment Agency, LLC | $495.00 | |
| | | Prepaid Interest ( per day from  to  ) | $35.26 | |
| | | **Title Charges** | | |
| | | Title - Lender's Title Insurance to Holler Law Firm, LLC (Westcor Land Title Insurance Company: $143.60) | $359.00 | |
| | | Title - Owner's Title Insurance to Holler Law Firm, LLC (Holler Law Firm, LLC: $189.24, Westcor Land Title Insurance Company: $126.16) | $315.40 | |
| | | Title - Attorney's fees to Holler Law Firm, LLC | $750.00 | |
| | | Title - Examination to Holler Law Firm, LLC | $395.00 | |
| | | Title - Co-Ordination Fee to Spruce | $495.00 | |
| | | **Government Recording and Transfer Charges** | | |
| $870.00 | | City Mortgage Tax/Stamps to Meriden Town Clerk | | |
| | | Recording fees: Deed $72.00 | $72.00 | |
| | | Mortgage $343.00 | $343.00 | |
| $1,305.00 | | State Deed Tax/Stamps to Commissioner of Revenue Services | | |
| **Seller** | | | **Borrower** | |
| Debit | Credit | | Debit | Credit |
| $123,314.68 | $174,848.07 | **Subtotals** | $180,757.73 | $208,810.90 |
| | | Due To Borrower | $28,053.17 | |
| $51,533.39 | | Due To Seller | | |
| $174,848.07 | $174,848.07 | **Totals** | $208,810.90 | $208,810.90 |

File # CT-SAL-SPR-116726
Printed on 3/4/2020 at 1:06 PM

Doc ID: 98b5058af1786086e885ebc4a76eb9841aeafa65

**Acknowledgement**

We/I have carefully reviewed the ALTA Settlement Statement and find it to be a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction and further certify that I have received a copy of the ALTA Settlement Statement. We/I authorize Holler Law Firm, LLC to cause the funds to be disbursed in accordance with this statement.

**BORROWER(S)**

*Benjamin Black*

EK REAL ESTATE FUND I, LLC

**SELLER(S)**

*Susan Allen*

SUSAN ALLEN

File # CT-SAL-SPR-116726
Printed on 3/4/2020 at 1:06 PM

Doc ID: 98b5058af1786086e885ebc4a76eb9841aeafa65

An official website of the Commonwealth of Massachusetts   Here's how you know



Menu



| Search Mass.gov | SEARCH |
|---|---|

(/) ❯ **Office of the Attorney General** (/orgs/office-of-the-attorney-general)

◀                                                                                                        ▶

PRESS RELEASE

# AG Campbell Reaches Precedent Setting Settlement Against Real Estate Company EasyKnock For Deceptive Practices That Stripped Consumers Of Home Equity

**Settlement with EasyKnock sets important precedent in combatting technology-based equity-skimming practices in Massachusetts**

FOR IMMEDIATE RELEASE:

12/05/2023

Office of the Attorney General

Office of the Attorney General

---

MEDIA CONTACT

### Sabrina Zafar , Deputy Press Secretary

**Phone**

(617) 727-2543 (tel:6177272543)

**Online**

Sabrina.Zafar2@mass.gov (mailto:Sabrina.Zafar2@mass.gov)

**BOSTON** — Attorney General Andrea Joy Campbell has announced a precedent setting settlement, via an **assurance of discontinuance** (/doc/20231205-easyknock-aod-as-filed/download) (AOD), with the "PropTech" company EasyKnock, for engaging in an unlawful sale-leaseback scheme. The settlement resolves allegations that the company engaged in an unfair and deceptive equity-skimming scheme that involved purchasing the homes of cash-strapped consumers at bargain-basement prices and then renting them back to the consumers, at times for unfair rents. According to the AG's Office, EasyKnock then violated laws designed to protect tenants, including by charging unlawful and untimely fees and failing to make necessary repairs. The AG's Office alleges that this unfair and deceptive sale-leaseback scheme violated Massachusetts consumer protection law.

Under the terms of the settlement, EasyKnock has agreed to permanently cease its unfair and deceptive "sale-leaseback solution" business in Massachusetts and to undertake changes to their business practices, including returning tens of thousands of dollars of improperly held funds to consumers, lowering rents for certain existing tenants, and complying with landlord-tenant laws. Additionally, EasyKnock will make a payment of $200,000 to the Commonwealth. Notably, the AG's settlement has set a precedent that will reinforce efforts to protect consumers from companies who similarly bamboozle consumers out of their hard-earned home equity.

"I am proud of the leadership of my team in this precedent-setting settlement with EasyKnock," said **AG Campbell**. "We will continue to protect consumers, especially in the housing sector."

"PropTech" companies like EasyKnock operate under an emerging business model that uses technology like AI and big data to conduct real estate transactions, including complex and confusing ones such as EasyKnock's "sale-leaseback solutions." Unfortunately, such technology can be used to target and exploit vulnerable "house-rich, cash-poor" consumers, who, despite having significant home equity, have little cash income or savings. Some "PropTech" companies, such as EasyKnock, take advantage of these consumers by offering cash up front in exchange for significantly larger amounts of home equity.

An investigation by the AG's Office found that EasyKnock targeted consumers with online advertisements that used loan-like language and failed to adequately disclose that the company's products require the consumer to sell their home to EasyKnock. The investigation also found that EasyKnock deceived consumers about market rent and engaged in bait-and-switch tactics, changing the terms of its contract at the last minute to consumers' detriment. Consumers ended up saddled with complex and lopsided terms which they did not always fully understand.

The AG's Office also found that EasyKnock violated Massachusetts landlord-tenant law by charging up-front fees and deposits to its tenants far in excess of the legal maximum. It also failed to consistently maintain its properties as required under the state sanitary code, and illegally shifted the costs of repairs to tenants. Additionally, EasyKnock illegally charged tenants late fees prior to 30 days and illegally charged tenants for water. Under the terms of the settlement, EasyKnock will ensure compliance with landlord-tenant laws and lower rental amounts for existing tenants.

Consumers who believe they may have been subject to unfair and deceptive business practices may file a **consumer complaint** (/how-to/file-a-consumer-complaint) with the AG's Office.

This matter has been handled by Assistant Attorneys General Matthew Lashof-Sullivan and Colin Harnsgate, Division Chief Yael Shavit, and Paralegal Sky Karp, all of the AG's Consumer Protection Division, assisted by Marlee Leo of the AG's Civil Investigations Division.

###

# Media Contact

### Sabrina Zafar , Deputy Press Secretary

### Phone

(617) 727-2543 (tel:6177272543)

### Online

## Office of the Attorney General



## Office of the Attorney General

The Attorney General is the chief lawyer and law enforcement officer of the Commonwealth of Massachusetts.



All Topics (/topics/massachusetts-topics)

Site Policies (/massgov-site-policies)

Public Records Requests (/topics/public-records-requests)

© 2024 Commonwealth of Massachusetts.

Mass.gov® is a registered service mark of the Commonwealth of Massachusetts. **Mass.gov Privacy Policy** (/privacypolicy)

**COMMONWEALTH OF MASSACHUSETTS**

SUFFOLK, ss.

SUPERIOR COURT
DEPARTMENT OF THE TRIAL COURT
CIVIL ACTION NO. 2384CV02751

---

**In re EasyKnock, Inc.**

---

**ASSURANCE OF DISCONTINUANCE PURSUANT TO G.L. c. 93A, §5**

The Commonwealth of Massachusetts, by and through the Office of Attorney General

Andrea Joy Campbell ("AGO"), and EasyKnock, Inc. ("EasyKnock") (collectively, the

"Parties") hereby agree to this Assurance of Discontinuance ("Assurance") pursuant to

Massachusetts General Laws chapter 93A, § 5.

**I.    Introduction**

1.    EasyKnock is a Delaware Corporation with a principal place of business in New

York. EasyKnock describes itself as a "real estate technology company" which markets Sale-

Leaseback products to consumers.

2.    Pursuant to G.L. c. 93A, § 6, the AGO conducted an investigation into

EasyKnock's compliance with G.L. c. 93A, § 2 and G.L. c. 186, § 15B in its marketing and

administration of its Sale-Leaseback products in Massachusetts.

3.    Based on the investigation, the AGO alleges that EasyKnock engaged in unfair

and deceptive acts and practices in the process of marketing its Sale-Leaseback products and

transacting with Massachusetts consumers, in violation of G.L. c. 93A.

4.    The AGO further alleges that EasyKnock's Sale-Leaseback products violated

Massachusetts Landlord-Tenant Law.

5.      In lieu of litigation and in recognition of EasyKnock's assistance and cooperation throughout the investigation, the AGO agrees to accept this Assurance on the terms and conditions contained herein, pursuant to the Massachusetts Consumer Protection Act, G.L. c. 93A, § 5.

6.      EasyKnock denies the AGO's allegations in paragraphs 17 through 44 below and further denies that it has violated Massachusetts law. In an effort to avoid the uncertainty of litigation and resolve this investigation, EasyKnock agrees to enter into and be bound by the terms of this Assurance. EasyKnock's agreement to this Assurance does not constitute an admission to any of the AGO's allegations.

## II.   Definitions

The following definitions shall apply wherever the defined terms are used within this Assurance:

7.      "Covered Conduct" means those acts or practices alleged in paragraphs 17-44, below.

8.      "Dwelling Unit" means any real property leased to Massachusetts consumers by EasyKnock, and shall include any building or structure, or any unit therein or part thereof, and all the common areas inside and outside such building or structure, occupied or intended for occupancy as a residence by one or more individuals.

9.      "Effective Date" means the date that this Assurance is filed in the Superior Court.

10.     "Landlord" means any person who holds title to one or more Dwelling Units in any manner including but not limited to a partnership, corporation or trust, and shall include one who manages, controls, and/or customarily accepts rent on behalf of the owner.

11.     "Remediation Plan" shall mean the plan EasyKnock submits to the AGO to address all applicable rent adjustments for Tenants.

2

12.     "Residential Lease Agreement" shall mean any express or implied agreement for use and occupancy of a Dwelling Unit between EasyKnock and Massachusetts consumers.

13.     "Sale-Leaseback" shall refer to a real property transaction between EasyKnock and a Massachusetts consumer, which includes the following features: (a) the consumer sells a property to EasyKnock; (b) the consumer and EasyKnock enter into a lease by which the consumer continues to occupy such property as a Tenant of EasyKnock; and (c) the consumer and EasyKnock enter into an option contract relating to the resale of the property back to the consumer and/or to a third party.

14.     "Tenancy" shall mean the occupation or use of a Dwelling Unit under a rental agreement.

15.     "Tenant" shall mean any Massachusetts person who inhabits or is entitled to inhabit a Dwelling Unit under a Residential Lease Agreement.

## III.   Allegations

16.     As a result of the Attorney General's investigation into EasyKnock's Sale-Leaseback products, conducted pursuant to her authority under G.L. c. 93A, § 6, the Attorney General alleges the following related to EasyKnock.

### A. EasyKnock's Residential Sale-Leaseback Products

17.     EasyKnock describes itself as a "real estate technology company" which markets Sale-Leaseback products to consumers.

18.     In a Sale-Leaseback, the consumer sells their home to EasyKnock, and then rents the home back from the company.

19.     As a result of the Sale-Leaseback transaction, EasyKnock becomes the owner of the property and Landlord, and the consumer becomes a Tenant and pays rent.

3

20.     As part of a Sale-Leaseback transaction, EasyKnock also grants to the consumer an option contract. The option contracts EasyKnock entered in Massachusetts varied, but each one contained an "Option Exercise Price," and entitled the consumer to proceeds from the resale of the property above the Option Exercise Price.

21.     In some Sale-Leaseback options, the consumer also could elect to re-purchase the property from EasyKnock for the Option Exercise Price.

22.     The Sale-Leaseback options varied in the amounts of fees charged to consumers, in the timing of the fees, and in the details of how the Option Exercise Price was calculated.

### B. EasyKnock Advertised to Consumers Who Were Seeking Loans

23.     EasyKnock advertised its Sale-Leaseback products through digital paid advertisements to consumers who were seeking loans, using phrases like "convert your home equity to cash."

24.     EasyKnock advertised using search engines, and directed its ads to be shown when consumers searched for loan-related terms such as "bad credit cash out refinance" and "refinance mortgage divorce." These ads featured content such as "Don't Let Bad Credit Keep You From a Home Improvement Loan. Qualify with EasyKnock Today!"

25.     Some of EasyKnock's ads did not state in the headings of the ads that its Sale-Leaseback products were not loans. For example, they used images such as the below:



26.     EasyKnock also employed telephone sales representatives to speak with consumers who were considering a Sale-Leaseback transaction. In at least one instance, an EasyKnock representative spoke with a Massachusetts consumer who referred to EasyKnock's product as a loan and the EasyKnock representative failed to correct the consumer's misstatement during that call.

27.     EasyKnock's marketing equivocated in its description of the amount of money consumers would receive in exchange for their property between "value," "cash funding," and actual cash payments in a way that may have been confusing to some consumers.

28.     EasyKnock also stated that consumers would be charged fair market rent when, at least as to some consumers, the fair market rent information in documents provided to EasyKnock prior to closing differed from the rent EasyKnock charged to those consumers.

29.     When purchasing consumers' homes, EasyKnock assigned responsibility to consumer-sellers for certain transaction costs which are typically paid by the buyer. Some of EasyKnock's Sale-Leaseback options assign these costs back to the seller upon resale, requiring the consumers to pay these costs twice.

5

30.      In some instances, EasyKnock represented to consumers that it would cover certain fees or costs, when those costs were actually paid by a deduction from the consumer's sale proceeds.

31.      In some instances, EasyKnock altered the terms of its agreement with consumers days or hours before closing, either reducing the price, adding holdbacks and fees, or otherwise modifying the agreement.

32.      The AGO alleges that the acts or practices identified in paragraphs 17-31 above constitute violations of G.L. c. 93A, §2.

### C. EasyKnock Violated Massachusetts Landlord-Tenant Law

33.      EasyKnock has been engaged in the leasing, ownership, and management of real property in Massachusetts.

34.      Upon executing the Purchase and Sale Agreement and Residential Lease Agreement included in each Sale-Leaseback, EasyKnock becomes the owner and Landlord of the Dwelling Unit and the consumer-occupant(s) become Tenants.

35.      As a result, EasyKnock and Tenants become subject to all applicable rights and obligations of owners, tenants, lessors, and lessees, including but not limited to those contained in G.L. c. 239, G.L. c. 186, 105 CMR 410, and 940 CMR 3.17.

36.      EasyKnock's Residential Lease Agreements include terms that violate Massachusetts law, including:

   a. Requiring Tenants to pay so-called "Rent Holdbacks" and "Repair Holdbacks," in violation of G.L. c. 186, § 15B(1)(b) and 940 CMR 3.17(4)(a);

   b. Reserving EasyKnock's right to charge a penalty for failure to pay rent prior to such rent being thirty days past due, in violation of G.L. c. 186, § 15B(1)(c);

   c. Allowing EasyKnock to disclaim violations of the implied warranty of habitability; and

6

     d. Conditioning EasyKnock's obligation to make repairs on whether a Tenant is current on rent.

37.    EasyKnock regularly exercised the illegal lease term regarding the late payment of rent. EasyKnock typically levied late fees of $100 and as early as the sixth day after rent was due.

38.    On at least three occasions, EasyKnock required Tenants to pay for repairs to a Dwelling Unit, which included tree and mold removal. Said repairs were EasyKnock's responsibility pursuant to 105 CMR 410.

39.    EasyKnock's Residential Lease Agreements require Tenants to pay for water usage at the Dwelling Units.

40.    The Massachusetts Water Law, G.L. c. 186, § 22, permits landlords to require Tenants to pay for water under limited circumstances and only if certain preconditions are met, such as the use of water conservation fixtures, proper submetering, and filing a certification of compliance with the Water Law with the proper authorities.

41.    EasyKnock violated G.L. c. 186, § 22 because:

    a. None of EasyKnock's Dwelling Units were eligible for the imposition of water charges on the Tenants under § 22(d);

    b. EasyKnock failed to ensure that all faucets, showerheads, and toilets in the Dwelling Unit were water conservation devices; and

    c. EasyKnock failed to file the certification required by § 22(c).

42.    EasyKnock's conduct as a Landlord as described in paragraphs 33-41 violated G.L. c. 186, § 15B, G.L. c. 186, § 22, and/or 940 CMR 3.17, and thus violated G.L. c. 93A, §2.

43.    The AGO alleges that the acts or practices identified in paragraphs 17-42 above constitute violations of G.L. c. 93A, §2.

44.     EasyKnock knew or should have known that all of these acts violated G.L. c. 93A, §2.

## IV.     Assurances and Undertakings

### A. Monetary Payment

45.     On or before thirty (30) days from the Effective Date of this Assurance, EasyKnock shall pay $200,000 to the AGO by check or wire transfer payable to the "Commonwealth of Massachusetts."

46.     At her sole discretion, the Attorney General may distribute the payment described in the foregoing paragraph in any amount, allocation or apportionment and for any purpose permitted by law, including but not limited to: (a) payments to or for consumers and for the facilitation of this Assurance; (b) payments to the General Fund of the Commonwealth of Massachusetts; (c) payments to the Local Consumer Aid Fund established pursuant to G.L. c. 12, § 11G; or (d) for programs or initiatives in furtherance of the protection of the people of the Commonwealth.

47.     For avoidance of doubt, EasyKnock shall have no right to direct, nor any responsibility as to the use or application of funds by the Attorney General.

### B. No New Massachusetts Sale-Leaseback Transactions

48.     EasyKnock shall not solicit or enter into any Sale-Leaseback transaction as defined by this Assurance on any residential property in Massachusetts.

49.     If EasyKnock desires to offer any other financial product to consumers involving a sale of real property from a consumer to EasyKnock in Massachusetts in the future, EasyKnock shall send written notice describing the product to the AGO sixty (60) days before marketing or offering the product to Massachusetts consumers ("Advance Notification Requirement"). The

8

AGO's response or lack of response to such Advance Notification shall not constitute an approval or endorsement of EasyKnock's proposed offering or a covenant not to bring an action relating to the product(s), and EasyKnock shall make no representation to the contrary. EasyKnock's Advance Notification Requirement shall expire five (5) years after the Effective Date.

50.     Notwithstanding the foregoing paragraphs, EasyKnock may engage in nationwide advertising so long as: (a) it does not specifically target Massachusetts consumers; and (b) the advertisements and EasyKnock's website disclose that the Sale-Leaseback product is not available in Massachusetts.

### C. Adjustments to Rents and Withheld Funds

51.     EasyKnock shall adjust certain Tenant's monthly rents as set forth in the Remediation Plan that EasyKnock has submitted to the AGO, and the AGO has approved in connection with this Assurance.

52.     EasyKnock shall identify all unspent funds it has withheld from any consumer's sale proceeds for the completion of repairs (the "Repair Holdback Funds"), and shall deliver to each such consumer a check for the full amount of the consumer's Repair Holdback Funds within 30 days of the Effective Date.

### D. Adjustments to Leases and Landlord Practices

53.     Within thirty (30) days of the Effective Date, EasyKnock shall submit to the AGO a proposed revised form lease which shall not contain any term which violates Massachusetts law (including but not limited to the terms identified in paragraph 36 above), and which shall not contain any term less favorable to the consumer than EasyKnock's prior lease(s), along with a proposed cover notice explaining the changes for the consumer.

9

54.     Within 15 days after such submission, the AGO shall either approve the proposed lease and cover notice, or identify with particularity the terms in the proposed lease or cover notice which violate the requirements of the above paragraph, after which EasyKnock shall promptly submit a revised proposal.

55.     After the revised form lease and cover notice are approved, EasyKnock shall promptly submit the notice and revised lease to the consumer for signature.

56.     Regardless of whether or not the consumer signs the revised lease and notwithstanding any lease term to the contrary, EasyKnock shall act in full compliance with Massachusetts Landlord-Tenant Law. Such compliance shall include, *inter alia*:

- a. EasyKnock shall not enforce, or threaten or attempt to enforce, any provision of any lease which violates Massachusetts law.
- b. To the extent required by law, EasyKnock shall comply with any applicable local or municipal regulation or rule concerning the leasing of a Dwelling Unit.
- c. EasyKnock shall make, at its own sole cost and expense, any and all repairs and maintenance required under the warranty of habitability, *see Boston Housing Auth. v. Hemingway*, 363 Mass. 184 (1973), 105 CMR 410, G.L. c. 186, § 14, and 940 CMR 3.17. EasyKnock shall not charge any Tenant for any such repair and shall not deduct the cost of any such repair from the consumer's closing date proceeds upon the exercise or expiration of any Sale-Leaseback option.
- d. EasyKnock shall not charge any interest or penalty for failure to pay rent until thirty days after such rent shall have been due.
- e. EasyKnock shall not impose a charge for water usage on any Tenant.
- f. EasyKnock shall otherwise comply with all Massachusetts laws or rules applicable to the relationship between Landlords and Tenants.

57.     Prior to issuing any notice to quit, or initiating or advancing any eviction proceeding, EasyKnock shall take reasonable steps and make a good faith effort to avoid eviction. Such steps may include, without limitation, communications with Massachusetts

10

consumers regarding total or partial unpaid rent forgiveness whether unconditional or contingent, relocation assistance, and/or moving assistance. EasyKnock shall provide at least 30 days' notice to the AGO prior to issuing any notice to quit, and an additional 10 days' notice before further advancing any eviction proceeding involving any Massachusetts consumer who is a Tenant as of the Effective Date. Such notice shall include the grounds for eviction, and documentation of the good faith efforts EasyKnock has made to avoid eviction.

### E. Miscellaneous

58.     EasyKnock shall inform the holder of each outstanding Sale-Leaseback option that such option shall be recorded in the registry of deeds after 30 days unless the option holder instructs EasyKnock not to record. Any option holder who initially instructs EasyKnock not to record the option shall have the right to later instruct EasyKnock to record the option, and EasyKnock shall so record within thirty days of such instruction.

59.     If a consumer exercises a Sale-Leaseback option, EasyKnock shall use reasonable best efforts to close on the same promptly, and shall not charge a Tenant any rent for periods of the Tenancy prolonged by delay caused primarily by EasyKnock.

60.     Upon closing a sale of a property from EasyKnock to a third party, EasyKnock shall deliver the full amount of money due to the Sale-Leaseback option holder within 10 days of closing.

61.     EasyKnock shall comply with any reasonable request by the AGO for individual consumer account data relating to current or former Massachusetts Tenants.

62.     The AGO agrees that all confidential information disclosed to it by EasyKnock under CID in the course of the investigation and in connection with this Assurance shall be kept

11

confidential by the AGO to the degree provided by G.L. c. 93A, § 6, G.L. c. 4, § 7(26)(a) and (f), and other applicable law.

## V.  Release

63.     Contingent on the completion of the payment obligation set forth in paragraph 45 and the account adjustments set forth the Remediation Plan, the AGO fully and finally releases EasyKnock, its present or former employees, officers, directors, managers, agents, parents, subsidiaries and subdivisions, shareholders, investors, successors, and assigns from any and all civil liability arising from the Covered Conduct occurring prior to the Effective Date.

64.     Notwithstanding the preceding paragraph, for the removal of any doubt, any and all of the following forms of liability are specifically reserved and excluded from the above releases:

a.  private rights of action, including any claims consumers have or may have on an individual or class basis under state consumer protection laws against any person or entity, include EasyKnock;

b.  tax liability;

c.  criminal liability;

d.  claims alleging violations of state or federal securities laws;

e.  claims alleging violations of state or federal antitrust laws; and/or

f.  claims by any other agency or subdivision of the Commonwealth of Massachusetts.

65.     Further, nothing in this Assurance shall be deemed to preclude the AGO's review of conduct that occurs after the Effective Date, or any claims that may be brought by the AGO to enforce EasyKnock's compliance with the Assurance.

12

## VI.   Notice

66.     Any notice that is made or required under the terms of this Assurance shall be

provided via electronic mail and first-class mail to the following addresses.

>       For the Commonwealth:

>>              Massachusetts Attorney General's Office
>>              Consumer Protection Division
>>              ATTN: Matthew Lashof-Sullivan
>>              One Ashburton Place, 18th Floor
>>              Boston, MA 02108
>>              matthew.lashof-sullivan@mass.gov

>       For EasyKnock:

>>              EasyKnock, Inc.
>>              111 West 33rd Street
>>              Suite 1901
>>              New York, NY 10120
>>              Attn: Legal Department
>>              legal@easyknock.com

>       With a copy to:

>>              James Kim
>>              Christine Emello
>>              Troutman Pepper Hamilton Sanders LLP
>>              875 Third Avenue
>>              New York, NY 10022
>>              james.kim@troutman.com
>>              christine.emello@troutman.com

## VII.   General Provisions

67.     This Assurance shall be governed by and interpreted in accordance with the laws

of the Commonwealth of Massachusetts, and Superior Court for Suffolk County shall retain

jurisdiction over this Assurance.

68.     This Assurance shall be effective as of the Effective Date.

13

69.     This Assurance and the Remediation Plan referenced herein together contain the complete agreement between the Parties. No promises, representations, or warranties other than those set forth in this Assurance and the Remediation Plan have been made by either party. This Assurance and the Remediation Plan together supersede all prior communications, discussions, or understandings, if any, of the Parties, whether written or oral.

70.     The provisions of this Assurance are severable. If any provision herein is found to be legally insufficient, invalid, void, or unenforceable, the remaining provisions shall continue in full force and effect and shall in no way be affected, impaired, or invalidated.

71.     This Assurance shall be binding on EasyKnock's successors, subsidiaries, and all other persons who have authority to control or who in fact control and direct EasyKnock's business in the Commonwealth of Massachusetts.

72.     Nothing contained in this Assurance shall be used, offered, or received in evidence in any proceeding to prove any liability, any wrongdoing, or any admission on the part of EasyKnock or any of EasyKnock's subsidiaries or affiliates or by any individual or entity not a party hereto; provided, however, that the foregoing provision shall not limit the Attorney General's rights under G.L. c. 93A, § 5, and shall not prevent this Assurance from being used, offered, or received in evidence in any proceeding between the Parties to enforce its terms.

73.     EasyKnock waives all rights to appeal or to otherwise challenge or contest the validity of this Assurance.

74.     Except as to Notice provision, this Assurance can be amended or supplemented only by a written document signed by all parties or by court order.

14

75.    This Assurance, as well as any amendments thereto, may be signed in multiple counterparts, each of which will be considered an original and all of which, when considered together, will constitute a whole.

76.    Nothing in this Assurance shall relieve EasyKnock of any obligations to comply with all applicable federal and state laws, rules, and regulations.

77.    This Assurance does not constitute an approval by the AGO of EasyKnock's acts or practices, and EasyKnock shall make no representation to the contrary.

78.    EasyKnock shall not knowingly cause, encourage, or permit third parties acting as EasyKnock's agent, on EasyKnock's behalf or for its benefit, or otherwise under EasyKnock's control or direction, to engage in practices from which EasyKnock is prohibited by this Assurance.

79.    EasyKnock and its signatories have consulted with counsel in connection with their decision to enter into this Assurance.

80.    Signatories for EasyKnock represent and warrant that they have the full legal power, capacity, and authority to bind EasyKnock.

81.    By signing below, EasyKnock agrees to comply with all of the terms of this Assurance.

15

COMMONWEALTH OF MASSACHUSETTS
ANDREA JOY CAMPBELL, ATTORNEY GENERAL

By:
Matthew Lashof-Sullivan, BBO #695922
Yael Shavit, BBO #695333
Colin Harnsgate, BBO #696453
Assistant Attorneys General
Consumer Protection Division
One Ashburton Place
Boston, MA 02108
p. 617.727.7200

Dated:  11/30/23

EasyKnock, Inc.

By:
Jarred Kessler
Chief Executive Officer
111 West 33rd Street
Suite 1901
New York, NY 10120

Dated:  1/29/23

16